IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION



| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 6:03-CV-73 |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § | JUDGE DAVIS |
| Defendants. | § | |

## DEFENDANT EMCARE INC.'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Pursuant to Fed. R. Civ. P. 56, EmCare, Inc. ("EmCare") files this Motion for Summary Judgment and Brief in Support, and would respectfully show the following:

## I.
## SUMMARY OF MOTION

Plaintiff June Belt has sued EmCare, along with Texas EM-I Medical Services, P.A. ("Texas EM-I") and St. Paul ERDocs, P.A. ("ERDocs"), under 29 U.S.C. section 216(b) of the Fair Labor Standards Act. Texas EM-I previously employed Belt as a nurse practitioner, and she assisted Texas EM-I in fulfilling its contractual service obligations at several hospitals in Texas. Belt alleges that she is entitled to unpaid overtime from the defendants because either 1) she did not perform overtime-exempt work while employed by the defendants; or 2) if she was performing exempt duties, she was not paid a salary that would satisfy the salary basis test under the FLSA. She seeks to recover unpaid overtime damages on behalf of herself as well as nurse practitioners ("N.P.'s") and physician assistants ("P.A.'s") located in Texas and throughout the United States. Plaintiff contends that she was employed by EmCare. Plaintiff further asserts that



she was jointly employed by EmCare, Texas EM-I and St. Paul ER Docs and that the defendants are alter egos of one another.

The record establishes that Texas EM-I, not EmCare, was Plaintiff's employer. Plaintiff also worked as an independent contractor for St. Paul ERDocs. The record is devoid of evidence sufficient to create a genuine issue of material fact as to whether EmCare was Plaintiff's employer under the FLSA, a joint employer with Texas EM-I or ERDocs, or an alter ego of those entities. Consequently, as discussed below, Plaintiff's claims against EmCare fail as a matter of law and should be dismissed.

## II.

## STATEMENT OF MATERIAL FACTS

*EmCare's Corporate Structure and Functions*

1.     EmCare, Inc. provides emergency medicine management services to hospitals and physician groups at various locations.   (Exh. A, Declaration of James L. Murphy, pp. 1-2 ¶ 4).

2.     These physician groups may employ or contract with P.A.'s and/or N.P.'s to provide care in the emergency room setting.  Depending upon the state in which they practice, N.P.'s and P.A.'s may be employed by a professional association or professional corporation or may work as independent contractors. *Id.*

3.     These state-specific professional associations and professional corporations are wholly-owned by a physician or group of physicians, and in virtually every case, a physician serves as the sole officer and only director of the association or corporation.  Neither EmCare, Inc. nor any EmCare subsidiary has any ownership interest, either direct or indirect, in these physician-owned professional associations or professional corporations. *Id.*

2

4.     In some states, the physician groups contract with hospitals or other medical facilities to staff the facilities with medical professionals and to provide a variety of management and administrative services to the hospitals. *Id.* at p. 2, ¶ 5.   The group may outsource the medical billing services, payroll services, and other administrative functions to a state-specific subsidiary of EmCare, Inc., (EmCare of [State]), which may then contract with EmCare, Inc. to meet or fulfill their obligations to the physician group. *Id.*

5.     Neither the EmCare of [State] nor EmCare, Inc. have an ownership interest in any of the physician groups they service pursuant to contracts. *Id.*

6.     Pursuant to contract, EmCare, Inc. may provide the following management services pursuant to its contracts:  recruiting, scheduling, malpractice insurance coverage, risk management support, CQI/Customer Satisfaction Programs, charting systems, electronic scripting and patient discharge instruction systems, clinician payroll support, billing and coding reimbursement services, and physician education resources. *Id.* at p.2, ¶ 6.

7.     N.P.'s and P.A.'s may be hired in a variety of contexts to fulfill the hospital contracts.  The physician group may be hiring new personnel, replacing a nurse practitioner or a physician assistant who has departed, seeking to increase coverage in the emergency department, or replacing a physician with a physician assistant or nurse practitioner to provide more cost-efficient services. *Id.* at pp. 2-3, ¶ 7.

8.     In most instances, the Medical Director of the physician group instigates the search for qualified N.P.'s and P.A.'s and makes the hiring decision(s) with respect to those individuals. (*Id.*; *see also* Exh. B, Declaration of William Daney, M.D., p. 1-2, ¶ 2).

9.     Pursuant to its contracts, EmCare provides recruiting services to locate qualified N.P.'s and/or P.A.'s to fill these open position(s).  This recruiting service is carried out, in part,

3

through advertising in relevant markets and on EmCare's website. (Exh. A, p. 3, ¶ 7).

10.     Medical Directors employed by the physician groups are responsible to ensure the emergency department has enough clinicians to provide the proper amount of clinician coverage. (Exh. B, p. 1, ¶ 2).  If a Medical Director decides to hire a N.P. or P.A., he or she advises EmCare's recruiting department and provides information about the position to be filled.  *Id.*

11.     After receiving information about any qualified and interested candidates, the Medical Director selects individuals to interview.  (*Id.*; *see also* Exh. A, p. 3, ¶ 8).  If the Medical Director decides to hire an individual, that individual is then presented to the hospital for credentialing.  *Id.*  If the individual is granted privileges by the hospital, the Medical Director may then hire the individual.  *Id.*

12.     Pay rates and compensation practices for N.P.'s and P.A.'s at various hospitals and in various states are determined by a variety of factors, including the prevailing market rate and past practices of the physician groups.  (Exh. A, p. 3 ¶ 9).  While EmCare of [State] may make recommendations as to competitive rates, it is ultimately the physician group's decision as to the rate of pay for N.P.'s or P.A.'s.  In addition to base pay, aspects of total compensation for N.P.'s and P.A.'s such as holiday pay, vacation pay, overtime pay, bonuses, and benefits vary from state to state and market to market.  *Id.*

13.     If employed by an EM-I, nurse practitioners and physician assistants receive compensation for their services and any employee benefits from such EM-I, pursuant to employment agreements with such EM-I.  (Exh. A, p. 4, ¶ 10).  Through the various contractual arrangements, EmCare provides payroll-processing services; however, the wages are paid by such EM-I.  Each EM-I has its own accounts receivable and is financed by fees received through hospital contracts and billing from physician services provided by such EM-I's medical

professionals. *Id.*

14.     As part of the various contractual arrangements with the state professional corporations/associations or physician groups, EmCare makes available a pro forma employee handbook for the professional corporation and/or physician group. (Exh. A, p. 4, ¶ 11 & Tab 2). The handbook expressly states: "EmCare, Inc. (the "Company") provides physician practice management services to professional associations that specialize in unscheduled patient care. **You are an employee of one of these professional associations.**" *Id.* The physician group or professional corporations/associations may, and often do, deviate from the suggested policies and/or procedures set forth in the handbook, either in practice or as defined by contract.     (*Id.*; *see also* Exh. C, Declaration of David Pillow, p. 2, ¶ 3).

15.     Neither EmCare, Inc. nor any of its state-specific subsidiaries, *e.g.* EmCare of Texas, participate in or direct the day-to-day or clinical activities of any N.P.'s or P.A.'s working for physician groups, nor do they mandate or direct the work schedules for the N.P.'s or P.A.'s. (Exh. A, p. 4, ¶ 12; Exh. B, p. 1, ¶ 2).

16.     The Medical Directors of the physician groups make decisions about whether to terminate N.P.'s and P.A.'s. (Exh. A, p. 4, ¶ 2; Exh. B p. 2, ¶ 3).

***Plaintiff's Employment with Texas EM-I***

17.     Plaintiff was formerly employed as a nurse practitioner by Texas EM-I. (Exh. C, Declaration of David Pillow, M.D., p. 3 ¶ 4).

18.     Texas EM-I is a professional association wholly owned by Dr. William Jernberg. (Exh. D, Declaration of William Jernberg, M.D., p. 1 ¶ 3). Dr. Jernberg is the sole officer and director of Texas EM-I. Dr. Jernberg is not an officer of EmCare, Inc. or of St. Paul ER Docs. *Id.* Texas EM-I and EmCare have no common officers or directors. *Id.*

5

19.     Medical Directors employed by Texas EM-I are responsible for supervising the day-to-day activities of the physicians, N.P.'s and P.A.'s in the emergency department.  (Exh. B, p. 1, ¶ 2; Exh. C, p. 2, ¶ 2).

20.     The Medical Director also ensures adequate coverage in the department and makes employment termination decisions regarding N.P.'s and P.A.'s. *Id.*

*21.*     Texas EM-I, a professional association authorized to do business in the State of Texas only, contracts with EmCare of Texas, a wholly-owned subsidiary of EmCare, to provide physician management services, such as billing, payroll, scheduling, and other administrative services, relevant to the operation of Texas EM-I's emergency departments at Texas hospitals. (Exh. A, pp. 4-5, ¶ 12 & Tab 3).   EmCare of Texas, in turn, contracts with EmCare, Inc. (formerly EmCare OP, LP) for the provision of those services. *Id.* at Tab 1.

22.     Despite its authorization to EmCare of Texas to perform certain management services, Texas EM-I, through its physicians, retains complete authority, responsibility, supervision, and control over the provision of all emergency department medical services and other professional healthcare services performed for patients. (Exh. A, pp. 4-5, ¶ 12).

23.     Texas EM-I contracts with EmCare of Texas for the staffing and scheduling of continuous emergency coverage by Texas EM-I's healthcare professionals; however, neither EmCare nor EmCare of Texas has authority to require Texas EM-I personnel to work at certain times or for certain hours.  (Exh. A, p. 5 ¶ 13; Exh. D, p. 2  ).

24.     Texas EM-I contracts with EmCare of Texas for its billing and collections; however, Texas EM-I has the exclusive authority to establish the amount of the fees charged and maintains sole control over its accounts and deposits. *Id.*  Neither EmCare nor EmCare of Texas receives revenue from Texas EM-I's hospital contracts. *Id.*

6

25.     Texas EM-I contracts with EmCare of Texas to recruit potential healthcare personnel to be employed by Texas EM-I; however, Texas EM-I maintains the sole discretion to hire or otherwise retain the services of those personnel and to terminate such services. *Id.*

26.     Texas EM-I maintains responsibility regarding compensation decisions for its healthcare personnel, based on its needs and the applicable market factors. (Exh. D, p. 2, ¶ 9 ).

27.     Texas EM-I maintains exclusive control, supervision, and direction over its employees in the performance of medical services in its emergency departments. (Exh. D, p. 2, ¶10)

28.     Texas EM-I and EmCare have no common stock ownership.  (Exh. A, p. 5 ¶ 14; Exh. D, p. 2 ¶11).

29.     Texas EM-I has no business departments; it contracts with other entities to provide administrative support incidental to the provision of medical services.  (Exh. D, p. 2, ¶ 12).

30.     Texas EM-I's hospital contracts are assets owned by Texas EM-I, not EmCare or EmCare of Texas.  (Exh. D, p. 3, ¶ 13).

31.     Texas EM-I observes corporate formalities by keeping separate books and accounts and holding its own separate board meetings. *Id.*

*Plaintiff's Contract with St. Paul ERDocs*

32.     In September 2001, St. Paul University Hopsital terminated its service agreement with Texas EM-I Medical Services, P.A.  Prior to this time, Dr. David Pillow had resigned from his position of employment with Texas EM-I and incorporated the entity known as St. Paul ER Docs, P.A. ("ER Docs").  (Exh. C, Declaration of David Pillow, p. 3 ¶ 5).

33.     ERDocs is a professional association under Texas law, and Dr. Pillow is its sole shareholder. *Id.*

34.     Neither EmCare, Inc. nor its subsidiaries has any ownership or financial control in ERDocs. (Exh. C, p. 1, ¶ 2)

35.     In March of 2001, and on behalf of ER Docs, Dr. Pillow executed an agreement with St. Paul Medical Center to provide emergency medicine staffing at that hospital.  (Exh. C, p. 3, ¶ 5).

36.     On April 14, 2001, and on behalf of ER Docs, Dr. Pillow executed an agreement with Healthcare Administrative Services Inc. ("HASI"), a wholly-owned subsidiary of EmCare, Inc., for HASI to provide ER Docs with certain administrative and billing support to assist ER Docs in fulfilling its contractual obligations to St. Paul University Hospital. *Id.*

37.     In July of 2001, ER Docs also executed an agreement with Texas EM-I Medical Services, P.A. under which Texas EM-I agreed to provide N.P.'s and P.A.'s to staff the St. Paul Medical Center emergency department. (Exh. C, p. 3, ¶ 6).  Belt continued to provide services at St. Paul through her continuing employment with Texas EM-I.

38.     In September of 2001, the contract between Texas EM-I and St. Paul ended, and ER Docs took over all responsibilities for staffing the emergency department at St. Paul with N.P.'s and P.A.'s. (Exh. C, p. 3, ¶ 7).

39.     In addition to her work for Texas EM-I, Plaintiff also provided services at St. Paul Medical Center through ERDocs as an independent contractor, as did other N.P.'s and P.A.'s retained by ERDocs. *Id.*

40.     Dr. Pillow was responsible for negotiating all terms and conditions of the independent contractor agreements with the N.P.'s and P.A.'s and was the final decision-maker with respect to the final contracts executed. *Id.*

41.     Dr. Pillow is solely responsible for retaining, compensating, supervising, and terminating the services of N.P.'s and P.A.'s he retains to service ERDocs' hospital contracts. (Exh. C, p. 3, ¶ 8).

42.     ERDocs and EmCare have no common stock ownership. (Exh. C, p. 4, ¶ 10).

43.     ERDocs has no business departments; it contracts with other entities to provide administrative support incidental to the provision of medical services. (Exh. C, p. 4, ¶ 11).

44.     ERDocs's hospital contracts are assets owned by ERDocs, not EmCare. (Exh. C, p. 4, ¶ 12).

45.     ERDocs observes corporate formalities by keeping separate books and accounts and holding its own separate meetings. (Exh. C, p. 4, ¶ 13).

### III.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and evidence show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c) (West 2003). *Crescent Towing & Salvage Co., Inc. v. M/V Anax*, 40 F.3d 741, 743 (5th Cir. 1994). Only disputes about material facts, as defined by the applicable substantive law, will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of showing that there is no genuine issue for trial. *National Association of Gov't Employees v. City Pub. Serv. Bd of San Antonio,* 40 F.2d 698, 712 (5th Cir. 1994). Once the movant has presented a properly supported motion for summary judgment, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue of material fact. *Elliott v. Lynn,* 38 F.3d 188, 190 (5th Cir. 1994) *cert. denied,* 524 U.S. 1117 (1995). There must be more than "some metaphysical doubt as to the material facts" to satisfy this burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-movant cannot avoid summary judgment with only conclusory allegations or unsubstantiated assertions. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 871-73 (1990); *Hopper v. Frank,* 16 F.3d 92, 96-97 (5th Cir. 1994).

## IV.

## ARGUMENT AND AUTHORITIES

**A.    EmCare Is Not an Employer of Plaintiff or the Proposed Class Under The Fair Labor Standards Act.**

Under the FLSA an "employer" is defined as including "any person acting directly in the interest of an employer in relation to an employee." 29 U.S.C.A. § 203(d) (2003). Liability under the FLSA is based upon the existence of an employer-employee relationship. *Patel v. Wargo,* 803 F.2d 632, 637 (11th Cir. 1986). Determination of employee status is a question of law and is judged by the "economic realities" of the individual case, which in turn focuses on whether the plaintiff was economically dependent upon the putative employer. *See Watson v. Graves,* 909 F.2d 1549, 1553 (5th Cir. 1990). The federal courts look at the surrounding circumstances of the total work arrangement and not technical or isolated factors to determine the economic realities. *See Goldberg v. Whitaker House Co-op, Inc.,* 366 U.S. 28, 33 (1961); *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d 235, 237-38 (5th Cir. 1973).

Plaintiff asserts that EmCare, Texas EM-I and St. Paul ERDocs are joint employers of Plaintiff and the rest of the proposed class of N.P.'s and P.A.'s. *See* Pl.'s Orig. Cmplt., ¶ 9. In determining whether an employment relationship exists under the "economic realities" test, courts ask whether the alleged employer: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See Watson*, 909 F.2d at 1553; *Catani v. Chiodi*, No. CIV.00-1559(DWF/RLE), 2001 WL 920025, *6 (D. Minn. Aug. 13, 2001). As set forth below, Plaintiff cannot establish a genuine issue of material fact that these factors compel the conclusion that EmCare was her employer, either standing alone or by virtue of its subsidiaries' contractual relationships with Texas EM-I or ERDocs or that EmCare employs the rest of the proposed class of N.P.'s and P.A.'s.

### 1. Power to Hire or Fire Employees

EmCare is not a medical service provider and does not employ any N.P.'s or P.A.'s to provide medical services. (Exh. A, p. 4 ¶ 2). Rather, EmCare, through its subsidiaries, provides emergency department management services pursuant to contract for Texas EM-I and other physician groups, which actually employ and supervise Plaintiff and the other medical professionals who provide emergency department services. *Id.* The Medical Directors of the physician groups also make the decisions about whether to terminate N.P.'s and P.A.'s. (*Id.* at p. 5, ¶ 15; *see also* Exh. B, p. 2 ¶ 3). EmCare does not have the power to hire and fire N.P.'s or P.A.'s employed by Texas EM-I or the other physician groups, nor do they control or oversee the day-to-day work of N.P.'s or P.A.'s employed by Texas EM-I or other physician groups. (Exh. A, p. 5 ¶¶ 14-15). Therefore, EmCare cannot be said to "suffer or permit" Plaintiff or the proposed class members to work such that it could be considered to employ them under the

FLSA. 29 U.S.C. § 203(g).

EmCare's role in the physician groups' selection process is limited to recruiting interested and qualified candidates for available positions, then referring those qualified candidates to Medical Directors who have expressed a need to hire additional medical personnel. (Exh. A, p. 3 ¶ 7-8). After they hire or otherwise contract with the needed personnel, the Medical Directors evaluate the qualifications and performance of medical personnel and ultimately decide whether those individuals will be retained. *Id.*; *see also* Exh. B, p. 1, ¶ 2). This delineation of authority is clearly spelled out in the contract between EmCare of Texas and Texas EM-I as well as in similar contracts between EmCare's subsidiaries and other physician groups employing N.P.'s and P.A.'s. (Exh. A at Tab 3).

Such an arrangement does not create an employment relationship. In *Catani v. Chiodi,* the plaintiff brought a claim for failure to pay overtime wages under the Fair Labor Standards Act against her employer and the temporary staffing agency ("Chiodi"). *Catani v. Chiodi*, No. CIV.00-1559(DWF/RLE), 2001 WL 920025 (D. Minn. Aug. 13, 2001). A steel plant entered into a contractual arrangement with Chiodi's staffing agency to provide individuals to perform work at the plant. *Id.* at *1. The plant identified individuals it wanted to hire and referred them to Chiodi so that she could process their initial employment paperwork. *Id.* Chiodi was responsible for collecting the necessary tax and employment eligibility paperwork at the commencement of employment. *Id.* at * 1-2. Chiodi also processed the payroll, cut and mailed employees their paychecks and mailed W-2's at the end of the year. *Id.* at *2. Chiodi did not train, supervise or otherwise discipline the employees. *Id.* Further, Chiodi had no authority with regard to firing, scheduling or giving raises to employees. *Id.* Based on these facts, the court determined that Chiodi was not an employer because she did not exert sufficient control over the

manner in which the employees performed their work. *Id.* at *4-5.

Similarly, in *Jeanneret v. Aron's East Coast Towing, Inc.*, No. 01-8001-CIV-HURLEY, 2002 U.S. Dist. LEXIS 12200, *26-27 (S.D. Fla. Jan. 29, 2002), the plaintiff brought suit under the FLSA, alleging that both the auto towing business he worked for, as well as an unrelated employee leasing company ("Sunshine"), were his joint employers.   Sunshine moved for summary judgment, arguing that it was not the plaintiff's employer and that it merely performed administrative services for a fee under a subscriber services agreement with the towing company. 2002 U.S. Dist. LEXIS, *10-12.

The agreement between the two entities expressly stated that the relationship created was a "joint employer relationship" and specifically reserved for Sunshine the authority to hire, fire, and discipline the leased employees, the right of direction and control over some aspects of the work, and the responsibility for the payment of wages to the workers. *Id.* at *10-22.  Even with these specific grants of authority in the agreement, however, the court examined the economic realities in light of the actual practices of the two companies and found that Sunshine was not actually exercising the authority allowed by the agreement.  Therefore, the court concluded that Sunshine was not an employer under the FLSA, despite calling the arrangement "joint employment" and retaining the ability to control certain aspects of plaintiff's employment. *Id.* at 28.

Likewise, although EmCare distributed a *pro forma* employee handbook to Texas EM-I's employees pursuant to a series of management services agreements, this fact is not determinative of an employment relationship between EmCare and Texas EM-I or other physician groups. Besides the obvious point that the handbook clearly states that the professional association and not EmCare is the employer, (Exh. A, p. 4 ¶ 11 & Tab 2), it is the actual practices of the parties

13

to the agreements that controls, not just theoretical authority conferred by a writing.   *See Jeanneret*, 2002 U.S. Dist. LEXIS 12200, *27.  Here, the undisputed evidence is that that Texas EM-I and St. Paul ERDocs, like other physician groups contracting with EmCare's subsidiaries, can and do depart from the suggested policies in the handbook and manage their own emergency department practices.  (Exh. A, p. 4 ¶ 11; Exh. C, p. 2 ¶ 3 ).

### 2.   Supervision of the Employees

The agreement between Texas EM-I and EmCare of Texas, as well as the agreement between ERDocs and HASI, specifies that the management services providers have no right of control or supervision over medical decisions in the emergency departments.  (Exh. A, p. 4 ¶ 4 and Tabs 1 &3).   In the emergency departments where they perform medical services, the N.P.'s and P.A.'s receive all necessary instruction and direction from the Medical Directors, not from EmCare.  (Exh. B, p. 1 ¶ 2; Exh. C, p. 2, ¶ 3).   These Medical Directors at the hospitals where Plaintiff provided services were employees/officers of Texas EM-I (or ERDocs), not EmCare.   (Exh. A, p. 4 ¶ 13).

Further, EmCare does not control the hours of work for Plaintiff or the proposed class.  Once the Medical Directors determine how much coverage is needed in a particular emergency department to provide appropriate clinical coverage, EmCare's schedulers contact N.P.'s and P.A.'s of the physician groups to find out when they are available to work so that adequate coverage can be arranged.   (Exh. B, p.1, ¶ 2)).  This is done as part of EmCare's administrative services to the physician groups.  (Exh. A, p. 2 ¶ 6).  The N.P.'s and P.A.'s work schedules are not dictated to them by EmCare.  (Exh. A, p. 4, ¶ 12).  Accordingly, it is undisputed that EmCare does not supervise the N.P.'s or P.A.'s in their work, nor does it dictate their hours of work or the manner in which their work is carried out.

### 3.    Determining Rate and Method of Pay

It is undisputed that EmCare does not have final authority to determine the rate and method of pay of N.P.'s and P.A.'s. retained by the physician groups. EmCare makes recommendations regarding the rate and method of pay of these workers depending on the market conditions in that location. (Exh. A, p. 3 ¶ 9). However, the Medical Directors maintain the ultimate authority to indicate their own preferences and set the actual rate of pay, which results in N.P.'s and P.A.'s being compensated differently depending on the physician group by which they are retained. *Id.*; *see also* Exh. D, p. 2, ¶ 9) EmCare merely implements this decision in its management services role when computing payroll, which is paid by the physician groups. (Exh. A, p. 4 ¶ 10). Thus, the compensation of these N.P.'s and P.A.'s is the responsibility of the physician group (e.g., Texas EM –I or ERDocs) and not EmCare.

### 4.    Maintenance of Employment Records

Although EmCare maintains employment records on the N.P.'s and P.A.'s retained or employed by the physician groups for which it provides contract services, these records are necessarily kept by EmCare as part of its obligation to provide payroll support and services under a series of contracts with physician groups. (Exh. A, p. 4 ¶ 10). Therefore, this fact is not determinative of EmCare's status as a joint employer in light of the other factors bearing on this issue. *See Chiodi*, 2001 WL 920025, at *7.

Viewing these facts in the totality of the circumstances, the factors under the economic reality test do not support Plaintiff's assertion that she is an employee of EmCare, and EmCare should be dismissed from this lawsuit on that basis alone.

**B.**     **The Defendants Are Not Alter Egos.**

"Under Texas law the alter ego doctrine allows the imposition of liability on a corporation for the acts of another corporation when the subject corporation is organized or operated as a mere tool or business conduit." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999). Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetuate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances.[1] *Rodriquez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 (5th Cir. 2001) (citations omitted). There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort. *Id.* Absent proof that the companies are alter egos, the corporate form must be respected. *Rodriguez*, 242 F.3d at 573.

Courts will not disregard corporate structure and hold parent companies liable except where a parent company's officers, directors, or stockholders utilize that corporate entity as a sham to perpetuate a fraud, shun personal liability or for other truly exceptional situations. *Subway Equip. Leasing Corp. v. Sims*, 994 F.2d 210, 218 (5th Cir. 1993), *cert. denied*, 510 U.S. 1049, 114 S. Ct. 702 (1994). Plaintiff bears the heavy burden of producing evidence of EmCare, Texas EM-I and ERDoc's alleged sham usage of the corporate form, because the alter ego doctrine is reserved exclusively for cases of improper use of the corporate fiction. *See Periman Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991).

The Fifth Circuit has developed a list of factors to be used when determining whether

---

[1] The majority of cases analyzing the alter ego issue construe the relationship between a parent and subsidiary. However, the Fifth Circuit has determined that the factors used in determining whether a subsidiary is an alter ego of its parent apply to related companies who have no such relationship, as in the case at bar. *See Gundle Lining Constr. Corp. v. Adams County Asphalt*, 85 F.3d 201, 208 n.3 (5th Cir.

related companies are alter egos:

> (1) the parent and the subsidiary have common stock ownership; (2) the parent and the subsidiary have common directors or officers; (3) the parent and the subsidiary have common business departments; (4) the parent and the subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records.

*Gundle Lining Constr. Corp. v. Adams County Asphalt*, 85 F.3d 201, 208-09 (5th Cir. 1996) (citations omitted). The determination of the existence of alter ego relationships must be based on a consideration of "the totality of the circumstances." *Id.*

Plaintiff cannot produce evidence of a sham or fraud, nor evidence of a truly exceptional situation. Texas EM-I, ERDocs and EmCare are legitimate, separate corporate entities that are separately incorporated, are adequately capitalized, maintain independent sources of business, and have separate hiring practices and accounts receivable. (Exh. A, ¶¶ 4, 5, 10, 12, 15; Exh. C, ¶¶ 2, 9-13; Exh. D, ¶¶ 1, 7, 11-14). Moreover, the companies do not share common stock ownership, nor do the companies have common directors or officers or common management. *Id.* The sole owners and directors of Texas EM-I and ERDocs are not officers, directors or employees of EmCare. *Id.*

ERDocs and Texas EM-I have their own accounts receivable and are financed by fees received through hospital contracts and billing from physician services provided by Texas EM-I's and ERDocs' medical professionals. (Exh. C, ¶¶ 2, 9-13; Exh. D, ¶¶ 1, 7, 11-14). These accounts provide adequate capital for Texas EM-I's and ERDocs' operations. *Id.* Neither

ERDocs nor Texas EM-I have no business departments in common with EmCare; rather, both physician groups contract with other entities to provide administrative support incidental to the provision of medical services. *Id.* Both Texas EM-I and ERDocs pay their own employees/contractors for work performed by N.P.'s and P.A.'s. *Id.* The hospital contracts are assets owned by Texas EM-I or ERDocs, not EmCare. *Id.* Both ERDocs and Texas EM-I observe corporate formalities by keeping separate books and accounts and holding separate meetings. *Id.*

In light of these facts, the totality of the circumstances shows that EmCare's role is limited to that of a management services provider through its' subsidiaries' contracts with Texas EM-I and ERDocs. Texas EM-I and ERDocs are not entities being used by EmCare as a sham to perpetuate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances justifying the disregard of the corporate form. Rather, each is an independent entity with a separate purpose, separate management, and separate organizational structure. Accordingly, the Court should grant EmCare's motion for summary judgment on this issue, as well, because Plaintiff has produced no issue of material fact to justify classifying EmCare as an alter ego of the other named defendants so as to hold EmCare liable for the challenged employment decisions in this litigation.

**V.**

**CONCLUSION**

The undisputed facts and applicable case law show that summary judgment is appropriate as a matter of law. Plaintiff has failed to present legally sufficient evidence that EmCare is her employer; is a joint employer; or existed to perpetuate a sham in order to shun liability in this lawsuit, i.e., is an alter ego. Consequently, Plaintiff's claims against EmCare must fail.

18

Respectfully submitted,

Kimberly A. Lucas

KYLE & MATHIS, L.L.P.
8300 Douglas, Suite 700
Dallas, TX  75225
(214)706-7600 – voice
(214)706-7622 - facsimile

ATTORNEYS FOR DEFENDANT
EMCARE, INC.

**DEFENDANT EMCARE INC.'S MOTION**
**FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**
DALLAS:112304.2 037186.1011

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served upon counsel of record by facsimile on this  16th day of June, 2003, as shown below:

James A. Jones
Jones & Associates, P.C.
5015 Tracy, Suite 100
Dallas, TX  75205
Facsimile 214.219.9309

John T. Cox III
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas  75201
Facsimile 214.981.3839

Ronald E. Manthey
Littler Mendelson, P.C.
2001 Ross Avenue
Suite 2600, Lock Box 116
Dallas, Texas 75201.2931
Facsimile 214.880.0181

Kimberly A. Lucas

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | **CIVIL ACTION NO. 6:03-CV-73** |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § § | |
| Defendants. | § | |

## DECLARATION OF JAMES L. MURPHY

1.      My name is James L. Murphy.  I am of sound mind, over the age of twenty-one (21), have never been convicted of a felony, and am fully authorized and competent to make this Affidavit.  The facts and statements contained in this Affidavit are made on the basis of my personal knowledge and are true and correct.

2.      I am currently employed by EmCare, Inc. as its Executive Vice President, and I have held this position since 2001, but I have been employed by EmCare, Inc. for more than ten years in various capacities.

3.      As Executive Vice President, I am responsible for oversight and management of EmCare's various regional offices and the Emergency Department management services they provide.

4.      EmCare, Inc. provides emergency medicine management services to hospitals and physician groups.  These physician groups may employ or contract with physician assistants

1



and/or nurse practitioners to provide care in the emergency room setting. Some of these nurse practitioners and physician assistants may be employed by various professional associations or professional corporations, depending upon the state in which they practice. Others may work as independent contractors. In cases where the nurse practitioner or physician assistant works for a state-specific professional association or professional corporation, the state-specific professional association or professional corporation is wholly-owned by a physician (in some cases more than one physician), and that physician is, in virtually every case, the only officer and only director of the employer. Neither EmCare, Inc. nor any EmCare subsidiary has any ownership interest, either direct or indirect, in these entities.

5.      In some states, the physician groups contract with hospitals or other medical facilities to staff the facilities with medical professionals, and to provide a variety of management and administrative services to the hospitals. The group may outsource the medical billing services, payroll services, and other administrative functions to a state-specific subsidiary of EmCare, Inc. (EmCare of [State]), which may then contract with EmCare, Inc. to meet or fulfill their obligations to the physician group. A true and correct copy of such a contract is attached hereto as Tab 1. Neither the EmCare of [State] nor EmCare, Inc. have an ownership interest in any of the physician groups they service pursuant to contracts.

6.      Pursuant to contract, EmCare, Inc. may provide the following management services:   recruiting, scheduling, malpractice insurance coverage, risk management support, CQI/Customer Satisfaction Programs, charting systems, electronic prescriptions and patient discharge instruction systems, clinician payroll support, billing and coding reimbursement services, and physician education resources.

7.      Once a contract to provide emergency room services for a hospital has been

2

executed, either by an EM-I or other entity for which EmCare, Inc. ultimately provides emergency room management services, nurse practitioners and physician assistants may be hired in a variety of contexts.  The emergency practice group may be hiring nurse practitioners and physician assistants in the first instance, the group may be replacing a nurse practitioner or a physician assistant who has departed, the group may be seeking to increase coverage in the emergency department, or the group may be replacing a physician with a physician assistant or nurse practitioner.  In most instances, the Medical Director instigates the search for qualified nurse practitioners and physician assistants and makes the hiring decision(s) with respect to those individuals.  Pursuant to contract, EmCare provides recruiting services to locate qualified nurse practitioners and/or physician assistants to fill these open position(s).  This recruiting service is carried out, in part, through advertising in relevant markets and on EmCare's website.

8.      Qualified candidates are presented to the Medical Director and then to the hospital credentialing committee.  If the Medical Director has determined that he or she wishes to hire the individual and the hospital grants practicing privileges to the individual, the individual may then be able to provide services in the emergency department.  If the hospital does not grant privileges or otherwise indicates that it does not wish for the individual to work in the emergency department, then the nurse practitioner will not be employed to provide services in that emergency department.

9.      Pay rates and practices are determined by a variety of factors including the prevailing market rate and past practices of the physician groups.  While EmCare of [State] may make recommendations as to competitive rates, it is ultimately the physician group's decision as to the rate of pay for N.P.'s or P.A.'s.  In addition to base pay, aspects of total compensation for nurse practitioners and physician assistants such as holiday pay, vacation pay, overtime pay,

3

bonuses, and benefits vary from state to state and market to market.

10.     If employed by an EM-I, nurse practitioners and physician assistants receive compensation for their services and any employee benefits from such EM-I, pursuant to employment agreements with such EM-I.   Through the various contractual arrangements, EmCare provides payroll-processing services; however, the wages are paid by such EM-I.  Each EM-I has its own accounts receivable and is financed by fees received through hospital contracts and billing from physician services provided by such EM-I's medical professionals.

11.     As part of the various contractual arrangements with the state professional corporations/associations or physician groups, EmCare makes available a pro forma employee handbook for the professional corporation and/or physician group.  A true and correct copy of the handbook is attached at Tab 2.  The physician group or professional corporations/associations may and do deviate from the policies and/or procedures set forth in the handbook either in practice or as defined by contract.

12.     The nurse practitioners and physician assistants employed by an EM-I physician group are supervised by Medical Directors, all of whom are physicians and are EM-I employees. Specifically, the Medical Directors provide day-to-day clinical and administrative supervision for the physicians, nurse practitioners and physician assistants, and they may also act as a liaison with the hospital clinical staff and administration.  Neither EmCare, Inc. nor any of its state-specific subsidiaries, *e.g.* EmCare of Texas, participate in or direct the day-to-day or clinical activities of any nurse practitioners or physician assistants nor do they mandate or direct the work schedules for the nurse practitioners or physician assistants.

13.     Texas EM-I, a professional association authorized to do business in the State of Texas only, contracts with EmCare of Texas, a wholly-owned subsidiary of EmCare, to provide

4

included in such record; and the record was made at or near the time or reasonably soon thereafter.  The records attached hereto are exact duplicates of the originals.

       I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 16 , 2003.

JAMES L. MURPHY

ROBYN ELLIOTT BAKALAR
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
SEPTEMBER 30, 2006

6

# MANAGEMENT SERVICES AGREEMENT

## BY AND BETWEEN

## EMCARE OP, L.P.,
### a Texas limited partnership

## AND

## EMCARE OF TEXAS, INC.,
### a Texas corporation

## EFFECTIVE February 26, 1999



EXHIBIT

Tab A-1

# TABLE OF CONTENTS

                                                                                    **Page**

ARTICLE 1.   DEFINITIONS..................................................................................1
        1.1.    Affiliate ...................................................................................1
        1.2.    Emergency Department Medical Services ..................................2
        1.3.    GAAP........................................................................................2
        1.4.    Governmental Authority ..........................................................2
        1.5.    Hospital Contracts....................................................................2
        1.6.    Hospitals ...................................................................................2
        1.7.    Legal Requirements ..................................................................2
        1.8.    Management Fee........................................................................2
        1.9.    Management Services ................................................................2
        1.10.   Management Services Agreement .............................................3
        1.11.   Physician ...................................................................................3
        1.12.   Physician Group .......................................................................3
        1.13.   Practice Expenses .....................................................................3
        1.14.   Representatives .........................................................................3
        1.15.   Term...........................................................................................3
ARTICLE 2.   APPOINTMENT AND AUTHORITY OF BUSINESS
        MANAGER ...........................................................................................3
        2.1.    Appointment. ............................................................................3
        2.2.    Authority. ..................................................................................3
        2.3.    Patient Referrals. ......................................................................4
        2.4.    Practice of Medicine. ................................................................4
ARTICLE 3.   COVENANTS AND RESPONSIBILITIES CONCERNING
        BUSINESS MANAGER .......................................................................4
        3.1.    Support Services. ......................................................................4
        3.2.    Peer Review and Quality Assurance. ........................................5
        3.3.    Licenses and Permits. ...............................................................5
        3.4.    Business Manager Personnel. ...................................................5
        3.5.    Contract Negotiations. ..............................................................5
        3.6.    Billing and Collection. .............................................................5
        3.7.    Fiscal Matters. ..........................................................................6
                3.7.1.    Accounting and Financial Records. ...........................6
                3.7.2.    Sales and Use Taxes. .................................................6
        3.8.    Reports and Records. ................................................................6
                3.8.1.    Medical Records. .......................................................6
                3.8.2.    Other Reports and Records. .......................................6
        3.9.    Recruitment and Review of Physicians. ...................................6
        3.10.   Physician Group Insurance. .....................................................7
        3.11.   Additional Obligations of Business Manager. ..........................7

ARTICLE 4.    FINANCIAL ARRANGEMENT ....................................................................7
     4.1.    Management Fee. ...........................................................................7
ARTICLE 5.    TERM AND TERMINATION ......................................................................7
     5.1.    Initial and Renewal Term. ..............................................................7
     5.2.    Effects of Termination. ..................................................................8
ARTICLE 6.    MISCELLANEOUS .....................................................................................8
     6.1.    Administrative Services Only. ........................................................8
     6.2.    Relationship of the Parties. ............................................................8
     6.3.    GOVERNING LAW. ......................................................................8
     6.4.    Assignment. ..................................................................................9
     6.5.    Waiver of Breach. .........................................................................9
     6.6.    Gender and Number. ......................................................................9
     6.7.    Additional Assurances. ..................................................................9
     6.8.    Set Off. .........................................................................................9
     6.9.    Severability. ..................................................................................9
     6.10.    Divisions and Headings. ...............................................................9
     6.11.    Amendments and Agreement Execution. .......................................9
     6.12.    Entire Agreement. ......................................................................10

# MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT ("Agreement") is made and entered into effective as of February 26, 1999 (the "Effective Date"), by and between EmCare OP, L.P., a Texas limited partnership ("Business Manager"), and EmCare of Texas, Inc., a Texas corporation ("EmCare").

## AGREEMENT RECITALS

This Agreement is made with reference to the following facts:

A.  EmCare is a validly existing corporation under the laws of the State of Texas. EmCare has entered into the Management Services Agreement pursuant to which EmCare has agreed to provide (either directly or indirectly) management, administrative and business services to Physician Group in connection with Physician Group's management and staffing of emergency departments of the hospitals or other healthcare facilities which are parties to the Hospital Contracts.

B.  Business Manager is a validly existing limited partnership under the laws of the State of Texas, which is in the business of managing the non-medical aspects of emergency room physician practices.

C.  EmCare wishes to engage Business Manager to provide such management, administrative and business services as are necessary and appropriate for the performance of the obligations of EmCare under the Management Services Agreement, and Business Manager desires to provide such services, all upon the terms and conditions hereinafter set forth.

D.  Business Manager is willing to commit significant resources to EmCare based upon execution and delivery of this Agreement by EmCare.

NOW, THEREFORE, in consideration of the mutual terms, covenants and conditions hereinabove and hereinafter set forth, the parties agree as follows:

## ARTICLE 1.
## DEFINITIONS

For the purposes of this Agreement, the following terms shall have the meanings ascribed thereto, unless otherwise clearly required by the context in which such term is used:

1.1.  **Affiliate** shall mean any person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with another person. The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

1.2. **Emergency Department Medical Services** shall mean all medical services required in connection with the operation of an emergency department of a hospital or other healthcare facility, including the following matters to the extent that they involve the practice of medicine: the staffing of continuous 24-hour emergency physician coverage, the establishment of a schedule of usual and customary fees, the maintenance of medical records that adequately reflect the quality of care rendered and instructions given to patients, and the maintenance within such emergency department of the standards of professional practice set forth in the medical staff by-laws, rules, and regulations of the healthcare facility and in accordance with the ethical and professional standards of the Joint Commission on Accreditation of Healthcare Organizations.

1.3. **GAAP** shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity or other practices and procedures as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of the determination.

1.4. **Governmental Authority** shall mean the United States, any state, and any other political or other subdivision of any of the foregoing, and any agency, department, commission, board, bureau, court or instrumentality of any of them which now or hereafter has jurisdiction over EmCare, Business Manager, the performance of Emergency Department Medical Services, Physician Group or the performance of Emergency Department Medical Services by Physician Group.

1.5. **Hospital Contracts** shall mean any and all contracts now or hereafter entered into by Physician Group with Hospitals providing for the provision of Emergency Department Medical Services and administrative services related thereto, and any and all amendments, restatements, extensions, substitutions and modifications thereof.

1.6. **Hospitals** shall mean any hospital, clinic, or other healthcare entity which contracts with Physician Group with respect to the provision of Emergency Department Medical Services.

1.7. **Legal Requirements** shall mean any law, ordinance, order, rule or regulation of any Governmental Authority.

1.8. **Management Fee**, in respect of each period set forth in **Section 4.1.**, shall mean the amount to be paid to Business Manager pursuant to **Section 4.1.** as compensation for Management Services.

1.9. **Management Services** shall mean the business, administrative, and management services to be provided by Business Manager pursuant to this Agreement, including, without limitation, the administration and performance of all services required under the Management Services Agreement, the provision of supplies, support services, non-medical personnel, any

necessary office space, management, administration, financial record keeping and reporting, and other business services.

**1.10.  Management Services Agreement** shall mean the contract entered into by EmCare with Physician Group for the provision of management, administrative and business services (other than Emergency Department Medical Services) pursuant to the Hospital Contracts, and any and all amendments, restatements, extensions, substitutions and modifications of such contract.

**1.11.  Physician** shall mean each individually licensed physician who is employed or otherwise retained by or associated with Physician Group.

**1.12.  Physician Group** means Texas EM-I Medical Services, P.A., a Texas professional association, and its successors and assigns, and any other party to the Management Services Agreement referred to therein by the term "Physician Group."

**1.13.  Practice Expenses** shall mean any and all expenses paid by Business Manager pursuant to this Agreement which are (i) incurred by Business Manager in order to perform the services of Business Manager required under this Agreement, (ii) incurred by EmCare in the provision of services under the Management Services Agreement, or (iii) incurred by Physician Group in the provision of Emergency Department Medical Services (including Physician and non-physician healthcare employee wages).

**1.14.  Representatives** shall mean a party's officers, directors, employees, or other agents, representatives or advisors.

**1.15.  Term** shall mean the term of this Agreement as described in **Section 5.1.**.

### ARTICLE 2.
### APPOINTMENT AND AUTHORITY OF BUSINESS MANAGER

**2.1.  Appointment.** EmCare hereby appoints Business Manager as its sole and exclusive agent for the administration and provision of services by EmCare with respect to the Management Services Agreement, and Business Manager hereby accepts such appointment, subject at all times to the provisions of this Agreement and the ability of Business Manager to subcontract with third parties to provide the services required under this Agreement, including coding, billing and financial management services.

**2.2.  Authority.** Consistent with the provisions of this Agreement, Business Manager shall have the responsibility and commensurate authority to provide the Management Services. Subject to the terms and conditions of this Agreement, Business Manager is hereby expressly authorized to provide the Management Services in any reasonable manner Business Manager deems appropriate to meet the day-to-day requirements of the business functions of EmCare and Physician Group under the Hospital Contracts and the Management Services Agreement.

Moreover, Business Manager, acting alone and without the joinder of EmCare or any other party, shall have the sole and exclusive authority to sell, transfer or encumber all or any part of the assets of EmCare with respect to the Management Services Agreement. Subject to the provisions of this Agreement, Business Manager is also expressly authorized to negotiate and execute on behalf of EmCare contracts that do not relate to the provision of Emergency Department Medical Services. The parties acknowledge and agree that Physician Group, through its Physicians, will be responsible for and shall have complete authority, responsibility, supervision, and control over the provision of all Emergency Department Medical Services and other professional healthcare services performed for patients, and that all diagnoses, treatments, procedures, and other professional healthcare services will be provided and performed exclusively by or under the supervision of Physician Group and Physicians. Business Manager shall have and exercise absolutely no control or supervision over the provision of Emergency Department Medical Services.

2.3. **Patient Referrals.** The parties acknowledge that the benefits to the parties hereunder do not require, are not payment for, and are not in any way contingent upon referrals or admissions to or from any healthcare provider, or any other arrangement for the provision of any healthcare item or service.

2.4. **Practice of Medicine.** The parties acknowledge that Business Manager is not authorized or qualified to engage in any activity that may be construed or deemed to constitute the practice of medicine. To the extent any act or service herein required by Business Manager should be construed to constitute the practice of medicine by any Governmental Authority, the requirement to perform that act or service by Business Manager shall be deemed waived and unenforceable.

## ARTICLE 3.
## COVENANTS AND RESPONSIBILITIES CONCERNING BUSINESS MANAGER

During the Term, Business Manager shall provide all Management Services as are necessary and appropriate for the day-to-day administration of the business aspects of the operations of EmCare and Physician Group under the Hospital Contracts and the Management Services Agreement, including, without limitation, those set forth in this **Article 3.**, in accordance with all Legal Requirements.

3.1. **Support Services.** With respect to each of the Hospital Contracts, Business Manager shall provide or arrange for all non-medical services required in connection with the physical operation of the applicable emergency department of a healthcare facility, including, but not limited to, the staffing and scheduling of continuous 24-hour emergency coverage by the Physicians, assisting Physician Group with the establishment of a schedule of usual and customary fees charged by the Physicians and the administration of such schedule, maintaining medical records that adequately reflect the quality of care rendered and instructions given to

patients, assisting Physician Group in maintaining within the emergency department the standards of professional practice as set forth in the medical staff by-laws, rules, and regulations of the hospital or other healthcare facility and in accordance with the ethical and professional standards of the Joint Commission on Accreditation of Healthcare Organizations, and all other non-medical support services as Business Manager deems reasonably necessary and appropriate for the provision of Emergency Department Medical Services by Physician Group in connection with the Hospital Contracts.

3.2.  **Peer Review and Quality Assurance.** Business Manager shall provide administrative assistance to Physician Group in performing its peer review and quality assurance activities. In connection therewith, Business Manager agrees to assert all privileges as may be applicable to the communications and documentation sent or received by it in providing such assistance.

3.3.  **Licenses and Permits.** At the discretion of Business Manager, Business Manager shall, on behalf of and in the name of Physician Group, apply for, obtain and maintain all licenses and regulatory permits required by any Legal Requirements for or in connection with the Hospital Contracts or the Management Services Agreement, including the operation of Physician Group or any applicable emergency room pursuant to the Hospital Contracts, other than those relating to the practice of medicine or the administration of drugs by Physicians employed by or associated with Physician Group.

3.4.  **Business Manager Personnel.** Business Manager shall employ or otherwise retain any and all personnel that Business Manager deems reasonably necessary and appropriate for Business Manager's performance of its duties and obligations under this Agreement.

3.5.  **Contract Negotiations.** Business Manager shall assist Physician Group in negotiating contractual arrangements with third parties with regard to the provision of Emergency Department Medical Services, including, but not limited to, Hospital Contracts and managed care contracts. Business Manager may advise Physician Group with respect to the economic impact of any such third party contracts, including providing cash flow analysis and profitability projections.

3.6.  **Billing and Collection.** On behalf of and for the account of Physician Group, Business Manager shall establish and maintain or shall arrange for the establishment and maintenance (via a third party) of billing and collection policies and procedures that Business Manager deems reasonably necessary and appropriate in order to timely bill and collect all professional and other fees for all billable Emergency Department Medical Services provided by Physician Group or fees generated from Hospitals pursuant to Hospital Contracts. Business Manager shall advise and consult with Physician Group regarding the fees for Emergency Department Medical Services provided by Physician Group and fees paid by Hospitals pursuant to Hospital Contracts; it being understood, however, that Physician Group shall establish the fees to be charged for Emergency Department Medical Services and that Business Manager shall have no authority whatsoever with respect to the establishment of such fees. Business Manager shall

also assist Physician Group in negotiating managed care contracts.  As contemplated by the Management Services Agreement, EmCare hereby assigns to and delegates the rights and responsibilities of EmCare arising under the special powers of attorney granted to EmCare by the Physician Group under the Management Services Agreement to Business Manager.  Upon request of Business Manager, EmCare shall request Physician Group to execute and deliver such additional instruments as may be necessary to evidence or effect the special power of attorney and authority delegated to Business Manager pursuant to this Agreement and Management Services Agreement.

### 3.7.  Fiscal Matters.

3.7.1.  **Accounting and Financial Records.**  Business Manager shall establish and administer the accounting policies, procedures, controls and systems (including accounts payable and payroll) that Business Manager deems reasonably necessary and appropriate for the development, preparation, and safekeeping of administrative or financial records and books of account relating to the Hospital Contracts and the Management Services Agreement, all of which shall be prepared and maintained in accordance with GAAP.

3.7.2.  **Sales and Use Taxes.**  To the extent that any of the services to be provided by Business Manager hereunder may be subject to any state sales and use taxes, Business Manager may collect such taxes and remit same to the appropriate tax collection authorities.

### 3.8.  Reports and Records.

3.8.1.  **Medical Records.**  At Business Manager's discretion, Business Manager shall establish, monitor, and maintain procedures and policies for the timely creation, preparation, filing and retrieval of all medical records generated by Physician Group in connection with Physician Group's provision of Emergency Department Medical Services.  All such medical records shall be retained and maintained in accordance with all Legal Requirements relating to the confidentiality and retention thereof. Notwithstanding anything to the contrary herein, however, all medical records shall be and remain the property of Physician Group.

3.8.2.  **Other Reports and Records.**  Business Manager shall timely create, prepare, and file such additional reports and records that Business Manager deems reasonably necessary and appropriate with respect to Physician Group's provision of Emergency Department Medical Services.

### 3.9.  Recruitment and Review of Physicians.  Business Manager shall perform all administrative services that Business Manager deems reasonably necessary and appropriate to recruit potential physician personnel to be retained by Physician Group.  Business Manager shall provide Physician Group with model agreements to document Physician Group's employment,

retention or other service arrangements with such individuals. Business Manager shall also assist Physician Group in identifying potential physician personnel by (i) performing interviews; (ii) reviewing credentials; (iii) reviewing academic and professional histories; (iv) contacting academic and professional references; and (v) providing to Physician Group a written or oral summary of the qualifications and other useful information to assist Physician Group in reaching a decision on whether Physician Group will employ or otherwise retain a prospective physician. Physician Group shall retain the sole and complete responsibility to select, employ or otherwise contract with, supervise, control and terminate all Physicians performing Emergency Department Medical Services or other professional services, and Business Manager shall have no authority whatsoever with respect to such activities. At Business Manager's discretion, Business Manager shall also provide any administrative and other assistance needed by Physician Group in order to assist Physician Group in preparing Physician reviews.

3.10.  **Physician Group Insurance.** Throughout the Term, Business Manager shall negotiate, obtain, and maintain with commercial carriers, through self-insurance or some combination thereof, appropriate professional liability and malpractice insurance coverage for Physicians employed by or otherwise engaged by Physician Group as required by the Management Services Agreement, in such amounts, on such basis, and upon such terms and conditions as Business Manager deems appropriate or as stated in the Physician's employment agreements with Physician Group.

3.11.  **Additional Obligations of Business Manager.** In addition to the duties and obligations specified above, Business Manager may in its reasonable business judgment provide other nonmedical professional support that Business Manager deems reasonably necessary and appropriate to carry out the obligations of Business Manager to EmCare and of EmCare to the Physician Group.

## ARTICLE 4.
## FINANCIAL ARRANGEMENT

4.1.  **Management Fee.** With respect to each calendar month in the Term, EmCare shall pay Business Manager an amount equal to the aggregate amount of all fees and other compensation accrued by EmCare under the Management Services Agreement in consideration for the Management Services provided in such month.

## ARTICLE 5.
## TERM AND TERMINATION

5.1.  **Initial and Renewal Term.** The term of this Agreement will continue until the termination of the Management Services Agreement, unless sooner terminated by agreement of the parties.

**5.2.   Effects of Termination.** Upon termination of the Term, neither party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of termination, including, without limitation, payment of the Management Fee relating to services provided prior to such termination, (ii) obligations, promises, or covenants set forth herein that are expressly made to extend beyond the Term, which provisions shall survive such termination; and (iii) the obligation of EmCare to pay to Business Manager all sums advanced to or on behalf of EmCare by Business Manager in connection with this Agreement (including, without limitation, all Practice Expenses incurred), which obligations shall be due and payable upon such termination.    In effectuating the provisions of this **Section 5.2.**, EmCare specifically acknowledges and agrees that Business Manager shall continue the collection services contemplated by this Agreement with respect to all cash and accounts receivable in existence at the time of such termination.

**ARTICLE 6.**
**MISCELLANEOUS**

**6.1.   Administrative Services Only.** Nothing in this Agreement is intended or shall be construed to allow Business Manager to exercise control or direction over the manner or method by which Physician Group or its Physicians perform Emergency Department Medical Services or other professional healthcare services.  The rendition of all Emergency Department Medical Services, including, but not limited to, the prescription or administration of medicine and drugs shall be the sole responsibility of Physician Group and its Physicians, and Business Manager shall not interfere in any manner or to any extent therewith.  Nothing contained in this Agreement shall be construed to permit Business Manager to engage in the practice of medicine, it being the sole intention of the parties hereto that the services to be rendered by Business Manager are solely for the purpose of providing non-medical management and administrative services to Physician Group so as to enable Physician Group to devote its full time and energies to the professional conduct of its medical practice and provision of Emergency Department Medical Services to its patients and not to administration or practice management.

**6.2.   Relationship of the Parties.** It is expressly acknowledged that the parties hereto are independent contractors, and nothing in this Agreement is intended and nothing shall be construed to create an employer/employee, partnership, joint venture or special relationship between the parties, or to allow either to exercise control or direction over the manner or method by which the other performs the services that are the subject matter of this Agreement; provided always that the services to be provided hereunder shall be furnished in a manner consistent with the standards governing such services and the provisions of this Agreement.

**6.3.   GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS TO BE PERFORMED WHOLLY WITHIN THE STATE.

**6.4.    Assignment.** This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

**6.5.    Waiver of Breach.** The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or another provision hereof.

**6.6.    Gender and Number.** Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

**6.7.    Additional Assurances.** Except as may be herein specifically provided to the contrary, the provisions of this Agreement shall be self-operative and shall not require further agreement by the parties; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as are reasonable and as the requesting party may deem necessary to effectuate this Agreement.

**6.8.    Set Off.** Business Manager may set-off any amounts that EmCare owes to Business Manager as a result of this Agreement or otherwise against any amounts that Business Manager owes to EmCare as a result of this Agreement or otherwise.

**6.9.    Severability.** The parties hereto have negotiated and prepared the terms of this Agreement in good faith with the intent that each and every one of the terms, covenants and conditions herein be binding upon and inure to the benefit of the respective parties. Accordingly, if any one or more of the terms, provisions, promises, covenants or conditions of this Agreement or the application thereof to any person or circumstance shall be adjudged to any extent invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction or an arbitration tribunal, such provision shall be as narrowly construed as possible, and each and all of the remaining terms, provisions, promises, covenants and conditions of this Agreement or their application to other persons or circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law. To the extent this Agreement is ever construed by any Governmental Authority to violate any applicable Legal Requirements, then the parties agree to negotiate in good faith to amend this Agreement, to the extent possible consistent with its purposes, to conform to all Legal Requirements as may be applicable.

**6.10.    Divisions and Headings.** The divisions of this Agreement into articles, sections, and subsections and the use of captions and headings in connection therewith is solely for convenience and shall not affect in any way the meaning or interpretation of this Agreement.

**6.11.    Amendments and Agreement Execution.** This Agreement and amendments or other modifications hereto shall be in writing and may be executed in multiple copies. Each multiple copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

**6.12.** __Entire Agreement.__ With respect to the subject matter of this Agreement, this Agreement supersedes all previous contracts and constitutes the entire agreement between the parties. Neither party shall be entitled to benefits other than those specified herein. No prior oral statements or contemporaneous negotiations or understandings or prior written material not specifically incorporated herein shall be of any force and effect, and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein, such amendment(s) to become effective on the date stipulated in such amendment(s). The parties specifically acknowledge that, in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.

[SIGNATURES INTENTIONALLY APPEAR ON FOLLOWING PAGE]

Compliance and Integrity Program ................................................14
Prohibited Conduct and Progressive Discipline ........................15
Substance Abuse Policy ..............................................................17
Attendance ....................................................................................17
Solicitation in the Workplace ......................................................18
Dress and Grooming Standards ...................................................18
Misuse of Office Equipment /Desktop/E-mail/ etc. ..................18
Conflict of Interest .......................................................................20
Confidentiality Policy ..................................................................21
Workplace Violence Prevention .................................................21
Identification Badges/Secured Access Areas .............................21
Telephone Policy ..........................................................................22

**TERMINATION PROCEDURES** ..............................................23
Notice of Intent to Leave Employment ......................................23
Return of Employer Property .......................................................23

**HOSPITAL ADMINISTRATIVE PROCEDURES** ...................24
Professional Responsibilities ......................................................24
Medicare Participation Agreement .............................................24
Medical Professional Liability Coverage ...................................24
Chart Completion ..........................................................................24
Reporting Incidents ......................................................................25
DEA Number .................................................................................26
Maintenance of Current Licensure/Certifications .....................26
Business Expense Reimbursement Accounts (BERA) ..............26

**ACKNOWLEDGMENT** ............................................................27

**ADDENDUM** ..............................................................................28
Family and Medical Leave ...........................................................28
Procedures for Requesting Family and Medical Leave .............29
Other Points ..................................................................................30
Pregnancy-Related Disability Leave ..........................................31
Health and Safety .........................................................................33

**APPENDIX 8**

# INTRODUCTION

## Overview

EmCare, Inc. (the "Company") provides physician practice management services to professional associations that specialize in unscheduled patient care. You are an employee of one of these professional associations. As a clinician in this network, you have joined an exciting team of professionals dedicated to excellence in the delivery of healthcare services. Although you are an employee of the professional association (the "Employer"), you will notice when reviewing this handbook that the professional association has engaged the Company to perform many of the activities with respect to the employment arrangement. You may contact the Company by telephone at (214) 712-2000 or (800) 527-2145.

## Professionalism

As you are a professional, the Employer will not control or dictate the clinical or professional aspects of your job. Accordingly, medical decisions for your patients are solely your responsibility. The Employer will not interfere with your clinical decisions.

## How to Use this Handbook/The Employment Relationship

The Employer has provided this handbook as a ready reference and summary of human resource guidelines, work philosophies, and benefits. This handbook is not a contract and should not be construed as creating contractual obligations. Most clinicians enter into an employment agreement with the Employer regarding the terms and conditions of their employment. When such an agreement is made, the terms of that agreement establish the relationship of the parties and the provisions of that agreement control to the extent they conflict with provisions in this handbook. If you do not understand the handbook for any reason or have any questions, please contact the Regional Office.

No handbook can anticipate every circumstance or question about policy. Accordingly, the Employer reserves the right to revise, supplement or rescind any policies or portions of this handbook. As policies and benefits change, the Employer will attempt to make you aware of them as soon as it is practical to do so. To promote the continual improvement of this handbook, please contact the Regional Office with your suggestions and comments on it.

**APPENDIX 9**

# MANAGEMENT SERVICES AGREEMENT

## BY AND BETWEEN

# EMCARE OF TEXAS, INC.,
## a Texas corporation

### AND

# TEXAS EM-I MEDICAL SERVICES, P.A.,
## a Texas professional association

## EFFECTIVE February 26, 1999

**EXHIBIT**

Tab A-3

# TABLE OF CONTENTS

Page

ARTICLE 1.  DEFINITIONS ..................................................................................1
    1.1.    Affiliate ................................................................................1
    1.2.    Confidential Information ......................................................2
    1.3.    Covenant Not to Compete ...................................................2
    1.4.    Emergency Department Medical Services ...........................2
    1.5.    GAAP .................................................................................2
    1.6.    Governmental Authority ......................................................2
    1.7.    Hospital Contracts ..............................................................2
    1.8.    Hospitals ............................................................................3
    1.9.    Legal Requirements ............................................................3
    1.10.   Management Fee .................................................................3
    1.11.   Management Services .........................................................3
    1.12.   Medical Assets ...................................................................3
    1.13.   Non-Compete Period ..........................................................3
    1.14.   Physician ...........................................................................3
    1.15.   Practice Expenses ...............................................................3
    1.16.   Representatives ...................................................................3
    1.17.   State ...................................................................................4
    1.18.   Term ..................................................................................4
ARTICLE 2.  APPOINTMENT AND AUTHORITY OF BUSINESS
    MANAGER ............................................................................4
    2.1.    Appointment. ......................................................................4
    2.2.    Authority. ...........................................................................4
    2.3.    Patient Referrals. ................................................................4
    2.4.    Practice of Medicine. ..........................................................4
ARTICLE 3.  COVENANTS AND RESPONSIBILITIES CONCERNING
    BUSINESS MANAGER ..........................................................5
    3.1.    Support Services. ................................................................5
    3.2.    Peer Review and Quality Assurance. ...................................5
    3.3.    Licenses and Permits. .........................................................5
    3.4.    Business Manager Personnel. ..............................................6
    3.5.    Contract Negotiations. ........................................................6
    3.6.    Billing and Collection. ........................................................6
         3.6.1.   Hospital Billing. .....................................................6
         3.6.2.   Patient Billing. .......................................................6
         3.6.3.   Third Party Payer Billing. .......................................6
         3.6.4.   Collections. ............................................................7
         3.6.5.   Deposits. ................................................................7
         3.6.6.   Possession of Payment Instruments. ........................7

3.7.    Physician Group Account. ...............................................7
3.8.    Authority of Physician Group Over Fee Schedules. ...............7
3.9.    Fiscal Matters. ...............................................................8
        3.9.1.   Accounting and Financial Records. .........................8
        3.9.2.   Sales and Use Taxes. ...........................................8
3.10.   Reports and Records. .......................................................8
        3.10.1.  Medical Records. ................................................8
        3.10.2.  Other Reports and Records. ..................................8
3.11.   Recruitment and Review of Physicians. ..............................8
3.12.   Physician Group Insurance. ..............................................9
3.13.   Additional Obligations of Business Manager. .......................9
3.14.   Authority of Physician Group Over Emergency
        Department Medical Services. ...........................................9

ARTICLE 4.    COVENANTS AND RESPONSIBILITIES CONCERNING
              PHYSICIAN GROUP ............................................................9
4.1.    Provision of Emergency Department Medical
        Services. .......................................................................9
4.2.    Physician Group Personnel. ............................................10
        4.2.1.   Physicians. ........................................................10
        4.2.2.   Non-Physician Healthcare Personnel. ....................10
        4.2.3.   Locum Tenens. ...................................................11
        4.2.4.   Professional Standards. .......................................11
        4.2.5.   Special Power of Attorney. ...................................11
4.3.    Peer Review and Quality Assurance. .................................11
4.4.    Organization and Operation. ...........................................11
4.5.    Confidential and Proprietary Information. ...........................12
4.6.    Non-Competition. ..........................................................12
        4.6.1.   Covenant Not to Compete. ...................................13
                 4.6.1.1.   Interference. .......................................13
                 4.6.1.2.   Hospitals. ...........................................13
                 4.6.1.3.   Ownership or Affiliation with
                            Competitors. .......................................13
                 4.6.1.4.   Advancement of Competitor's
                            Interest. .............................................13
                 4.6.1.5.   Solicitations for Competition. ...............13
        4.6.2.   Shareholders of Physician Group. ..........................13
        4.6.3.   Passive Investments. ...........................................14
        4.6.4.   Reformation. .....................................................14
        4.6.5.   Ancillary Agreement. ..........................................14
        4.6.6.   Extension of Non-Compete Period. ........................14
ARTICLE 5.    FINANCIAL ARRANGEMENTS .............................................14
5.1.    Management Fee. ..........................................................14
5.2.    Cash Flow. ...................................................................15

ARTICLE 6.    TERM AND TERMINATION .................................................................15
    6.1.    Initial and Renewal Term. ....................................................15
    6.2.    Termination. ............................................................................15
        6.2.1.    Termination By Business Manager. ....................15
            6.2.1.1.    Loss of Provider Number. ....................15
            6.2.1.2.    Physician Licenses. .............................15
            6.2.1.3.    Bankruptcy. .........................................15
            6.2.1.4.    Default. .................................................15
            6.2.1.5.    Legislative Change. .............................16
            6.2.1.6.    Ninety Days Notice.............................16
        6.2.2.    Termination By Physician Group. .......................16
        6.2.3.    Termination by Agreement. ................................16
        6.2.4.    Legislative, Regulatory or Administrative
            Change. ..............................................................16
    6.3.    Effects of Termination. .........................................................16
ARTICLE 7.    MISCELLANEOUS ...........................................................................17
    7.1.    No Dividends. ........................................................................17
    7.2.    Relationship of the Parties. ..................................................17
    7.3.    GOVERNING LAW. .............................................................17
    7.4.    Assignment. ...........................................................................17
    7.5.    Arbitration. ............................................................................18
        7.5.1.    Arbitrator. .........................................................18
        7.5.2.    Applicable Rules. ..............................................18
    7.6.    Waiver of Breach. .................................................................19
    7.7.    Enforcement. ..........................................................................19
    7.8.    Gender and Number. .............................................................19
    7.9.    Additional Assurances. .........................................................19
    7.10.    Consents, Approvals, and Exercise of Discretion. ................19
    7.11.    Set Off. .................................................................................19
    7.12.    Severability. ..........................................................................20
    7.13.    Cumulative Remedies. ..........................................................20
    7.14.    Divisions and Headings. ........................................................20
    7.15.    Amendments and Agreement Execution. ...............................20
    7.16.    Entire Agreement. .................................................................20
    7.17.    Prior Actions.. .......................................................................21

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT ("Agreement") is made and entered into effective as of February 26, 1999 (the "Effective Date"), by and between EmCare of Texas, Inc., a Texas corporation ("Business Manager"), and Texas EM-I Medical Services, P.A., a Texas professional association ("Physician Group").

## AGREEMENT RECITALS

This Agreement is made with reference to the following facts:

A.      Physician Group is a validly existing professional corporation under the laws of the State of Texas, formed for and engaged in the conduct of a medical practice and the provision of Emergency Department Medical Services through individual physicians who are licensed to practice medicine in the State of Texas and who are employed or otherwise retained by Physician Group.

B.      Physician Group has entered into various Hospital Contracts pursuant to which Physician Group has agreed to manage and staff (either directly or indirectly) the emergency departments of the hospitals or other healthcare facilities which are parties to the Hospital Contracts.

C.      Business Manager is a validly existing corporation under the laws of the State of Texas, which is in the business of managing the non-medical aspects of emergency room physician practices.

D.      Physician Group wishes to engage Business Manager to provide such management, administrative and business services as are necessary and appropriate for the performance of the non-medical obligations of Physician Group under the Hospital Contracts, and Business Manager desires to provide such services, and is willing to commit significant resources to the requirements of the Physician Group, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual terms, covenants and conditions hereinabove and hereinafter set forth, the parties agree as follows:

## ARTICLE 1.
## DEFINITIONS

For the purposes of this Agreement, the following terms shall have the meanings ascribed thereto, unless otherwise clearly required by the context in which such term is used:

1.1.     <u>Affiliate</u> shall mean any person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with another person.

The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

**1.2.    Confidential Information** shall mean any information of Business Manager (whether written or oral), including all business management or economic studies, Hospital information, proprietary forms, proprietary business or management methods, marketing data, fee schedules, computer hardware and software, or trade secrets of Business Manager, whether or not such Confidential Information is disclosed or otherwise made available before or after the date hereof pursuant to this Agreement or in connection herewith. Confidential Information shall also include the terms and provisions of this Agreement and any transaction or document executed by the parties pursuant to this Agreement.

**1.3. Covenant Not to Compete** shall mean the covenants contained in **Section 4.6.**.

**1.4.    Emergency Department Medical Services** shall mean all medical services required in connection with the operation of an emergency department of a hospital or other healthcare facility, including the following matters to the extent that they involve the practice of medicine:  the staffing of continuous 24-hour emergency physician coverage, the establishment of a schedule of usual and customary fees, the maintenance of medical records that adequately reflect the quality of care rendered and instructions given to patients, and the maintenance within such emergency department of the standards of professional practice set forth in the medical staff by-laws, rules, and regulations of the healthcare facility and in accordance with the ethical and professional standards of the Joint Commission on Accreditation of Healthcare Organizations.

**1.5.    GAAP** shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity or other practices and procedures as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of the determination.

**1.6.    Governmental Authority** shall mean the United States, any state, and any other political or other subdivision of any of the foregoing, and any agency, department, commission, board, bureau, court or instrumentality of any of them which now or hereafter has jurisdiction over Business Manager, the performance of Emergency Department Medical Services, Physician Group or the performance of Emergency Department Medical Services by Physician Group.

**1.7.    Hospital Contracts** shall mean any and all contracts now or hereafter entered into by Physician Group with Hospitals providing for the provision of Emergency Department Medical Services and administrative services related thereto, and any and all amendments, restatements, extensions, substitutions and modifications thereof.

contract with, supervise, control and terminate all Physicians performing Emergency Department Medical Services or other professional services, and Business Manager shall have no authority whatsoever with respect to such activities. Although Business Manager may identify physicians and other medical professionals for Physician Group to employ and recommend the compensation that Physician Group pays to such individuals, Physician Group shall be ultimately responsible for such employment and compensation decisions. Such compensation, however, must be reasonable and competitive within the applicable market. At Business Manager's discretion, Business Manager shall also provide any administrative and other assistance needed by Physician Group in order to assist Physician Group in preparing Physician reviews.

3.12. **Physician Group Insurance.** Throughout the Term, Business Manager shall negotiate, obtain, and maintain with commercial carriers, through self-insurance or some combination thereof, appropriate professional liability and malpractice insurance coverage for Physicians employed by or otherwise engaged by Physician Group as required by this Agreement, in such amounts, on such basis, and upon such terms and conditions as Business Manager deems appropriate or as stated in the Physician's employment agreements with Physician Group.

3.13. **Additional Obligations of Business Manager.** In addition to the duties and obligations specified above, Business Manager may in its reasonable business judgment provide other nonmedical professional support that Business Manager deems reasonably necessary and appropriate to carry out the obligations of Business Manager to the Physician Group.

3.14. **Authority of Physician Group Over Emergency Department Medical Services.** Notwithstanding anything to the contrary in this Agreement, Physician Group shall have exclusive authority with respect to the performance of Emergency Department Medical Services, except that Business Manager may recommend fee schedules to Physician Group as provided in **Section 3.8.** and identify physicians and recommended compensation as provided in **Section 3.11.**

## ARTICLE 4.

## COVENANTS AND RESPONSIBILITIES
## CONCERNING PHYSICIAN GROUP

4.1. **Provision of Emergency Department Medical Services.** Physician Group shall provide Emergency Department Medical Services to the Hospitals at such times and in such manner as may be required pursuant to the Hospital Contracts. Nothing in this Agreement is intended or shall be construed to allow Business Manager to exercise control or direction over the manner or method by which Physician Group or its Physicians perform Emergency Department Medical Services or other professional healthcare services. The rendition of all Emergency Department Medical Services, including, but not limited to the prescription or administration of medicine and drugs, shall be the sole responsibility of Physician Group and its

Physicians, and Business Manager shall not interfere in any manner or to any extent therewith. Nothing contained in this Agreement shall be construed to permit Business Manager to engage in the practice of medicine, it being the sole intention of the parties hereto that the Emergency Department Medical Services required under the Hospital Contracts are to be rendered only by Physician Group.

## 4.2. Physician Group Personnel.

4.2.1.   **Physicians.** Physician Group shall employ or otherwise engage, at competitive market rates, that number of Physicians as is reasonably necessary and appropriate for the provision of Emergency Department Medical Services pursuant to the Hospital Contracts, each of whom shall be bound by and subject to applicable provisions of this Agreement. Each Physician retained by Physician Group shall hold and maintain a valid and unrestricted license to practice medicine in the State. For the Term, Physician Group shall enter into, maintain, and enforce with each such retained Physician a written employment agreement substantially in the form of **Schedule 4.2.1.**, including the "Non-Interference Clause" contained in Paragraph 4 thereof. Physician Group shall not amend such agreement or waive any rights thereunder without the prior approval of Business Manager. Physician Group recognizes that Business Manager would not have entered into this Agreement but for Physician Group's covenant to maintain such agreements with the Physicians. Physician Group shall pay to Business Manager, on or before three (3) days after receipt thereof, any damages, compensation, payment, or settlement received by Physician Group from a Physician who terminates his or her employment agreement without cause or whose agreement is terminated by Physician Group for cause. Physician Group shall be responsible for paying the compensation and benefits, as applicable, for all Physicians, including any other Physician personnel and any other contracted or affiliated Physicians, and for withholding, as required by any Legal Requirements. Business Manager shall, on behalf of Physician Group, administer the compensation with respect to such persons in accordance with their written agreements with Physician Group.   Business Manager shall neither control nor direct any Physicians in the performance of Emergency Department Medical Services.

4.2.2.   **Non-Physician Healthcare Personnel.** Physician Group shall employ or otherwise engage, at competitive market rates, that number of physician assistants and nurse practitioners as is reasonably necessary and appropriate for the provision of Emergency Department Medical Services pursuant to the Hospital Contracts; and such persons shall be under Physician Group's control, supervision and direction in the performance of or in connection with Emergency Department Medical Services. Physician Group shall be responsible for paying the compensation and benefits, as applicable, of all physician assistants and nurse practitioners employed by Physician Group, and for withholding as required by any Legal Requirements. Business Manager shall, on behalf of Physician Group, administer the compensation with respect to such persons in accordance with their written agreements with Physician Group.

Texas - Management Services Agreement.
EmCare, Inc.
DA990900.089/1+

10

**DEF 0014**

4.2.3. **Locum Tenens**. Physician Group shall ensure that Physicians and non-physician healthcare personnel are available as necessary to provide Emergency Department Medical Services under the Hospital Contracts. In the event that Physicians employed by Physician Group are not available to provide Emergency Department Medical Services coverage under the Hospital Contracts, Physician Group shall engage and retain *locum tenens* coverage at competitive market rates. Physicians retained on a *locum tenens* basis shall meet all of the requirements of **Section 4.2.4.**.

4.2.4. **Professional Standards**. Each Physician and any other physician personnel retained by Physician Group to provide Emergency Department Medical Services must (i) have and maintain a valid and unrestricted license to practice medicine in the State and (ii) comply with, be controlled and governed by and otherwise provide Emergency Department Medical Services in accordance with all Legal Requirements, and the ethics and standards of care of the medical community in which the Emergency Department Medical Services are performed, and (iii) obtain and retain appropriate medical staff membership with appropriate clinical privileges at any hospital or healthcare facility at which Emergency Department Medical Services are to be provided. Procurement of temporary staff privileges pending the completion of the medical staff approval process shall satisfy this provision, provided the Physician actively pursues full appointment and receives full appointment within a reasonable time.

4.2.5. **Special Power of Attorney**. In connection with this **Section 4.2.** and in order to assure the compliance by Physician Group of the covenants made herein, Physician Group hereby grants to Business Manager an irrevocable special power of attorney and appoints Business Manager as Physician Group's exclusive true and lawful agent and attorney-in-fact, with power of substitution and re-substitution, throughout the Term, and Business Manager hereby accepts such special power of attorney and appointment, to enforce each of the employment agreements referred to in **Section 4.2.1.**, as well as any agreements with physician assistants or nurse practitioners, contemplated by this Agreement, for and on behalf of Physician Group. Upon request of Business Manager, Physician Group shall execute and deliver such additional documents and instruments as may be necessary to evidence or effect such special power of attorney.

4.3. **Peer Review and Quality Assurance**. Physician Group shall adopt a peer review and quality assurance program to monitor and evaluate the quality of Emergency Department Medical Services provided by physician personnel of Physician Group. Such program shall give effect to the applicable requirements of the Health Care Quality Improvement Act of 1986 (and similar state law).

4.4. **Organization and Operation**. Physician Group, as a continuing condition of Business Manager's obligations under this Agreement, shall at all times during the Term be and remain legally organized and operated to provide Emergency Department Medical Services in a manner consistent with all Legal Requirements. Physician Group shall operate and maintain a

full-time practice of medicine specializing in the provision of Emergency Department Medical Services.

    **4.5.**  **Confidential and Proprietary Information.** Physician Group shall not disclose any Confidential Information of Business Manager without Business Manager's express written authorization, such Confidential Information shall not be used in any way directly or indirectly detrimental to Business Manager, and Physician Group shall keep such Confidential Information confidential and shall ensure that its Affiliates and Representatives who have access to such Confidential Information comply with these non-disclosure obligations; provided, however, that Physician Group may disclose Confidential Information to those of its Affiliates and Representatives who need to know Confidential Information for the purposes of this Agreement, it being understood and agreed to by Physician Group that such Affiliates and Representatives will be informed of the confidential nature of the Confidential Information, will agree to be bound by this **Section 4.5.**, and will be directed by Physician Group not to disclose to any other person any Confidential Information.  Physician Group agrees to be responsible for any breach of this **Section 4.5.** by its Affiliates or Representatives. If Physician Group is requested or required (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands, or similar processes) to disclose or produce any Confidential Information furnished in the course of its dealings with Business Manager or its Affiliates or Representatives, Physician Group shall (i) provide Business Manager with prompt notice thereof and copies, if possible, and, if not, a description of the Confidential Information requested or required to be produced so that Business Manager may seek an appropriate protective order or waive compliance with the provisions of this **Section 4.5.** and (ii) consult with Business Manager as to the advisability of Business Manager taking legally available action to resist or narrow such request.  Physician Group further agrees that, if in the absence of a protective order or the receipt of a waiver hereunder Physician Group is nonetheless compelled to disclose or produce Confidential Information concerning Business Manager to any tribunal or to stand liable for contempt or suffer other censure or penalty, Physician Group may disclose or produce such Confidential Information to such tribunal legally authorized to request and entitled to receive such Confidential Information without liability hereunder; provided, however, that Physician Group shall give Business Manager written notice of the Confidential Information to be so disclosed or produced as far in advance of its disclosure or production as is practicable and shall use reasonable efforts to obtain, to the greatest extent practicable, an order or other reliable assurance that confidential treatment will be accorded to such Confidential Information so required to be disclosed or produced.

    **4.6.**  **Non-Competition.** Physician Group hereby recognizes and acknowledges that Business Manager will incur substantial costs in providing the equipment, support services, personnel, management, administration, and other items and services that are necessary to assist Physician Group in its performance of its services under the Hospital Contracts and that in connection with the performance of this Agreement, Physician Group will be privy to Confidential Information to which Physician Group would not otherwise be exposed. Physician Group agrees and acknowledges that the Covenant Not to Compete described hereunder is

necessary for the protection of Business Manager and that Business Manager would not have entered into this Agreement without the Covenant Not to Compete.

4.6.1. **Covenant Not to Compete.** Physician Group covenants and agrees that during the Non-Compete Period Physician Group will not, and will cause each of its shareholders not to, directly or indirectly:

4.6.1.1. **Interference.** Either on such person's own account or for any other person, solicit, induce, attempt to induce, interfere with, or endeavor to cause any: (a) Hospital to modify, amend, terminate, or otherwise alter a Hospital Contract in any respect that is adverse to Business Manager; (b) Physician to modify, amend, terminate, or otherwise alter his employment agreement described in **Section 4.2.1.**; or (c) Physician engaged by Physician Group or any Affiliate of Physician Group or Business Manager to terminate any other agreement or arrangement with Physician Group or such Affiliate, respectively.

4.6.1.2. **Hospitals.** Enter into any agreement or relationship with any Hospital unless Business Manager provides the Management Services with respect thereto pursuant to this Agreement.

4.6.1.3. **Ownership or Affiliation with Competitors.** Own, manage, operate, maintain, engage in, serve as an advisor or consultant for, control, or otherwise participate in or be involved as a shareholder, member, partner, guarantor, or other holder of a financial interest in, or have any other interest in, or enter into a services or management agreement or relationship with, any person or entity providing healthcare management services in the State or any state contiguous to the State.

4.6.1.4. **Advancement of Competitor's Interest.** Make any statement or perform any act intended to advance an interest of any existing or prospective competitor or encourage any other person or entity to make any such statement or to perform any such act.

4.6.1.5. **Solicitations for Competition.** Make any statement or perform any act intended to cause any existing or potential client of Business Manager or any Affiliate thereof, including, without limitation, the Hospitals, to use the services or purchase the products of any competitor.

4.6.2. **Shareholders of Physician Group.** Physician Group represents and warrants to Business Manager that as of the effective date of this Agreement, Physician Group has only one shareholder, who is the individual who has executed and delivered this Agreement on behalf of Physician Group. If such shareholder or any future shareholder of Physician Group causes Physician Group to violate the Covenant Not to Compete by taking any of the actions described in **Section 4.6.1.**, Physician Group shall

immediately notify EmCare, Inc. so that EmCare, Inc. may exercise its rights under the Stock Transfer and Option Agreement between EmCare, Inc. and such shareholder.

4.6.3. **Passive Investments.** The restriction contained in **Section 4.6.1.3.** shall not apply to ownership as a passive investor of less than a one percent (1%) interest in the outstanding equity securities of any publicly held corporation listed on a national securities exchange or association.

4.6.4. **Reformation.** If a court of competent jurisdiction determines that the Covenant Not to Compete is partially or wholly inoperative, invalid or unenforceable in a particular case because of its duration, geographical scope, restricted activity or any other parameter, such court shall reform such duration, geographical scope, restricted activity or other parameter with respect to such case to permit enforcement of such reformed Covenant Not to Compete to the greatest extent allowable.

4.6.5. **Ancillary Agreement.** The Covenant Not to Compete shall be construed as an agreement ancillary to the other provisions of this Agreement and the existence of any claim or cause of action of Physician Group or any of its shareholders against Business Manager or any of its Affiliates, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Business Manager of the Covenant Not to Compete. Any breach or violation of the Covenant Not to Compete shall entitle Business Manager to an injunction restraining any further or continued breach or violation. Such right to an injunction shall be in addition to and cumulative of (and not in lieu of) any other remedies to which Business Manager is entitled because of such breach or violation.

4.6.6. **Extension of Non-Compete Period.** In the event that Physician Group or any of its shareholders violates the Covenant Not to Compete, then notwithstanding any provision herein to the contrary the Non-Compete Period shall be extended day for day for the time period that Physician Group or any of its shareholders is in violation of the Covenant Not to Compete.

## ARTICLE 5.
## FINANCIAL ARRANGEMENTS

5.1. **Management Fee.** As provided in Section 3.8., Physician Group possesses the ultimate authority for setting the fees to be paid for Emergency Department Medical Services. Each month Physician Group shall pay Business Manager a management fee equal to the excess, if any, of the fees for Emergency Department Medical Services accrued by Physician Group for such month over the salaries payable for such month under the employment agreements referred to in Sections 4.2.1. and 4.2.2. and the other Practice Expenses that Physician Group reasonably incurred during such month in the performance of its obligations under this Agreement (other than the management fee). As provided under Section 3.11., Physician Group possesses the

ultimate authority for setting the compensation under such employment agreements at competitive market rates.

    **5.2. Cash Flow.** Business Manager shall be responsible for managing the cash flow of Physician Group. Accordingly, Physician Group contemplates that it will forward to Business Manager all receipts received by Physician Group and from such receipts Business Manager shall pay on behalf of Physician Group all salaries payable under the employment agreements referred to in Sections 4.2.1. and 4.2.2. and the other Practice Expenses that Physician Group reasonably incurred in the performance of its obligations under this Agreement, including the Management Fee payable to Business Manager. Business Manager and Physician Group shall maintain accounts payable and receivable, respectively, to reflect the amounts owed by and to one another under this cash management arrangement. Nothing in this Section 5.2., however, shall require Physician Group to forward its receipts to Business Manager.

## ARTICLE 6.
## TERM AND TERMINATION

    **6.1. Initial and Renewal Term.** The term of this Agreement will continue until the termination of the last Hospital Contract subject to this Agreement, unless otherwise terminated as provided in **Section 6.2.**.

    **6.2. Termination.**

        **6.2.1. Termination By Business Manager.** Business Manager may, by notice to Physician Group, terminate the Term upon the occurrence of any one of the following events:

            **6.2.1.1. Loss of Provider Number.** Upon Physician Group's loss or the suspension of its Medicare or Medicaid provider number, or Physician Group's restriction from treating beneficiaries of the Medicare or Medicaid programs;

            **6.2.1.2. Physician Licenses.** The revocation, suspension, cancellation or restriction of any Physician licensed to practice medicine within the State if, in the judgment of Business Manager, Physician Group will not be financially or operationally viable after such revocation, suspension, cancellation or restriction;

            **6.2.1.3. Bankruptcy.** The liquidation or dissolution of Physician Group or the filing by it of a petition in voluntary bankruptcy, an assignment by it for the benefit of creditors, or other action taken voluntarily or involuntarily by it under any state or federal statute for the protection of debtors;

            **6.2.1.4. Default.** Default in any material respect by Physician Group in the performance of any of its material obligations hereunder;

Texas - Management Services Agreement.
EmCare, Inc.
DA990900.089/1+

15

**DEF 0019**

6.2.1.5. **Legislative Change.** Business Manager and Physician Group are unable to· reach an agreement on a new service agreement or basis for compensation after the occurrence of any event described in **Section 6.2.4.**; and

6.2.1.6. **Ninety Days Notice.** Upon ninety (90) days written notice from Business Manager to Physician Group, which may be given at any time.

**6.2.2. Termination By Physician Group.** Physician Group may terminate this Agreement upon at least one hundred eighty (180) days' notice that is not withdrawn in the event that Business Manager defaults in any material respect in the performance of any of its material obligations hereunder and such default continues for at least one hundred eighty (180) days after Business Manager receives notice of such default; provided, however, that in the event that such default is of a nature that it cannot, with due diligence, be cured within one hundred eighty (180) days, it shall not constitute a default so long as Business Manager begins to cure such default within one hundred eighty (180) days and thereafter diligently pursues such cure to completion or, if such default is not curable, ceases its action or inaction giving rise to such default. Termination by Physician Group hereunder shall require the affirmative vote of 100% of the outstanding equity ownership interests in Physician Group entitled to vote and may be withdrawn by the same vote.

**6.2.3. Termination by Agreement.** In the event Physician Group and Business Manager shall mutually agree in writing, the Term may be terminated on the date specified in the written agreement.

**6.2.4. Legislative, Regulatory or Administrative Change.** In the event of (i) a change, modification or reinterpretation in the Medicare or Medicaid statutes or regulations or in any other Legal Requirements, (ii) the adoption, modification or reinterpretation of new federal or state legislation or regulations, or (iii) a change in any third party reimbursement system, any of which are reasonably likely to materially and adversely affect the manner in which either party may perform or be compensated for its services as provided in this Agreement or which shall make this Agreement unlawful or no longer advisable or appropriate, the parties shall immediately use their best efforts to enter into a new service arrangement or provide a new basis for compensation for the services furnished pursuant to this Agreement, which complies with all Legal Requirements and approximates as closely as possible the economic position of the parties prior to such event.

**6.3. Effects of Termination.** Upon expiration or termination of the Term, neither party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of expiration or termination, (ii) obligations, promises, or covenants set forth herein that are expressly made to extend beyond the Term, including, without limitation, indemnification, confidentiality and non-competition provisions, which provisions shall survive such expiration or termination, and (iii) the obligation of Physician Group to pay to Business Manager all sums due

arbitrator may consider such matters as, in the opinion of the arbitrator, are necessary or helpful to make a proper valuation. The arbitrator may consult with and engage disinterested third parties to advise the arbitrator. The arbitrator shall not add any interest factor reflecting the time value of money to the amount of any loss and shall not award any punitive damages. If the arbitrator should die, resign or be unable to perform his duties hereunder, a replacement arbitrator shall be selected in accordance with the rules of the American Health Lawyers Association Alternative Dispute Resolution Service. As to any determination of the amount of any loss, or as to the resolution of any other claim, controversy, dispute or disagreement, that under the terms hereof is made subject to arbitration, no lawsuit based on such claimed loss or such resolution shall be instituted by any of the parties to this Agreement, other than to compel arbitration proceedings or enforce the award of the arbitrator. All privileges under applicable law, including attorney-client and work-product privileges, shall be preserved and protected to the same extent that such privileges would be protected in a court of law.

**7.6. Waiver of Breach.** The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or another provision hereof.

**7.7. Enforcement.** In the event of arbitration or legal action to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover the costs and expenses of such arbitration or action so incurred, including, without limitation, reasonable attorneys' fees.

**7.8. Gender and Number.** Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

**7.9. Additional Assurances.** Except as may be herein specifically provided to the contrary, the provisions of this Agreement shall be self-operative and shall not require further agreement by the parties; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as are reasonable and as the requesting party may deem necessary to effectuate this Agreement.

**7.10. Consents, Approvals, and Exercise of Discretion.** Whenever this Agreement requires any consent or approval to be given by either party, or either party must or may exercise discretion, and except where specifically set forth herein to the contrary, the parties agree that such consent or approval shall not be unreasonably withheld or delayed, and that such discretion shall be reasonably exercised.

**7.11. Set Off.** Business Manager or any of its Affiliates may set-off any amounts that Physician Group or any of its Affiliates or any equity owner thereof owes to Business Manager as a result of this Agreement or otherwise against any amounts that Business Manager or any of

its Affiliates owes to Physician Group or any of its Affiliates or any equity owner thereof as a result of this Agreement or otherwise.

**7.12. Severability.** The parties hereto have negotiated and prepared the terms of this Agreement in good faith with the intent that each and every one of the terms, covenants and conditions herein be binding upon and inure to the benefit of the respective parties. Accordingly, if any one or more of the terms, provisions, promises, covenants or conditions of this Agreement or the application thereof to any person or circumstance shall be adjudged to any extent invalid, unenforceable, void or violable for any reason whatsoever by a court of competent jurisdiction or an arbitration tribunal, such provision shall be as narrowly construed as possible, and each and all of the remaining terms, provisions, promises, covenants and conditions of this Agreement or their application to other persons or circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law. To the extent this Agreement is ever construed by any Governmental Authority to violate any applicable Legal Requirements, then the parties agree to negotiate in good faith to amend the Agreement, to the extent possible consistent with its purposes, to conform to all Legal Requirements as may be applicable.

**7.13. Cumulative Remedies.** Subject to **Section 7.5.**, any remedy conferred under this Agreement is not exclusive of any other remedy, and each such remedy shall be cumulative and in addition to each other remedy conferred under this Agreement and existing now or hereafter at law or in equity, whether by statute or otherwise. Moreover, any election of one or more of such remedies by a party to this Agreement shall not constitute a waiver of any other available remedies.

**7.14. Divisions and Headings.** The divisions of this Agreement into articles, sections, and subsections and the use of captions and headings in connection therewith are solely for convenience and shall not affect in any way the meaning or interpretation of this Agreement.

**7.15. Amendments and Agreement Execution.** This Agreement and any amendments or other modifications hereto shall be in writing and may be executed in multiple copies. Each multiple copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

**7.16. Entire Agreement.** With respect to the subject matter of this Agreement, this Agreement supersedes all previous agreements and constitutes the entire agreement between the parties. Neither party shall be entitled to benefits other than those specified herein. No prior oral statements or contemporaneous negotiations or understandings or prior written material not specifically incorporated herein shall be of any force and effect, and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein, such amendment(s) to become effective on the date stipulated in such amendment(s). The parties specifically acknowledge that, in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.

7.17. **Prior Actions.** The provisions of this Agreement shall also apply for any period prior to the transfer of a Hospital Contract to Physician Group to the extent that Physician Group rendered Emergency Department Medical Services with respect to such Hospital Contract during such prior period.

## [SIGNATURES INTENTIONALLY APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Business Manager and Physician Group have caused this Agreement to be executed by their duly authorized representatives, effective as of the date specified in the first paragraph of this Agreement.

**EMCARE OF TEXAS, INC.**

By: _____

Name:  David W. Singley, Jr.

Title:   Executive Vice President

Date of Execution: _____4/12/99_____

**TEXAS EM-I MEDICAL SERVICES,   P.A.**

By: _____

Name:  Dr. William C. Jernberg

Title:   President

Date of Execution: _____

IN WITNESS WHEREOF, Business Manager and Physician Group have caused this Agreement to be executed by their duly authorized representatives, effective as of the date specified in the first paragraph of this Agreement.

EMCARE OF TEXAS, INC.

By: _____
Name:  David W. Singley, Jr.
Title:   Executive Vice President
Date of Execution: _____

TEXAS EM-I MEDICAL SERVICES,   P.A.

By: _William C. Jernberg (DO)_
Name:  Dr. William C. Jernberg
Title:   President
Date of Execution: __4/15/99__

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

JUNE BELT, on behalf of herself and on § 
behalf of all other similarly situated, §
§
Plaintiff, §
§
vs. §　　CIVIL ACTION NO. 6:03-CV-73
§
(1) EmCare, Inc., §　　JUDGE DAVIS
(2) Texas EM-I Medical Services, P.A., and §
(3) St. Paul ERDocs, P.A. §
§
Defendants. §

## DECLARATION OF WILLIAM DANEY, M.D.

1.　　My name is William Daney, M.D. I am of sound mind, over the age of twenty-one (21), have never been convicted of a felony, and am fully authorized and competent to make this Declaration. The facts and statements contained in this Affidavit are made on the basis of my personal knowledge and are true and correct.

2.　　I am a licensed physician in the State of Texas. I am the Medical Director at Hillcrest Baptist Medical Center, Waco, Texas and have held this position for approximately ten years. I am currently an employee of Texas EM-I Medical Services, P.A. ("Texas EM-I"). As Medical Director, I am responsible for supervising the day-to-day activities of the physicians, physician assistants and nurse practitioners in the Hillcrest Baptist Medical Center emergency department. Specifically, I ensure that the department has enough clinicians to cover the number of patients typically seen in the department. I ensure that the schedules for each shift allow for the proper amount of clinician coverage. I also am responsible for ensuring that the department is staffed with qualified physicians, nurse practitioners and physician assistants. If I



EXHIBIT B

need to hire a nurse practitioner or a physician assistant, I will advise EmCare's recruiting department that I need assistance in locating qualified candidates and will provide them with information about the position(s) I am seeking to fill.  When I receive information about the qualified candidates, I select the individuals I wish to interview and then schedule an interview. If I make the decision that I would like to hire the individual, the individual is then presented to the hospital for credentialing.  If the individual is granted privileges by the hospital, I am then able to hire the individual in my department.

3.      As Medical Director, I am the decision-maker regarding decisions to terminate physicians, physician assistants and nurse practitioners.  I have terminated 2 midlevel provider employees in the last three years.  In each situation, I made the decision to end their employment. Upon making that decision, I advised EmCare's recruiting department that I had a position to fill and asked for the department to provide me with information regarding potential candidates to fill the position.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on ___June  13___, 2003.

_____
William Daney, M.D.

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 6:03-CV-73 |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § | |
| Defendants. | § § | |

## <u>DECLARATION OF DAVID J. PILLOW, JR., M.D.</u>

1.      My name is David J. Pillow.  I am of sound mind, over the age of twenty-one (21), have never been convicted of a felony, and am fully authorized and competent to make this Affidavit.  The facts and statements contained in this Declaration are made on the basis of my personal knowledge and are true and correct.

2.      I hold a medical degree from the University of Texas at Dallas Southwestern Medical School and have been a practicing physician since 1972.  I am the sole shareholder and hold all of the corporate office positions of St. Paul ERDocs, P.A. ("ERDocs").  I am employed by ERDocs and hold the position of Medical Director in the emergency department at St. Paul University Hospital ("St. Paul").  As Medical Director, I am responsible for every aspect of the business pertaining to St. Paul ER Docs, which includes providing emergency department clinical services and supervision and acting as an administrative liaison to the St. Paul.  I have held this position since September 1, 2001.  Prior to that time, I was employed by Texas EM-I,



EXHIBIT
C

Medical Services, P.A., a Texas professional association administratively managed by EmCare of Texas, as the Medical Director in the emergency department of St. Paul.

3. As the Medical Director for EM-I at St. Paul, I had both clinical and administrative responsibilities. As a physician, I treated patients who presented in the emergency department for various levels of emergency care. As an administrator, I was responsible for managing the day-to-day activities in the St. Paul emergency department. This included managing the nurse practitioners and physician assistants. In particular, I was responsible for ensuring that monthly work schedules for the nurse practitioners and physician assistants were prepared in a timely manner and that schedules were set to provide sufficient coverage during each shift. I was also responsible for monitoring each nurse practitioner's and physician assistant's job performance and for providing them with feedback and counseling about their work, including the quality of patient care, teamwork, organizational skills and professional development. In addition, I evaluated each nurse practitioner's and physician assistant's performance on an annual performance and made final recommendations regarding merit increases, if any. If disciplinary counseling related to on-the-job conduct was called for, I was responsible for investigating the matter and providing the counseling to the employee as appropriate, e.g. performance. Although EmCare, through EmCare of Texas, provided me with some resources to use with my staff, I was not required to use all of the resources or to adopt all of the policies or practices set forth in the materials, nor did I do so.

4. While I was employed by Texas EM-I, I hired nurse practitioners and physician assistants. At my request, EmCare, through EmCare of Texas, would provide me with the names of several qualified candidates to interview. After interviewing them and selecting the individuals I wished to hire, I presented these individuals to St. Paul's credentialing committee

for approval.  While I was employed by Texas EM-I, June Belt was employed by Texas EM-I to work as a nurse practitioner in the emergency department at St. Paul.

5.      In March 2001, St. Paul University Hospital entered into an agreement with ERDocs for ERDocs to provide all of St. Paul's emergency department services effective September 2001.    Prior to this time, I had resigned from my employment with Texas EM-I and incorporated ERDocs, P.A.    In anticipation of providing services to St. Paul on behalf of ERDocs, I executed an agreement with Healthcare Administrative Services Inc. ("HASI"), a subsidiary of EmCare, Inc., for HASI to provide ER Docs with certain administrative and billing support to assist ER Docs in fulfilling its contractual obligations to St. Paul.  A true and correct copy of this Agreement is attached hereto as Tab 1.

6.      ERDocs also executed an agreement with Texas EM-I Medical Services, P.A. under which Texas EM-I agreed to provide part-time nurse practitioners and physician assistants to staff the St. Paul emergency department. A true and correct copy of this Agreement is attached hereto as Tab 2.

7.      In September of 2001, the contract between Texas EM-I and St. Paul ended, and ERDocs took over all responsibilities for staffing the emergency department with nurse practitioners and physician assistants.  ERDocs did so on an independent contractor basis, and executed independent contractor agreements with the nurse practitioners and physician assistants in the department, including June Belt.  A true and correct copy of this Agreement is attached hereto as Tab 3.

8.      I was responsible for negotiating all terms and conditions of the independent contractor agreements with the nurse practitioners and physician assistants and was the final decision-maker with respect to the final contracts executed.    I am solely responsible for retaining, compensating, supervising, and terminating the services of nurse practitioners and

3

DECLARATION OF DAVID J. PILLOW, Jr., M.D.

# MANAGEMENT SUPPORT SERVICES AGREEMENT

This Agreement is made and executed on this 4 day of April, 2001 by and between HEALTHCARE ADMINISTRATIVE SERVICES, INC. (the "Administrative Company"), and ST. PAUL ERDOCS, P.A. ("Physician Group"), a Texas professional association.

## WITNESSETH

WHEREAS, Administrative Company provides management and administrative support services as more fully described herein to physicians, professional corporations, and other professional health care entities and individuals;

WHEREAS, Physician Group is in need of management and administrative support services for its operations, and desires for Administrative Company to provide such services to the Physician Group in connection with the Physician Group's contract ("Medical Center Contract") for the provision of services ("Contract Services") at St. Paul Medical Center ("Medical Center");

WHEREAS, Administrative Company desires to enter into an agreement to provide for the Physician Group such support services as are reasonably necessary and appropriate for the Physician Group's business operations and the provision of Contract Services by the Physician Group, in return for certain consideration;

**NOW, THEREFORE,** in consideration of the mutual agreements, covenants and conditions set forth herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**I.**    **Term and Termination.**

   **A.**    **Initial and Renewal Terms.** This Agreement shall be effective as of September 1, 2001 (or such earlier date as the parties may agree upon and designate in writing), for an initial period of three (3) years therefrom ("Initial Term"), and shall be automatically renewed for additional three (3) year periods thereafter; subject, however, to Section I.B hereof.

   **B.**    **Termination.** This Agreement may be terminated as follows:

      **1.**    **Without Cause.** After the Initial Term of this Agreement by either party at any time by providing the other party with ninety (90) days prior written notice.

      **2.**    **Certain Breaches.** Immediately by Administrative Company in the event the Physician Group shall fail to meet any of the qualifications set forth in Section III.A hereof.

      **3.**    **Other Breaches.** By either party in the event of material breach, in the event that the material breach is not cured within thirty (30) days following provision of written notice specifying the nature of the breach of a material duty or material obligation under this Agreement.



EXHIBIT

Tab C-1

04/32/01

4.    **Termination of Medical Center Contract**. Immediately by either party in the event the Medical Center Contract is terminated or not renewed for any reason.

C.    **Effects of Termination.**  Upon termination of this Agreement, as hereinabove provided, neither party shall have any further obligations hereunder except for (i) obligations accruing for services rendered prior to the date of termination, and (ii) obligations, promises, or covenants set forth herein that are expressly made to extend beyond the Term.

**II.    Responsibilities of Administrative Company.**  Administrative Company covenants and agrees with the Physician Group as follows:

A.    **Physician Recruitment.**    Administrative Company shall recruit physician candidates sufficient in number and qualifications to enable the Physician Group to provide Contract Services at Medical Center and shall present such candidates to the Physician Group for approval and retention by the Physician Group.   The proposed compensation rates and qualifications of each Physician candidate presented to the Physician Group shall be reasonable under the circumstances, taking into consideration market conditions, recruiting deadlines and the requirements of the Medical Center Contract.  Physicians approved and retained by Physician Group shall be referred to as "Physicians" for purposes of this Agreement.

B.    **Physician Scheduling.**  Administrative Company shall coordinate the schedule for Physicians to provide Contract Services at Medical Center.

C.    **Credentialing.**   Administrative Company shall collect and forward to the Physician Group all appropriate credentials documents and information for each physician candidate recruited by Administrative Company, presented by Administrative Company to Physician Group for approval and retention, and presented for ultimate credentialing by the Medical Center.

D.    **Annual Budget.**  Administrative Company shall prepare an operating budget for the Medical Center Contract for each fiscal year ("Annual Budget"), setting forth an estimate of the operating revenues and expenses associated with the provision of Contract Services. Administrative Company shall use prudent and reasonable efforts to perform its duties and obligations under this Agreement in a manner that is conducive to the Physician Group's operation within its Annual Budget.

E.     **Physician Compensation Reports.**  Administrative Company shall provide to Physician Group each month during the term of this Agreement a report detailing the appropriate compensation payable to each Physician providing services at Medical Center for the previous month.  Such report shall set forth total compensation payable to each Physician, including the Medical Director fee, based upon a compensation formula agreeable to Physician Group.

F.    **Accounting and Financial Records.**  Administrative Company shall establish and administer accounting procedures, controls and systems for the development, preparation and safekeeping of financial records and books of accounts relating to the provision of Contract Services. Administrative Company shall prepare and make available to the Physician Group monthly statistical and financial reports in such forms and formats as shall be mutually agreed upon by the parties.

04/02/01

G. **Expenses**. The following costs and expenses shall be the responsibility of Administrative Company, and shall not be payable from the Physician Group Account (as defined herein) except to the extent such costs may be construed as included with the Management Services Fee payable to Administrative Company:

1. **Administrative Personnel.** Salaries, wages, fringe benefits, any applicable Federal and State payroll taxes and other compensation and costs of administrative personnel retained by Administrative Company for the provision of the administrative functions set forth in this Agreement.

2. **Physician Recruiting and Scheduling.** Costs and expenses incurred by Administrative Company in connection with physician recruiting and scheduling, excluding travel expenses. Such costs and expenses do not include Physician Group physician or other Physician Group personnel compensation, salaries, wages, fringe benefits and payroll taxes, which shall be the responsibility of Physician Group.

3. **Financial Reports.** Costs and expenses incurred by Administrative Company in connection with preparing and maintaining all financial and accounting records required under this Agreement.

H. **Financing**. In recognition of the fact that the Contract Services may initially result in losses or cash flow shortages, Administrative Company agrees to advance funds into the Physician Group Account from time to time in order that Physicians Group may meet its financial obligations under its Agreement with the Medical Center. The loan amounts and repayment terms shall be as set forth in the Financial Assistance Agreement between the parties dated April __, 2001.

I. **Other Support Systems**. Administrative Company shall provide the following additional support systems:

1. **Handbooks/Guidelines.** Administrative Company shall provide Physician Group with access to handbooks and notebooks utilized by EmCare, Inc. and its various related and contractual affiliates. Such materials include the Best Practice Pathways, Advanced Nurse Triage Protocols and Medical Director Project Handbook.

2. **Operational Programs.** Administrative Company shall provide Physician Group with the opportunity to participate in the various operations assessment and improvement programs offered by EmCare, Inc., including customer service training, patient flow studies and quality improvement programs.

3. **Medical Leadership Programs.** Physician Group shall be entitled to send a participant, at Physician Group's expense, to the annual Leadership Training Course for Medical Directors hosted by EmCare, Inc. as well as the Regional Leadership courses hosted by EmCare, Inc.

4. **Internet Physician Education Programs.** Administrative Company shall provide Physician Group with access to the internet physician

**ST. PAUL 0022**

education programs of EmCare, Inc., which access shall be provided at the standard discounted rate available to physicians under contract with affiliated or managed entities of EmCare, Inc.

**J.** **Accounts Payable.** The Administrative Company shall monitor billing expenses, Physician compensation and such other expenses as may be associated with the provision of Contract Services at Medical Center. To facilitate payment of these expenses, Physician Group hereby expressly authorizes Administrative Company to withdraw and disburse funds from the Physician Group Account (as defined herein) to pay such expenses on behalf of the Physician Group in the manner and in the priority agreed upon by the parties.

**K.** **Insurance.** Upon request by Physician Group, the Administrative Company shall assist Physician Group with obtaining professional liability insurance coverage for the physicians contracting with Physician Group in such amounts and on such terms as would satisfy Physician Group's obligations under paragraph III.G of this Agreement.

**III.** **Covenants of the Physician Group.** The Physician Group covenants and agrees with Administrative Company as follows:

**A.** **Qualifications.** The Physician Group, being a professional association created under Texas law, shall at all times during the Term (i) be and remain legally organized to operate a medical practice and to provide Contract Services in a manner consistent with all State and federal laws; and (ii) be duly authorized to conduct business in the State of Texas.

**B.** **Confidentiality Agreements.** At the request of Administrative Company, Physician Group shall enter into any reasonable and appropriate software confidentiality and/or licensing agreements for products utilized by Physician Group or by Administrative Company on behalf of Physician Group, shall abide by all restrictions set forth therein, and shall require Medical Center to comply with all such software licensing agreements, terms, conditions and restrictions. Physician Group recognizes and agrees that the handbooks and other written material provided to Physician Group pursuant to paragraph II.I of this Agreement are proprietary material of EmCare, Inc. and agrees to treat such information in a confidential manner and abide by all copyright restrictions applicable to such material.

**C.** **Billing/Coding Services.** Physician Group shall enter into a billing services agreement with a mutually acceptable company qualified to perform billing and coding services for services rendered by Physicians in connection with the Medical Center Contract. Physician Group shall obtain and maintain, and hereby represents and warrants to Administrative Company that it has, the exclusive right to bill and collect for all physician professional services rendered in the Medical Center Emergency Department.

**D.** **Medical Director.** The Physician Group shall appoint a physician to serve as the Medical Director of the Physician Group, who shall be responsible for the overall supervision of all physicians retained by the Physician Group to provide Contract Services in the Medical Center's Emergency Department. The Medical Director shall be the primary representative for Physician Group in its dealings with the Administrative Company.

**E.** **Physician Group Account.** Physician Group shall obtain and maintain a bank account at a financial institution mutually agreeable to the parties, and shall sign all documentation necessary to ensure that all funds collected for Contract Services rendered at Medical Center shall be deposited into a bank account wholly owned by Physician Group and

**ST. PAUL 0023**

swept on a daily basis into another bank account wholly owned by Physician Group, but accessible by Administrative Company under the terms of this Agreement ("Physician Group Account").

**F.**     **Provision of Emergency Department Medical Services.**  Physician Group shall provide Emergency Department Medical Services to the Medical Center at such times and in such manner as may be required pursuant to the Medical Center Contracts.  Nothing in this Agreement is intended or shall be construed to allow Administrative Company to exercise control or direction over the manner or method by which Physician Group or its Physicians perform Emergency Department Medical Services or other professional healthcare services.  The rendition of all Emergency Department Medical Services, including, but not limited to the prescription or administration of medicine and drugs, shall be the sole responsibility of Physician Group and its Physicians, and Administrative Company shall not interfere in any manner or to any extent therewith.  Nothing contained in this Agreement shall be construed to permit Administrative Company to engage in the practice of medicine, it being the sole intention of the parties hereto that the Emergency Department Medical Services required under the Medical Center Contracts are to be rendered by Physician Group under the terms of this Agreement.

**G.**     **Insurance.**  Physicians Group shall obtain for Physicians, or require Physicians to obtain, professional liability insurance coverage identical to that described in the Independent Contractor Physician Agreement attached to this Agreement as Exhibit A, and shall require the Physicians to agree to the insurance covenants contained therein.

**H.**     **Physician Contracts.**  Physician Group shall require Physicians to execute physician agreements which are substantially similar to the sample agreement attached as Exhibit A, with reasonable revisions approved by competent legal counsel retained by Physician Group.

**I.**  .  **Compliance With Laws.**  Physician Group shall at all times operate under this Agreement in compliance with applicable federal and state laws and regulations.

**IV.**     **Compensation and Disbursement of Funds.**

**A.**     **Compensation.**    For the services furnished by Administrative Company hereunder, the Physician Group agrees to pay to Administrative Company an annual Administrative Support Services Fee in the amount of One Hundred and Fifty Thousand Dollars ($150,000), payable in monthly payments of Twelve Thousand Five Hundred Dollars ($12,500) upon receipt of invoice from Administrative Company.  The compensation payable under this paragraph is comprised of the following:

1.     **Compensation for Administrative Services.**  One Hundred Twenty Five Thousand Dollars ($125,000) annually for the administrative services furnished by Administrative Company hereunder.

2.     **Compensation for Financing Services.**  Twenty Five Thousand Dollars ($25,000) annually for the financial assistance services furnished by Administrative Company, as more fully set forth in the Financial Assistance Agreement.

**V.**     **Exclusivity of Arrangement.**

**ST. PAUL 0024**

**A.    Exclusivity.**   The parties recognize and agree that Administrative Company expends substantial resources and efforts in providing and refining services such as those set forth in this Agreement. The parties further recognize that, during the course of this Agreement both Administrative Company and Physician Group will be exposed to the other party's confidential methods of doing business. Therefore, during the term of this Agreement and for a period of twelve (12) months thereafter, Physician Group will not, either directly or indirectly, independently or in connection with any affiliated entities or nonaffiliated third parties, arrange for or provide emergency department management or administrative services of the type included in this Agreement at Medical Center or any client of Administrative Company or any affiliate or managed entity of EmCare, Inc., other than through Administrative Company. For purposes of this paragraph only, the term Physician Group shall include the Physician Group and any affiliated or related entity as well as any of their owners, stockholders, officers, directors, employees or contracted physicians.

**B.    Scope of Restrictions.**   In the event that the provisions of this Paragraph V.A. should ever be deemed to exceed the time or geographic limitations or any other limitations permitted by applicable law in any jurisdiction, then such provision shall be deemed reformed to provide the maximum restrictions permitted by applicable law.

**C.    Remedies.** Administrative Company and Physician Group acknowledge that the restrictions contained herein are reasonable and necessary in order to protect the parties' legitimate interests. Administrative Company and Physician Group therefore acknowledge and agree that, in the event of any violation thereof, the non-violating party shall be authorized and entitled to obtain, from any court of competent jurisdiction, injunctive relief, which rights and remedies shall be cumulative in addition to any other rights or remedies to which the non-violating party may be entitled.

**VI.    Miscellaneous.**

**A.    Independent Relationship.** It is mutually understood and agreed that the Physician Group and Administrative Company, in performing their respective duties and obligations under this Agreement, are at all times acting and performing as independent contractors with respect to each other, and nothing in this Agreement is intended nor shall be construed to create an employer/employee relationship or a joint venture relationship, or to allow Administrative Company to exercise control or direction of any nature, kind, or description over the manner or method by which the Physician Group or any physician performs Contract Services.

**B.    Notices.**   Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, or delivered by guaranteed, independent overnight delivery addressed as follows:

Physician Group:                    David Pillow, M.D.
                                    St. Paul ERDocs, P.A.
                                    5332 Wateka Drive
                                    Dallas, Texas  75209-5512


Administrative Company:             1717 Main Street
                                    Dallas, Texas 75201

**ST. PAUL 0025**

04/02/01

Attention: President

or to such other address, or to the attention of such other person or officer, as either party may by written notice designate.

**C.**     **Indemnification.**

1.     Notwithstanding any other provision in this Agreement, both parties to this Agreement agree to comply with all applicable provisions of federal, state and local statutes, rules and regulations including, but not limited to, anti-fraud and abuse and anti-kickback statutes.  Each party shall remain responsible for repayment of any funds incorrectly received by that party by any third party payer.

2.     Administrative Company shall indemnify Physician Group from any and all liability, loss or damages including attorneys' fees penalties, fines, and expenses related to any action, including any investigation by the Department of Health and Human Services or any State Agency, arising out of a breach of Section VI.C.1 with respect to the administrative and management services provided by Administrative Company under this Agreement.   Nothing contained herein shall relieve Physician Group of any obligation to return or refund any overpayments incorrectly received by any third party payer.

3.     Physician Group shall indemnify Administrative Company from any and all liability, loss or damages including attorneys' fees penalties, fines, and expenses related to any action, including any investigation by the Department of Health and Human Services or any State Agency, arising out of a breach of Section VI.C.1 with respect to Physician Group's obligations under this Agreement.

**D.**     **Assignment No Benefit to Others.**  Except as may be herein specifically provided to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors, and assigns; provided, however, that neither party shall assign their rights and obligations under this Agreement without the prior written consent of the other party.

**E.**     **Waiver of Breach.** The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or another provision hereof.

**F.**     **Gender and Number.**  Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

**G.**     **Additional Assurances.**  Except as may be herein specifically provided to the contrary, the provisions of this Agreement shall be self-operative and shall not require further agreement by the parties; provided, however, at the request of any party, any other party shall execute such additional instruments and take such additional acts as are reasonable and as the requesting party may deem necessary to effectuate this Agreement.

**ST. PAUL 0026**

H.    **Consents, Approvals and Exercise of Discretion.** Except as may be herein specifically provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party, or any party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed, and such discretion shall be reasonably exercised.

I.    **Force Majeure.** No party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed to result, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by any party's employees, or any other similar cause beyond the reasonable control of any party.

J.    **Severability.** In the event any provision of this Agreement is held to be invalid, illegal, or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall not affect the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms. Moreover, the parties agree to re-negotiate any such term or provision in good faith in order to bring such term or provision into compliance with the applicable laws or regulations.

K.    **Divisions and Headings.** The division of this Agreement into articles, sections, and subsections and the use of captions and headings in connection therewith are solely for convenience and shall not affect in any way the meaning or interpretation of this Agreement.

L.    **Amendments.** This Agreement and amendments thereto if any require the mutual consent of the parties and shall be in writing and executed in multiple copies. Each multiple copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

M.    **Entire Agreement.** With respect to the subject matter of this Agreement, this Agreement supersedes all previous contracts and constitutes the entire agreement between the parties. Neither party shall be entitled to benefits other than those specified herein. No oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and no changes in or additions to this Agreement shall be recognized unless mutually agreed to by the parties and incorporated herein by amendment as provided herein, such amendment(s) to become effective on the date stipulated in such amendment(s). The parties specifically acknowledge that, in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.

N.    **Third Party Beneficiary Rights.** No third party beneficiary right exists under this agreement with respect to any patient, the Medical Center, or any other non-party to this Agreement.

O.    **Changes In Law.** If any statute, rule or regulation is passed or any order issued or any statute or guideline adopted which materially increases the cost to Administrative Company of providing administrative services hereunder or materially alters the best intent of this Agreement, Administrative Company and Physician Group will mutually agree on additional compensation, if any, to be paid by Physician Group to Administrative Company as a result of such changes. Should the parties fail to reach agreement as to the amount of such additional

ST. PAUL 0027

## MID-LEVEL PRACTITIONER SERVICES AGREEMENT

This Mid-Level Practitioner Services Agreement ("Agreement") is made and entered into this _2o_ day of July, 2001, by and between ST. PAUL ERDOCS, P.A. ("ERDocs") and TEXAS EM-I MEDICAL SERVICES, P.A. ("Company").

### WITNESSETH

WHEREAS, ERDocs is a professional association which has entered into an emergency department services agreement ("ED Agreement") with St. Paul Medical Center ("Hospital") pursuant to which ERDocs is obligated to provide physicians and other mid-level practitioners ("MLP's") to provide coverage in the Hospital emergency department ("Emergency Department");

WHEREAS, Company employs MLP's and other healthcare professionals;

WHEREAS, ERDocs desires for Company to provide, and Company is willing to provide, MLP's to provide a portion of the services ERDocs is obligated to provide at Hospital.

NOW THEREFORE, in consideration of the forgoing premises and mutual covenants herein contained, the parties agree as follows:

I.  MLP'S COVERAGE

   1.1   Upon request by ERDocs with reasonable advance notice, Company shall provide MLP's to render professional medical services in Hospital's Emergency Department, which MLP's shall at all times while providing services hereunder be licensed to provide professional services in the Emergency Department.

   1.2   Company will contractually obligate MLP's to use their best efforts to perform professional medical services in accordance with this Agreement and with the schedule of coverage created by ERDocs and agreed upon by Company, to observe and comply with the Medical Staff Bylaws, the Rules and Regulations, Department Rules and Regulations, policies and procedures of Hospital, to participate in a corporate compliance policy and to adhere to all laws and regulations, including but not limited to those laws pertaining to confidentiality and patient rights, referrals of healthcare patients and/or business, and the Emergency Medical Treatment and Active Labor Act ("EMTALA").

II.  COMPENSATION FOR SERVICES OF COMPANY MLP'SS



EXHIBIT

Tab C-2

2.1  MLP's shall receive no compensation from ERDocs or Hospital under this Agreement. Company is solely responsible for the compensation of MLP's, which compensation may include, but is not limited to professional fees, benefits and other costs and expenses relating to such participation hereunder.

2.2  In consideration of the services provided by Company and the Company MLP's hereunder, ERDocs agrees to pay to Company the sum of Fifty Five Dollars and Fifty Cents ($55.50) per hour of coverage provided by MLP's pursuant to this Agreement, such amount to be paid by ERDocs on or before the 10th day of the month following the month in which such coverage was provided. Company shall provide an invoice to ERDocs setting forth the amount owed to Company, which ERDocs shall pay within 30 days of receipt.

2.3  ERDocs shall have responsibility for, and shall directly pay Hospital in a timely manner for, any and all of the Hospital medical staff fees and dues of Company MLP's providing services under this Agreement.

III.  INSURANCE

3.1  Company shall obtain for MLP's professional liability insurance coverage solely for claims arising out of the provision of services at the Emergency Department pursuant to the terms of this Agreement. Such insurance shall have coverage limits of One Million Dollars ($1,000,000) per loss event and Three Million Dollars ($3,000,000) in the aggregate annually. In the event this insurance is provided on a claims made basis, Company shall arrange for such coverage to remain in effect for a period equal to the longest applicable statute of limitations or purchase extending reporting period insurance.

IV.  INDEPENDENT STATUS OF PARTIES

4.1  In the performance of duties and obligations hereunder, no employee or agent of either party shall, for any purpose, be deemed to be an agent, servant or employee of any other party.

4.2  Company and MLP's understand and agree that: (i) Company MLP's will not be treated as employees or contractors of ERDocs for federal income tax purposes; (ii) ERDocs will not withhold on behalf of Company or MLP's pursuant to this Agreement any sums for income tax, unemployment tax, unemployment insurance, social security, or any other withholdings pursuant to any law or requirement of any governmental body relating to ERDocs and/or its residence or make available to Company or MLP's any benefits afforded to employees of ERDocs; (iii) all such payments, withholdings and benefits, if any, are the sole

07/19/01

responsibility of Company; (iv) Company shall comply with all applicable laws ·with respect to the organization and operation of its business, including but not limited to ERISA, OSHA, federal and state equal employment opportunity laws and regulations, EMTALA, and federal and state healthcare laws and regulations.

4.3    ERDocs and Company agree that the benefits to Company and to ERDocs hereunder do not require, are not payment for, and are not in any way contingent upon referrals or admissions to or from any healthcare provider or any other arrangement for the provision of any healthcare item or service.

V.    <u>CONFIDENTIALITY</u>

Neither Company, MLP's nor their employees or agents shall at any time during or after the term of this Agreement, without the prior written consent of the appropriate party, either directly or indirectly divulge, disclose or communicate in any manner whatsoever to any person not employed or affiliated with such party: (a) any confidential information, including, but not limited to, patient information and information regarding quality assurance, risk management and peer review activities; and (b) any confidential or proprietary information concerning any matters affecting or relating to the business or operations or future plans of such party, or any of its affiliates, including, but not limited to, policies, procedures, rules, regulations, and protocols.  This paragraph, however, shall not prohibit or restrict the divulgence, disclosure, or communication made pursuant to an order of a court of competent jurisdiction, or disclosures in sworn affidavits, depositions or other testimony required by law.   This confidentiality provision shall survive termination of this Agreement.

VI.    <u>ASSIGNMENT</u>

This Agreement shall not be assigned or subcontracted by either party without the prior written approval of the other party.

VII.    <u>GOVERNING LAW</u>

This Agreement shall be construed under and enforced in accordance with the laws of the State of Texas (excluding its choice of law provisions), and it shall be construed in a manner so as to conform with all federal, state and local laws and regulations.

VIII.    <u>SEVERABILITY</u>

**ST. PAUL 0015**

07/19/01

Should any provision(s) of this Agreement be held invalid, unlawful or unenforceable, the validity of any other provision(s) of this Agreement or this Agreement as a whole shall not be affected.

IX.   HEADINGS

Headings used in this Agreement are solely for the convenience of the parties and shall be given no effect in the construction or interpretation of this Agreement.

X.   WAIVER

No waiver of any breach shall be valid or binding unless approved in writing by the non-breaching party.  All remedies afforded in this Agreement shall be taken and construed as cumulative to every other remedy provided hereby or at law.

XI.   NOTICE

All notices under this Agreement shall be in writing and delivered by hand or deposited, postage prepaid, in first-class U.S. mail, registered and return receipt requested, addressed as follows or to such other address as a party may designate in accordance with this Section XI:

> If to ERDocs:
>
> David Pillow, M.D.
> St. Paul ERDocs, P.A.
> 5332 Wateka Drive
> Dallas, Texas  75209-5512
>
> If to Company:
>
> Texas EM-I Medical Services, P.A.
> 1717 Main Street, #5200
> Dallas, Texas  75201
>
> With a copy to:
>
> EmCare, Inc
> 1717 Main Street
> Dallas, Texas 75201
> Attn:  Legal Department

XII.   RECORDS RETENTION

Until the expiration of four (4) years after the furnishing of services under this Agreement, either party shall make available to the other, the Secretary of Health and Human Services, the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement and such of their books, documents

ST. PAUL 0017

07/19/01

and records as are necessary to verify the nature and extent of costs incurred by ERDocs with respect to such services for which payment may be made under Title XVIII or Title XIX of the United States Social Security Act.

XIII.   TERM AND TERMINATION

13.1   The term of this Agreement shall be three (3) years commencing September 1, 2001, and shall be automatically renewed for additional one (1) year periods unless terminated as set forth herein.

13.2   This Agreement may be terminated at any time upon written mutual consent of the parties.

13.3   This Agreement may be terminated by either party by providing the other party with written notice that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default is not cured within thirty (30) days following the giving of such written notice.

13.4   This Agreement may be terminated immediately by ERDocs upon termination of the ED Agreement.

13.5   This Agreement may be terminated immediately by Company upon termination of the Management Support Services Agreement between ERDocs and Healthcare Administrative Services, Inc.

XIV.   ENTIRE AGREEMENT AND AMENDMENTS

This Agreement contains the final and entire agreement between the parties, and they shall not be bound by any terms, conditions, statements or representations, oral or written, not herein contained or contained in a written amendment of this Agreement executed by the parties hereto. This Agreement may be amended only by written agreement executed by the parties.

XV.   NAME USE

Without a party's written permission, no other party shall use the name of that party or any of its tradenames in any advertising or publication.

XVI.   GOVERNMENT ACCESS

Until the expiration of four years after the furnishing of services pursuant to this Agreement, ERDocs and Company shall make available, upon written request, to the Secretary of the Department of Health and Human Services, or upon request to the Comptroller General, or any other duly authorized representatives, this Agreement, and books, documents and records that are necessary to certify the

07/19/01

nature and extent of the costs incurred by any Health Center with respect to the services furnished by ERDocs or Company hereunder in accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-499). Should the foregoing provision of OBRA 90 be deemed inapplicable to this Agreement, this paragraph shall be of no force and effect.

IN WITNESS WHEREOF, and in agreement hereto, ERDocs and Company have caused this Agreement to be executed in their respective behalf by their authorized representatives.

TEXAS EM-I MEDICAL SERVICES, P.A.

By:_____     Date of execution:__7|23|0 1_____

ST. PAUL ERDOCS. P.A.

By:__David J Pillow MD.__     Date of execution:__7/20/01_____

06/30/01

*Belt*

# INDEPENDENT CONTRACTOR PHYSICIAN AGREEMENT

This Independent Contractor Physician Agreement ("Agreement") made and entered this 1st day of August, 2001 by and between Saint Paul ERDocs, PA ("Group") and June Belt, NP ("Mid-level Practitioner");

## WITNESSETH:

WHEREAS, Group has prior to the date hereof contracted to provide licensed physicians for professional medical services at **Saint Paul Medical Center** ("Health Care Entity" or "HCE"), and

WHEREAS, "Mid-Level Practitioner" is licensed by the State of Texas to practice medicine and is desirous of contracting with Group as an independent contractor to provide a portion of such professional medical services,

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, it is agreed as follows:

1. <u>Mid-level Practitioner Representations</u>. Mid-level Practitioner hereby states that she is, and during the Term hereof, will continue to be a Mid-level Practitioner with a valid and unrestricted license to practice medicine in the state of Texas, Mid-level Practitioner further states that she has accurately and completely provided Group with all requested information on her professional background, including but not limited to, her professional liability claims history, professional disciplinary actions or restrictions. Mid-level Practitioner also hereby states that she is not currently the subject of any professional disciplinary proceeding of, or restriction imposed by, any governmental authority or health care entity in any jurisdiction, and that she is not currently excluded from providing services under Medicare, Medicaid, or any other governmental health care program or managed care plan. Mid-level Practitioner agrees to notify Group promptly in writing of any material changes to the foregoing statements.

2. <u>Mid-level Practitioner Duties</u>.

   A. Mid-level Practitioner shall perform the following services:

      1. Mid-level Practitioner agrees to provide professional medical services at HCE for an average of 36 hours per week, 50 weeks per year.

      2. Mid-level Practitioner agrees to coordinate her hours of coverage with the hours of coverage of other contract Mid-level Practitioners providing emergency services at HCE;



**EXHIBIT**
_Tab C-3_

06/30/01

3.  Mid-level Practitioner shall provide professional medical services and prepare medical records (which shall remain the property of the HCE) in strict accordance with (i) all legal requirements, (ii) all bylaws, rules, and regulations of the HCE, and (iii) all standards of care and ethics of the medical community in which the HCE is located;

4.  Mid-level Practitioner agrees to promptly complete any paperwork necessary to assign any payments for services provided by Physician hereunder to any entity designated by Group.

5.  Mid-level Practitioner shall obtain and retain medical staff membership with appropriate clinical privileges at HCE.  The Mid-level Practitioner agrees and understands that, the medical staff privileges obtained through this agreement are predicated and contingent upon HCE's contractual relationship with Group, and Group's subsequent relationship with Mid-level Practitioner. Therefore, upon termination of this Agreement, regardless of cause, Mid-level Practitioner relinquishes without recourse any medical staff membership and privileges at HCE obtained as a result of this Agreement; provided however, that this paragraph shall not result in the loss of medical staff membership and privileges obtained prior to the effective date of this Agreement.

3.  <u>Relationship of Parties</u>.  This Agreement shall in no way be construed to mean or suggest that Group is engaged in the practice of medicine, nor shall anything herein be construed to restrict Mid-level Practitioner duties and obligations under applicable law or to her patients. Group shall not exercise control of any nature, kind or description, relating to the manner or means in which Mid-level Practitioner performs medical services or makes medical decisions. The relationship between Group and Mid-level Practitioner pursuant to this Agreement shall be that of independent contractor.

4.  <u>Term and Termination</u>.  The Term of this Agreement shall begin as of September 1, 2001, and shall continue for a period of one (1) year; thereafter, this Agreement shall be automatically renewed for successive periods of one (1) year each, unless terminated as provided herein.

A. Either party may terminate this Agreement at any time by providing the other party with ninety (90) days prior written notice; provided, however that in the event this Agreement is terminated pursuant to this paragraph 4.b within the first twelve (12) months of the Agreement, then the parties shall not enter into an agreement for similar services for a period of one (1) year following the effective termination date.

B. Group may terminate this Agreement immediately upon written notice to Mid-level Practitioner for Good Cause.  For the purposes of this paragraph 4.c, the term "Good

**ST. PAUL 0002**

Cause" shall mean:

1. Any misrepresentation or omission by Mid-level Practitioner in connection with application for medical staff membership or privileges at Hospital;

2. Mid-level Practitioner's failure to complete any paperwork and/or documents requested by Group in order for Group to receive compensation for the services of Mid-level Practitioner provided hereunder;

3. The occurrence of any event which results in the representations of Mid-level Practitioner contained in paragraph one of this Agreement being inaccurate or incorrect in any respect;

4. HCE informs Group that Mid-level Practitioner is no longer permitted to provide services at HCE;

5. Group's contract to provide services at HCE is terminated or expires; or

6. Mid-level Practitioner fails to provide services specified herein in a competent and professional manner.

C. Either party may terminate this Agreement without prejudice to any other legal rights to which the terminating party may be entitled, upon default by the other party in performance of any provision of this Agreement, if such default is not cured within ten (10) days following written notice of such default to such other party.

While Group shall use reasonable efforts to provide Mid-level Practitioner with the hours of coverage set forth in paragraph 2.A of this Agreement during the period that this Agreement remains in effect, Group does not guarantee Mid-level Practitioner any amount of duty hours or level of income under this Agreement, and the termination of this Agreement by Group shall not require Group to pay any sums other than those earned by Mid-level Practitioner for services previously rendered but not yet paid.

5. <u>Mid-level Practitioner Fee</u>. On or about the twentieth (20th) day of each month following the month that services were performed, Group shall pay to Mid-level Practitioner an amount equal to $52.75 per hour of coverage provided by Mid-level Practitioner at HCE during the subject month.

6. <u>Professional Liability Insurance</u>.

A. Mid-level Practitioner hereby agrees to obtain and maintain professional liability insurance with an insurance carrier reasonably acceptable to Group, which insurance shall have per physician limits of One Million Dollars ($1,000,000.00) per occurrence, Three Million Dollars ($3,000,000.00) in the aggregate annually. The insurance coverage required under this paragraph 6 shall be maintained on either an occurrence basis or a claims-made basis. If the insurance coverage is provided on a claims-made basis, Mid-level Practitioner hereby agrees that not less than ten (10) days prior to the effective date of either termination of this Agreement or termination of insurance coverage by Mid-level Practitioner's current carrier, Mid-level Practitioner shall either: i) purchase tail coverage in the above-stated amounts with a carrier and in a form acceptable to Group for all claims arising out of incidents

ST. PAUL 0003

06/30/01

occurring prior to the applicable termination date; or ii) purchase and maintain insurance coverage in the above-stated amounts with a carrier and in a form acceptable to Group for all claims arising out of incidents occurring prior to the applicable termination date. The insurance required under this paragraph 6A(i) and 6A(ii) shall be maintained for a period equal to or exceeding the longest statute of limitations (including any tolling periods) period applicable to services provided by Mid-level Practitioner hereunder.

B. Upon execution of this Agreement and annually thereafter, and upon written request by Group with ten (10) days advance notice, Mid-level Practitioner shall provide Group with a certificate of the insurance coverage (and/or tail coverage) evidencing the insurance coverage required under paragraph 6.A above.

C. Mid-level Practitioner shall obtain the agreement of Mid-level Practitioner's insurance carrier to provide thirty (30) days written notice to Group prior to any cancellation or change in the insurance coverage required under this paragraph 6.

D. If Mid-level Practitioner fails to purchase the insurance coverage required under this paragraph 6 or fails to provide Group with a certificate of same in accordance with the above-stated requirements, Group shall have the right to purchase such coverage and notify Mid-level Practitioner in writing of the total premium costs therefore. Mid-level Practitioner hereby expressly acknowledges and agrees that the total premium cost for such coverage purchased by Group under this paragraph 6 shall be immediately due and payable by Mid-level Practitioner to Group upon Physician's receipt of said notice, and that any and all premium costs unpaid by Mid-level Practitioner may be deducted by Group from Mid-level Practitioner's compensation hereunder.

E. The requirements of this Paragraph 6 shall survive termination of this Agreement for any cause.

7. Payments. Mid-level Practitioner agrees to submit to Group on a monthly basis a Group timesheet detailing the number of hours of coverage provided by Mid-level Practitioner and signed by Mid-level Practitioner. Group shall process such timesheets and pay Mid-level Practitioner in accordance with the Rate of Compensation set forth herein. Group shall not withhold or in any way be responsible for the payment of any federal, state or local income or occupational taxes (including any gross receipts tax), FICA taxes, unemployment compensation or workers' compensation contributions, vacation pay, sick leave, retirement benefits or any other payments for or on behalf of Mid-level Practitioner. All such payments, withholdings and benefits are the responsibility of Mid-level Practitioner and Mid-level Practitioner shall indemnify and hold Group harmless from any and all loss or liability arising with respect to such payments, withholdings and benefits. Except as otherwise specifically provided in this Agreement, each party shall be responsible for any expenses incurred by it in connection with this Agreement.

ST. PAUL 0004

06/30/01

8. Covenant of Non-Interference.

A. Mid-level Practitioner agrees that during the Term of this Agreement, and twenty-four (24) months thereafter, she shall not directly or indirectly induce, persuade (or attempt to induce or persuade) any person or entity (including any HCE) to terminate or breach any contract with Group or any affiliates, subsidiaries, or managed entities thereof.

B. Mid-level Practitioner specifically acknowledges and agrees that (i) the foregoing covenants are commercially reasonable and reasonably necessary to protect the interest Group will acquire in entering into this Agreement, and (ii) her skills and experience qualify her to earn a reasonable living in the area in which she currently resides engaging in activities other than those prohibited by Paragraph 8A.

C. If any court or tribunal of competent jurisdiction shall refuse to enforce any or all of the foregoing covenants because, taken together, they are more extensive (whether as to time limit, geographic area, scope of business or otherwise) than is deemed to be reasonable, it is understood and agreed between the parties hereto that such foregoing covenants shall not be void but that for the purpose of such proceedings the restrictions contained therein (whether as to time limit, geographic area, scope of business or otherwise) shall be deemed to be reduced to the extent necessary to permit the enforcement of such foregoing covenants. The provisions of Section 8 shall survive the termination of this Agreement.

9. Notices. Any and all notices required or permitted to be given to Mid-level Practitioner hereunder shall be sufficient if in writing and hand delivered to Physician or if forwarded by registered or certified mail, return receipt requested, to her then current residence address. Any and all notices required or permitted to be given to Group pursuant to this Agreement shall be sufficient if in writing and forwarded by registered or certified mail, return receipt requested, to the following address: David J. Pillow MD, 5332 Wateka Drive, Dallas TX 75209-5512, with a copy to: 1717 Main St., Suite. 5200, Dallas TX 75201, Attn: Legal Department. Either party may change their address for notices upon written notice to the other party

10. Assignment. Mid-level Practitioner shall not be entitled to assign this Agreement or any of her rights and/or obligations or delegate her duties under this Agreement without the prior written consent of Group. Group shall be entitled to assign this Agreement or its rights and/or obligations or delegate its duties under this Agreement without the consent of Mid-level Practitioner. This Agreement and all of the terms and provisions hereof shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and approved assigns.

11. Waiver. A failure of either party to object to or take affirmative action with respect to any conduct of the other party that is in violation of the terms hereof shall not be construed as a waiver thereof, nor as a waiver of any future breach or subsequent wrongful conduct. The rights and remedies set forth herein are intended to be

**ST. PAUL 0005**

06/30/01

cumulative, and the exercise of any one right or remedy by either party shall not preclude or waive its exercise of any other rights or remedies hereunder or pursuant to law or equity.

12. <u>Remedies</u>.  Mid-level Practitioner agrees that the damages and remedies at law for any breach of Mid-level Practitioner of this Agreement would be inadequate and that, in the event of such a breach, Group may apply to a court of competent jurisdiction and shall be entitled to injunctive relief by such court to prevent a breach or further breach thereof.  Injunctive relief shall be in addition to damages or other relief afforded Group under this Agreement.

13. <u>Governing Law</u>.  The construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of Texas.

14. <u>Miscellaneous</u>. No amendment or modification of this Agreement shall be effective unless executed in writing by the parties hereto.  If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby.  This Agreement constitutes the entire agreement of the parties and is intended as a complete agreement of the promises, representations, negotiations, discussions, and agreements that may have been made in connection with the subject matter hereof, and supersedes any prior oral or written agreement.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The captions or headings are for convenience only and are not intended to limit or define the scope or effect of any provision of this Agreement.

 **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed on the date set forth below.

Saint Paul ERDocs, PA                        June Belt, NP

By _David J. Pillow MD._                  By _June Belt, NP, ACNP_
 President                                      Mid-level Practitioner

**ST. PAUL 0006**



October 8, 2001

June Belt, NP
4905 Thorntree Drive
Plano, TX 75024

Dear Ms. Belt:

Enclosed please find important information regarding your COBRA coverage for the following benefit(s):

> Group Medical/Dental Insurance

Please read this information carefully and return the necessary forms by the deadlines indicated if you wish to continue your coverage. Please remember to enclose a check for all premiums due when you submit the COBRA enrollment forms. All premiums thereafter will be due by the first of each month. *No monthly invoices will be sent to you.*

Also enclosed is your Certificate of Group Health Plan Coverage, which provides evidence of prior health coverage. Please keep this for your records.

Should you not understand the information provided in this packet or you have questions regarding the continuation of your coverage, please feel free to contact me at 800-527-2145 ext. 2413.

Sincerely,

*Cindy Chavez-Garza*

Cindy Chavez-Garza
Human Resources Generalist

enclosures

**ST. PAUL 0007**



**Leader in Physician Practice Management**

## CERTIFICATE OF GROUP HEALTH PLAN COVERAGE

♦ IMPORTANT - This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care, or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.

1.  Date of this certificate:               **October 8, 2001**

2.  Name of group health plan:          **Humana, Inc.**

3.  Name of participant:                 **June Belt**

4.  Identification number of participant:    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

5.  Name of any dependents to whom this certificate applies:    **None**

6.  Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate:

    **Donald L. King**
    **Manager, Compensation and Benefits**
    **EmCare, Inc.**
    **1717 Main Street., Suite 5200**
    **Dallas, TX  75201**

7.  For further information, call:      **(214) 712-2431**

8.  If the individual(s) identified in line 3 and line 5 has at least 18 months of creditable coverage (disregarding periods of coverage before a 63-day break), please check here ___ and skip lines 9 and 10.

9.  Date waiting period or affiliation period (if any) began:      **N/A**

10. Date coverage began:    **January 1, 1999**

11. Date coverage ended:    **August 31, 2001**  (or check if coverage is continuing as of the date of this certificate:  _____ )

NOTE: Separate certificates will be furnished if information is not identical for the participant and each beneficiary.

**ST. PAUL 0008**

# MEMORANDUM

DATE:        October 8, 2001

TO:          June Belt, NP

FROM:        Cindy Chavez-Garza

SUBJECT:     COBRA for Health Insurance Coverage

Due to the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), you may be eligible to continue your group health and dental coverage which ends August 31, 2001. Enclosed is a very important notice summarizing your rights regarding the continuation of that coverage.

If you apply in a timely manner, you will be assured of continuous protection. While you have at least sixty (60) days from the date of this notice or the date coverage is terminated (whichever is later) to make your election, it is suggested that arrangements for continued coverage be made as soon as possible.

If you wish to continue coverage, please complete the attached enrollment materials needed to establish your continued coverage. Any premiums not paid during the election period will be due at the time of your enrollment. Subsequent premiums will be due on the 1st day of each month. Remittance should be made to EmCare. I have enclosed a rate schedule for our current health provider for your information. If premium payments become more than thirty (30) days past due, your COBRA coverage will be terminated. **No monthly invoices will be sent.**

If you have any questions or require further assistance, please do not hesitate to call.

**ST. PAUL 0009**

## IMPORTANT NOTICE TO EMPLOYEES AND DEPENDENTS
## OF CONTINUATION OPTION

If you are married, both you and your spouse should take the time to read this notice carefully.

The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) was passed by Congress in 1986. Under COBRA, when participants (employees and dependents) lose eligibility for health insurance coverage because of the events stated below, the eligible participants may elect to retain group benefits. The continued coverage can remain in effect for 18 or 36 months depending on the reason that eligibility terminated.

Events allowing the 36-month continuation are:

1.  Death of an Employee.
2.  Divorce of an Employee.
3.  Medicare eligible employee (employee becomes eligible for Medicare, leaving dependents without group coverage).
4.  Children who lose coverage due to certain contractual eligibility limitations.

Events allowing the 18-month continuation are:

1.  Loss of coverage due to reduction of employee work hours.
2.  Voluntary employee termination including retirement.
3.  Employee layoff for economic reasons.
4.  Employee discharged, except for gross misconduct.

Who Is Eligible For Continued Coverage?

> Participants covered on the group at the time of the qualifying event are eligible for continued coverage.

How Do The Participants Apply?

> When the qualifying event is loss of coverage due to reduction of working hours or termination of employment, the employee makes the election for continued coverage for all eligible family members. When the qualifying event is the employee's death, divorce or Medicare eligibility, the spouse makes the election for continued group coverage for all eligible family members.

> The eligible participants have at least 60 days from the date of this notice or the date coverage terminates (whichever is later) to give written notice of the desire to continue coverage to the employer. The participants' coverage remains in effect during the election period if the premiums are timely paid.

As long as the premiums are paid on a timely basis, the participants' coverage will continue unless:

1.  The benefit time period expires.
2.  A continued participant becomes covered under another group health plan as either an employee or a spouse.
3.  A continued participant becomes entitled to Medicare benefits.

Benefits for continued participants will be the same as the group's. Rates will be based upon the group's. If a group changes benefits or rates, the participants will receive the new benefits and a new rate.

The law allows the employer to charge you a service fee of up to two percent (2%) of the premium to defray its administrative costs.

A conversion option to an individual health contract may be elected at the expiration of the continued group coverage.

**ST. PAUL 0010**

## COBRA ENROLLMENT FORM
## URGENT

THIS FORM MUST BE RETURNED BY **December 8, 2001** TO:

Cindy Chavez-Garza
EmCare, Inc.
1717 Main Street, Suite 5200
Dallas, Texas  75201

COBRA Participant:_____

SSN: _____

Street Address:_____

City, State, Zip:_____

❑   I elect continuation coverage under COBRA for myself and eligible dependents listed below.  Further, I agree to pay the applicable premium.

| NAME (Last,First, Middle) | Date of Birth | Sex | Social Security Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Are you or any of your eligible dependents covered under another employer-sponsored group health plan?  If so, please specify: _____

The current premiums are as stated below.  If a premium is not stated, please contact an EmCare, Inc. benefits representative at (214) 712-2000.

| Coverage Type | Medium Deductible Plan | Dental Plan |
|---|---|---|
| Single | 270.31 | 23.96 |
| Employee & Spouse | 610.32 | 54.63 |
| Employee & Children | 540.61 | 46.00 |
| Family | 738.76 | 77.63 |

COBRA Health Coverage:

❑ Yes  ❑ No

COBRA Dental Coverage:

❑ Yes  ❑ No

Coverage Type:

❑   Single Only

❑   Employee & Spouse

❑   Employee & Children

❑   Family

I hereby elect continuation coverage as provided by the Consolidated Omnibus Budget Reconciliation Act of 1986.  I further agree to pay any back premiums which may be necessary to reinstate coverage.

_____          _____

Employee's Signature                              Spouse's Signature

_____

Date Signed

**ST. PAUL 0011**



# HUMANA.
1100 Employers Boulevard
Green Bay, WI 54344

## Continuation of Medical/Dental Benefits
## Election Form

**Offered by Employers Health Insurance Company**

**Subject to the terms stated in your Certificate,** Continuation of Medical/Dental benefits may be available for you and/or your covered Dependents. Please refer to the Certificate for terms and limitations. To apply for continuation of Medical/Dental benefits, please complete and return this form to your Employer (or previous Employer, in the event of termination of employment).

Employer Name: _____       Group Number: _____

Employee Name: _____       Social Security Number: _____

Dependent Name: _____       Social Security Number: _____

Your Address: _____

Your Phone Number: (     ) _____

Check the qualifying event that applies to you and indicate the date of the qualifying event in the blank:

❏ Termination.          Last date employed:          _____     ❏ Reduced hours.     Date hours reduced:     _____
❏ Medicare.             Date covered by Medicare:   _____     ❏ Employee's Death.  Date:                  _____
❏ Legal Separation.     Date Legal Separation Filed: _____     ❏ Divorce.           Date Divorce Effective: _____
❏ Dependent Child.      Date Dependent Child ceased              ❏ Other.             (As stated in your Certificate
                        to be an eligible Dependent: _____                          provision for State Continuation) _____

**Employer complete** premium due for coverages. Date form is given to insured _____

|  | Medical | Dental |
|---|---|---|
| Employee Only | _____ /Month | _____ /Month |
| Employee + Spouse | _____ /Month | _____ /Month |
| Employee + Child | _____ /Month | _____ /Month |
| Family | _____ /Month | _____ /Month |

*(Note: Rates are subject to any Employer changes to plan.)* **PREMIUMS MUST BE PAID TO THE EMPLOYER.**

Timely payment of premium is required for the coverage to continue. For the premium due date for State Continuation, please refer to the Continuation provision in your Certificate. For Federal Continuation, the initial premium is due within 45 days after the date Continuation of coverage is elected. Subsequent premiums are due monthly by the _____ of the month. If the Employer does not receive full payment within 31 days of the due date, your coverage will be canceled.

## SIGNATURE OF PERSON ELECTING OR WAIVING CONTINUATION:     ❏ I elect continuation
                                                              ❏ I refuse continuation

Employee: _____          Date: _____

Spouse: _____            Date: _____

Dependent: _____         Date: _____       **ST. PAUL 0012**
(Over Age 19)

## SPOUSE AND DEPENDENT SIGNATURES ARE REQUIRED IF ANY DEPENDENT COVERAGES ARE BEING WAIVED.

If the State Continuation provision applies, a completed form must be returned within 31 days of termination. If the Federal Continuation (COBRA) provision applies, a completed form must be returned within 60 days after or the later of: 1) the date that you would lose coverage, or 2) the date that you are sent notice of your right to elect Cobra Continuation. An election is considered to be made on the date that it is sent to your Employer or plan sponsor. Failure to return form within the specified time may result in the loss of the Continuation privilege.
NOTE: If you are deemed Totally Disabled by the Social Security Administration, send a copy of the notification to our company as you may be entitled to an additional 11 months of coverage. Please call us for more information.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § § | |
| vs. | § § | CIVIL ACTION NO. 6:03-CV-73 |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF WILLIAM C. JERNBERG, M.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1.      My name is William C. Jernberg, M.D.  I am of sound mind, over the age of twenty-one (21), have never been convicted of a felony, and am fully authorized and competent to make this Affidavit.  The facts and statements contained in this Declaration are made on the basis of my personal knowledge and are true and correct.

2.      I am a physician licensed to practice in the State of Texas.

3.      I incorporated Texas EM-I Medical Services, P.A. on January 20, 1998 and am its sole shareholder.

4.      I currently work in the emergency department at Baylor Medical Center at Garland as an employee of Texas EM-I.



EXHIBIT
D

5.      Since its incorporation, Texas EM-I is or has been a party to contracts with various hospitals in Texas, including St. Paul University Hospital in Dallas and East Texas Medical Center Tyler, to provide emergency department services. In addition, Texas EM-I employs or has employed both nurse practitioners and physician assistants to work in the emergency departments of hospitals with which Texas EM-I has or has had contracts to provide emergency department services.

6.      Texas EM-I contracts with EmCare of Texas for the staffing and scheduling of continuous emergency coverage by Texas EM-I's healthcare professionals; however, EmCare of Texas has no authority to require Texas EM-I personnel to work at certain times or for certain hours.

7.      Texas EM-I contracts with EmCare of Texas for its billing and collections; however, Texas EM-I has the exclusive authority to establish the amount of the fees charged for medical services and maintains ultimate control over its accounts and deposits.

8.      Texas EM-I contracts with EmCare of Texas to recruit potential healthcare personnel to be employed by Texas EM-I; however, Texas EM-I maintains the sole discretion to hire or otherwise retain the services of those personnel and to terminate such services.

9.      Texas EM-I maintains responsibility regarding compensation decisions for its healthcare personnel, based on its needs and the applicable market factors.

10.     Texas EM-I maintains exclusive control, supervision, and direction over its employees in the performance of medical services in its emergency departments.

11.     Texas EM-I and EmCare, Inc. have no common stock ownership. In addition, Texas EM-I and EmCare of Texas have no common stock ownership.

**DECLARATION OF WILLIAM C. JERNBERG** – Page 2

12.     Texas EM-I has no business departments; it contracts with other entities to provide administrative support incidental to the provision of medical services.

13.     Texas EM-I's hospital contracts are assets owned by Texas EM-I, not EmCare of Texas or EmCare, Inc.

14.     Texas EM-I observes corporate formalities by keeping separate books and accounts and holding its own separate board meetings.

I hereby declare under penalty of perjury that the statements and facts contained in this Declaration consisting of _four_ (4) pages inclusive are true and correct and are within my personal knowledge.

WILLIAM C. JERNBERG, M.D.