IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 6:03-CV-73 |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § | JUDGE DAVIS |
| Defendants. | § § | |

**DEFENDANTS' EMCARE, INC.'S AND TEXAS EM-I'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, EmCare, Inc. ("EmCare") and Texas EM-I Medical Services, P.A. ("Texas EM-I") (collectively referred to as "Defendants") hereby file their Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment[1] and would respectfully show the Court as follows:

**I.
INTRODUCTION**

Defendants EmCare and Texas EM-I jointly oppose Plaintiffs' Motion for Partial Summary Judgment on several grounds. First, Defendant EmCare disputes that it is or has been

---

[1] Plaintiffs state in their motion for summary judgment motion that the claims of 12 Opt-in Plaintiffs from the State of California have been resolved in connection with a settlement of the California class action. The settlement is contingent upon certain factors, and it is undetermined at this time whether the claims will be resolved in this forum or in a California court. In the event that the contingencies related to this settlement are not met, Defendants reserve the right to respond to any motion for summary judgment regarding these claims, or to the extent that the Court construes this Motion to include the claims of the California Opt-in Plaintiffs, to supplement their response with evidence specifically pertaining to those Plaintiffs.

the employer of the Named Plaintiff June Belt ("Belt") or any of the Opt-in Plaintiffs[2] (the "Opt-ins") (collectively referred to as the "Plaintiffs"), and Texas EM-I disputes that it is or has been the employer of any individuals other than Belt and the Opt-ins who have worked for Texas EM-I in the State of Texas.   Together, EmCare and Texas EM-I assert that, in fact, the Nurse Practitioners ("NPs") and Physician Assistants ("PAs"), by virtue of the duties they perform or performed in the Emergency Departments in which they worked, qualify as overtime exempt under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

Sections 541.3 and 541.314 of the FLSA regulations can be read to include NPs and PAs as excepted from the salary basis requirement.  The NPs and PAs who work or have worked in the emergency medicine setting for Texas EM-I or entities with whom EmCare has or has had a contractual relationship are "practitioners licensed and practicing in the field of medical science and healing" such that the salary basis exception applies.   The individuals working in the relevant emergency departments provide primary healthcare, are highly compensated professionals, and are degreed and licensed by the state in which they practice.  As Plaintiffs must admit, job titles and descriptions are not dispositive in the context of determining if an exemption or exception under the FLSA applies.   The language in § 541.3, as well as in § 541.314, is sufficiently broad to cover these particular individuals.  Accordingly, Plaintiffs' motion should be denied in its entirety.

---

[2] Defendants dispute that Mary Taylor-Thompson is a legitimate Opt-in Plaintiff as Ms. Taylor-Thompson submitted her consent on March 15, which was forty days after the original deadline of February 4, 2004 and eleven days after the extended deadline of March 5, 2004 (Court's Docket Entry No. 66). App. 015 Signed Consent of Mary Taylor-Thompson. Because she failed to respond in a timely manner, her claims, if any, should not be considered as part of Plaintiffs' motion.

## II.
## ARGUMENT

### A.     Standard of Review

Rule 56 of the Federal Rules of Civil Procedure set forth the standard that a party moving

for summary judgment must meet.  The moving party must show that there are no genuine issues

of material fact and establish each element of his or her claim as a matter of law.  *Fontenot v.*

*Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If the movant fails to do so, then summary

judgment must be denied.  *Id.*; FED. R. CIV. P. 56(c).  In making its determination, a court must

construe all facts in the light most favorable to the nonmovant and is bound to resolve all

reasonable doubts about the facts in favor of the nonmovants.  *Fierros v. Texas Dep't of Health*,

274 F.3d 187, 190-91 (5th Cir. 2001).     Because Plaintiffs have failed to make the required

showing, their motion must be denied.[3]

### B.     EmCare, Inc. Does Not Employ Nurse Practitioners or Physician Assistants and Texas EM-I Does Not Employ Nurse Practitioners or Physician Assistants Outside of The State Of Texas

As a threshold matter, EmCare and Texas EM-I must address the issue of their alleged

employer status.  In Plaintiff's Motion for Partial Summary Judgment, Plaintiff fails to provide

any evidence that EmCare is an employer or joint employer with any other entity of the

Plaintiffs, that the Defendants are or have been joint employers with each other or that the

Defendants are the alter egos of the others.  *See* Plaintiffs' First Amended Complaint ¶¶ 3-11,

15-16. The following arguments, originally urged in support of EmCare's Motion for Summary

Judgment, clearly preclude a finding of partial summary judgment for the Plaintiffs for this

reason as there can be no finding of liability as to a non-employer.  29 U.S.C. §§ 203(d) and

216(b).

---

[3] Pursuant to Local Rule CV-56(b), Defendants are attaching their Statement of Genuine Issues as Exh. A to Defendants' Appendix.

EmCare is not an "employer" of the Named Plaintiff June Belt or of the Opt-in Plaintiffs as defined by the Fair Labor Standards Act nor is Texas EM-I an employer of any individuals other than June Belt and the Opt-in Plaintiffs who worked for Texas EM-I in Texas. There are four "economic realities" factors that courts analyze in the context of the FLSA when determining whether an employment relationship exists, including the alleged employer's: (1) power to hire and fire; (2) supervision and control of work schedules or conditions of employment; (3) power to determine rate and method of payment; and (4) maintenance of employment records. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).

As to the first factor, the power to hire and fire the Plaintiffs is vested solely with the physician groups such as Texas EM-I. The mere fact that EmCare has provided contractual recruitment and referral services to Texas EM-I is irrelevant to the determination whether an employment relationship has been created. *See Catani v. Chiodi*, No. CIV. 00-1559 (DFW/RLE), 2001 WL 920025 (D. Minn. Aug. 13, 2001) (holding that a company was not an employer where it processed all employment paperwork and handled all payroll functions but did not have the authority to hire, fire, or determine the terms and conditions of employment). Furthermore, the Texas EM-I employee handbook, although distributed by EmCare pursuant to a contract, clearly states that the physician groups are the employers and not EmCare. More importantly, it is undisputed that the physician groups have exercised their autonomy to unilaterally implement their own policies and practices in place of those suggested in the handbook. MSJ Exh. A, ¶ 11; MSJ Exh. C, ¶ 3.[4]

As to the second factor, supervision, EmCare's agreements with Texas EM-I and St. Paul ERDocs specifically states that EmCare has no right of control or supervision over medical

---

[4] References to evidence attached to Defendant EmCare, Inc.'s earlier Motion for Summary Judgment are cited as "MSJ Exh. ___." References to evidence attached to Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment are cited as "App. (page number) (document name)."

decisions in the emergency departments. MSJ Exh. A, ¶ 4 and Tabs 1 & 3.  Moreover, EmCare has or has had no control over the hours worked by Plaintiff Belt or the Opt-in Plaintiffs. The appropriate level of clinical coverage is determined by the Medical Directors.  MSJ Exh. A, ¶ 15.

Likewise, there is no evidence that Texas EM-I or St. Paul ERDocs have had any control or influence over the day-to-day operations or personnel decisions within the Emergency Departments that these respective entities staff.  From June 2001 to September 2001, St. Paul ERDocs has had an agreement with Texas EM-I for Texas EM-I to occasionally supply part-time midlevel practitioners to St. Paul ERDocs on an as needed basis.  The contract specifically states that the midlevels provided by Texas EM-I should not be deemed to be the employee of St. Paul ERDocs.  MSJ Exh. C, ¶ 16 and Tab 2.   In March 2001, Texas EM-I ended its contractual relationship with St. Paul Memorial Hospital with respect to the provision of Emergency Department professional services, and St. Paul ERDocs entered into an agreement with the hospital to provide these services.  MSJ Exh. C, ¶ 5 and Tab 2.   Finally, there is no evidence that anyone in management with Texas EM-I or St. Paul ERDocs has had any control or influence regarding the operations or day-to-day functions of EmCare or regarding individuals employed by entities in other states that may have contractual relationships with EmCare.

As to the third factor, determination of rate and method of pay, EmCare's authority rises only to the level of making recommendations based on its knowledge of market conditions.  MSJ Exh. A, ¶ 9.  The final authority for setting pay rates is determined by the Medical Directors, which results in different pay structures among employees of different physician groups. Furthermore, the fact that EmCare computes the payroll is not determinative of responsibility for rate and method of pay. This authority is based in contract and rests with the physician groups that actually fund the payroll accounts. MSJ Exh. A, ¶ 10.  Similarly, there is no evidence that

Texas EM-I has had any input or influence whatsoever regarding the rates and method of pay for any of the individuals employed by St. Paul ERDocs or regarding individuals employed by entities in states other than Texas.

As to the fourth factor, employment records, EmCare necessarily keeps certain employment records as part of its contractual obligation to provide payroll support to the physician groups. MSJ Exh. A, ¶ 10. However, the other three "economic realities" factors clearly outweigh the fourth. The maintenance of employment records is, by itself, insufficient support for a conclusion that EmCare is a joint employer along with the physician groups. *See Chiodi*, 2001 WL 920025, at *7.

Finally, Plaintiffs have not produced any support for the allegation that EmCare is the alter ego of Texas EM-I or St. Paul ERDocs. Courts will not disregard corporate structure and hold parent companies liable except where a parent company's officers, directors, or stockholders utilize that corporate entity as a sham to perpetrate fraud, shun personal liability or for other truly exceptional situations. *Subway Equip. Leasing Corp. v. Sims*, 994 F.2d 210, 218 (5th Cir. 1993). In *Permian Petroleum v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991) the Fifth Circuit held that the alter ego doctrine applies only when "there is such unity between corporation and individual that the separateness of the corporation has ceased. . . ." *Id.* at 272. Whether the alter ego doctrine applies depends on the following factors:

> the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*Id.* As the factors listed by the Texas Supreme Court suggest, the alter ego doctrine generally applies when a party seeks to hold an individual or entity liable for the obligations of a

corporation in which the individual or entity owns stock. *See Zahra Spiritual Trust v. United States,* 910 F.3d 240, 245-46 (5th Cir. 1990). In *Zahra,* the Fifth Circuit emphasized that Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the "alter egos" owns stock in the other. *Id.* at 246. There is no evidence that any of the Defendants own stock in each other. MSJ Exh. C, ¶ 2; MSJ Exh. D, ¶ 3. Accordingly, the application of the alter ego doctrine in this situation would be improper as a matter of law.

Furthermore, EmCare, Texas EM-I and St. Paul ERDocs are all separately incorporated, adequately capitalized, have independent sources of business, and have separate hiring practices and accounts receivable. MSJ Exh. A, ¶¶ 4, 5, 10, 12, 15; MSJ Exh. C, ¶¶ 2, 9-13; MSJ Exh. D, ¶¶ 1, 7, 11-14. Moreover, the companies have separate ownership, directors, officers, and management. *Id.* Each company observes corporate formalities by keeping separate books and accounts and holding separate meetings. *Id.* Plaintiff's lack of evidence of fails to meet the heavy burden of production required to show sham use of corporate form. *See Permian Petroleum Co.,* 934 F.2d at 643.

Although Plaintiff alleges that EmCare is a "joint employer" together with Texas EM-I and St. Paul ERDocs, such a label does not bootstrap liability from the other companies to EmCare when the "economic realities" test, as applied to EmCare, indicates that EmCare is not an employer at all. *Jeanneret v. Aron's East Coast Towing, Inc.,* No. 01-8001-CIV-HURLEY, 2002 U.S. Dist. LEXIS 12200, *26-27 (S.D. Fla. Jan. 29, 2002). In *Jeanneret,* the court found that a company was not an "employer" in an agreed "joint employer relationship" because the company was not actually exercising in practice the authority reserved to it to hire, fire, and discipline employees. *Id.* at *10-22. Similarly, in another opinion, the court stated that a company was not an employer where, even though it was party to a joint employment agreement

with another company, it did not possess the power to hire and fire. *Cruz-Lovo v. Ryder Sys.*, 298 F. Supp. 2d 1248, 1257 (S.D. Fla. 2003). Simply put, the descriptions contained in written agreements between companies cannot be used by plaintiffs to take a shortcut around the economic realities test.

Partial summary judgment for the Plaintiff is inappropriate because the foundation of the Plaintiff's argument–that EmCare is the Plaintiffs' employer or joint employer–is without support. The application of the "economic realities" test overwhelmingly provides evidence of a genuine issue of material fact, and the alter ego allegation is without any support whatsoever. Consequently, Plaintiff's Motion for Partial Summary Judgment must be denied.

**C.**      **Plaintiffs Have Failed to Offer Evidence Specific to Plaintiffs Other Than Named Plaintiff June Belt and Opt-In Plaintiffs Scott Freemen, David Jones, William Keldahl, Kevin Mounce and Herman Splatt**

Although Defendants stipulated to the issuance of notice in this case, Defendants specifically reserved and did not stipulate that the Plaintiffs were similarly situated or that is matter is appropriate to proceed as a representative action. (Court's Docket Entry 41). This Court has not issued an order certifying this action as a class action or stating that this action is appropriate for treatment as a representative action. In the absence of such an order by the Court or a stipulation by the parties, it would be inappropriate to grant summary judgment on behalf of Plaintiffs in the absence of evidence in the record that the Plaintiffs are all, in fact, similarly situated. *See Mooney v. Aramico Servs. Co.*, 54 F.3d 1207, 1215-16 (5th Cir. 1995) (district court did not abuse discretion in "decertifying" class in absence of evidence that Plaintiffs were not similarly situated). Plaintiffs argue, but fail to demonstrate, that all the Plaintiffs are subject to professional practice statutes sufficiently similar so as to render these Plaintiffs similarly situated. Plaintiffs have failed to offer evidence regarding the nature of the duties of any of the Plaintiffs seeking summary judgment other than June Belt, David Jones, Scott Freeman, Kevin

Mounce, William Keldahl, and Leo Brazeau so as to establish that each of the Plaintiffs are similarly situated.

As the movants, Plaintiffs bear the initial burden of establishing, at a minimum, those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" that they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Because they have not met this initial burden and have not submitted competent summary judgment evidence that would support their motion in its entirety, Plaintiffs' motion should be denied.

**D.**     **The Language of § 541.3 and § 541.314 Does Not Exclude PAs and/or NPs From the Salary Basis Test Exception.**

The matter of whether NPs and PAs are subject to the salary basis test under the regulations promulgated to enforce the FLSA is one of first impression for this court and would be a matter of first impression for any other court as there are no reported or unreported decisions resolving the matter either way. For the reasons set forth below, however, and subject to the arguments set forth above regarding employer status and for purposes of this motion only, Defendants assert that summary judgment is not proper because the type of licensing and the job duties, not the job titles, of the NPs and PAs at issue bring them within the scope of § 541.3 and § 541.304.

    **1.**     **Both Sections 541.3 and 541.314 Contain Language That Can Be Applied to NPs and PAs.**

As Plaintiffs note, the language in section 13(a) of the FLSA, which contains the white collar exemptions, is silent on the issue of exceptions to the salary basis requirement. Section 541.3(e) of the regulations is the first place that the salary basis exception appears in the statutory and regulatory framework. This section defines the parameters of the professional exemption in general terms. It goes on to set forth the salary requirements for an overtime

exempt professional (one "[w]ho is compensated for services on a salary or fee basis at a rate of not less than $170 per week...exclusive of board, lodging, or other facilities") and then sets forth the exception "in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof,..." 29 C.F.R. § 541.3(e). Section 541.3(e) does not define the phrase "any of their branches" nor does it provide an exclusive or nonexclusive list of areas of practice that would or would not qualify.

The next time regulations address the salary basis exception is in § 541.314. The phrase "any of their branches" appears once again in § 541.314(a):

> A holder of a valid license or certificate permitting the practice of law or medicine or any of their branches, who is actually engaged in practicing the profession, or a holder of the requisite academic degree for the general practice of medicine who is engage in an internship or resident program pursuant to the practice of his profession, or an employee employed and engaged as a teacher in the activity of imparting knowledge, is excepted from the salary or fee requirement. This exception applies only to the traditional professions of law, medicine, and teaching and not to employees in related professions which merely serve these professions.

The phrase "any of their branches" is undefined here or in subsections (b) or (c). While § 541.314(a) does explain that the exception only applies to "the traditional professions of law, medicine and teaching and not to employees in related professions which merely serve these professions," the last phrase of "which merely serve these professions" does not exclude NPs or PAs on its face and necessarily requires interpretation or further definition. A slight variation of the phrase is repeated again in § 541.314(c) as a catchall category following a list of occupations that are not subject to the salary basis exceptions. The list that does not specifically include NPs and PAs[5].

---

[5] Pharmacists, nurses, therapists, technologists, sanitarians, dieticians, social workers, psychologists, pychometrists, or other professions which service the medical profession.

Section 541.314(b) contains two subsections to describe further the exception "in the case of medicine" (as opposed to "in the case of 'physicians'"). Specifically, § 541.314(b) states that "[t]he exception applies to physicians and other practitioners licensed and practicing in the field of medical science and healing," and it is this phrase that Defendants contend correctly describes the status of the NPs and PAs in this case. Section (b)(1) provides additional definition related to the medical profession in particular and contains a non-exclusive list of occupations that may fall within this category: "Other practitioners in the field of medical science and healing **may include** podiatrists (sometimes called chiropodists), dentists (doctors of dental medicine), optometrists (doctors of optometry or bachelors of science in optometry)." 29 C.F.R. § 541.314(b)(1). The inclusion of "bachelors of science in optometry" is significant in that the DOL did not limit the definition of "other practitioners" only to those occupations requiring a medical degree. Moreover, the fact that the list is non-exclusive absolutely leaves the door open to the inclusion of other areas of practice that meet the requirement stated in subsection (b)(1).

Section 541.314(b)(2) also references "physicians and other practitioners" and notes that participants in internships or resident programs are excepted from the requirement as well. Again, the reasonable conclusion to draw is that the regulations do not necessarily require a medical degree for the exception to apply, given that the training programs are described as those that are "entered upon after the earning of the **appropriate** degree required for the general practice of their profession" as opposed to only those where a "medical degree" has been earned.

## 2.    Nurses are Not Nurse Practitioners.

As mentioned above, § 541.314(c) includes a list of occupations not covered by the exception, and nurses are in this list. However, "nurses" are a group separate and distinct from nurse practitioners, such as those who are Plaintiffs in this suit. The licensing or certification requirements for nurse practitioners are different from those of a registered nurse ("RN"), a

licensed practical nurse ("LPN"), or a licensed vocational nurse ("LVN"), and the definitional and/or preamble sections of each of the applicable state statutes or regulations set forth in Section F-1 below reveal that nurse practitioners have a practice in areas distinct from that of traditional nursing.  They cannot and should not be considered the same for purposes of this regulation.

In addition, all states but one state in which Opt-in NP Plaintiffs practice require the completion of a training program beyond the training required to hold a nursing license, and over half of the states in which there are Opt-in NP Plaintiffs require NPs to hold a masters degree or be certified by a national certifying organization.  All but three of the applicable states also require successful applicants to pass a national exam in order receive the applicable state license to practice.  Thus, it is clear the term "nurse" in § 541.314(c) cannot be read to mean "nurse practitioner" when the governing statutes and regulations make it clear that nurse practitioners are professionals that engage in a practice beyond that of nursing.

**E.**  **The New FLSA Regulations Contain Language That May Also be Read to Include NPs and PAs.**

The DOL's discussion of the salary basis test in the preamble portion of the new regulations set to go into effect on August 23, 2004 does not change and should not influence the outcome in this case and do not support Plaintiffs' arguments that summary judgment is appropriate.  The language regarding the salary basis exception previously found at § 541.3(e)(1) has been removed.  The language previously found in § 541.314 is now located in § 541.304 in slightly modified form as follows:

(a)  The term "employee employed in a bona fide professional capacity" in section 13(a)(1) also shall mean:

(1) Any employee who is the holder of a valid license or certificate permitting the practice law or medicine or any of their branches and is actually engaged in the practice thereof; and

(2) Any employee who is the holder of the requisite academic degree for the general practice of medicine and is engaged in an internship or resident program pursuant to the practice of the profession.

(b)   In the case of medicine, the exemption applies to physicians and other practitioners licensed and practicing in the field of medical science and healing or any of the medical specialties practiced by physicians or practitioners. The term "physicians" includes medical doctors including general practitioners and specialists, osteopathic physicians (doctors of osteopathy), podiatrists, dentists (doctors of dental medicine) and optometrists (doctors of optometry or bachelors or science in optometry).

(c)   Employees engaged in internship or resident programs, whether or not licensed to practice prior to commencement of the program, qualify as exempt professionals if they enter such internship or resident programs after the earning of the appropriate degree required for the general practice of their profession.

(d)   The requirements of § 541.300 and subpart G (salary requirements) of this part do not apply to the employees described in this section.

69 Fed. Reg. 22267.

Two revisions are particularly significant. Although the phrase "any of their branches" and the word "practitioners" are still used, the phrase "which merely serve (or service) the profession" no longer appears. Furthermore, the nonexclusive list previously used to illustrate the phrase "other practitioners in the field of medical science and healing" now appears in subsection (b)(2) with to illustrate the term "physician" instead. However, the phrase "other practitioners" and term "practitioners" are still used and cannot be assumed to have no meaning. Clearly, if the DOL had intended for § 541.304 to include only those individuals with medical degrees, it could have said so. If the phrase "other practitioners" originally was meant to cover only those with medical degrees, then the DOL could have eliminated it or included language to show whom the term or phrase was not meant to include. The DOL did not do so. The continued use of the phrase "other practitioners" would indicate that it has meaning, and the separate definition of "physician" suggests that "other practitioners" necessarily means something other than "physicians."

- 13 -

The extensive history of the salary basis exception presented by the Plaintiffs is interesting; however, a finding that NPs and PAs are covered by the salary basis exception does not require the Court to add a "new profession" to this exception as NPs and PAs are, in fact, engaged in the traditional profession of medicine, albeit not as individuals who possess a medical degree. *See* Section III. *infra.*   Various statutes at issue here specifically make reference to the practice of medicine in relation to NPs or PAs. *See, e.g.*, 18 VA. ADMIN. CODE § 90-30-120(A) (2004) ("A licensed nurse practitioner shall be authorized to engage in practices constituting the practice of medicine in collaboration with and under the medical direction and supervision of a licensed physician"); KY. REV. STAT. ANN. § 311.850(1)(e) Bender 2003) (specifically referencing a physician assistant's ability to "practice medicine"); TENN. COMP. R. & REGS.0880-3.03(3) (2003) (defining the profession of physician assistant as "one of the healing arts ...."); W. VA. CODE § 30-3-5 (2004) ("The board shall be the sole authority for the issuance of licenses to practice medicine and surgery and to practice podiatry and certificates for physician assistants in this state and shall be a regulatory and disciplinary body for the practice of medicine and surgery and the practice of podiatry and for physician assistants in this state.").

In the preamble to the new regulations, the DOL discusses a request made by the National Association of Chain Drug Stores (NACDS) to include pharmacists in the exception to the minimum salary test based solely on the increased educational requirements and professional standards for pharmacists. 69 Fed. Reg. 22172. The Department gives minimal attention to the reasons why pharmacists were not added, stating only that "the fact that the standards for the profession are rising does not mean that the minimum salary requirement should be removed," without saying more. Because Defendants assert that the phraseology used in §§ 541.3 and 541.314 are sufficiently broad to encompass NPs and PAs, the fact that the Department of Labor

notes that it decided not to remove salary requirements for nurses "and others" is hardly dispositive.

The American Academy of Physician's Assistants did write a letter during the comment period asserting that PAs perform duties that bring them within the coverage of the salary basis test; however, the AAPA made no reference to any adverse findings or case law holding that PAs, in fact, were not included.  Thus, in light of the DOL's very vague reference to "nurses and others" in the text of the preamble, one could not conclude that the inclusion of NPs and PAs was specifically rejected by the DOL.

**F.**    **There is No Case Law That Directly Supports Plaintiffs' Position.**

As Plaintiffs note, the plaintiffs in *Harrison v. Washington Hospital Center*, 1979 U.S. Dist. LEXIS 10063 (D.D.C. August 31, 1979), took a position on § 541.314 similar to the one that Defendants take here.  Obviously, the most significant distinction is that the plaintiffs in *Harrison* were nurses—not nurse practitioners or physician assistants.   And while the Department of Labor's 1974 opinion letter regarding PAs lists a weekly salary of $200 as a requirement for professional exempt status, there is no indication that the issue being addressed was whether the salary test applied or whether the position of physician assistant as presented to the Department of Labor qualified for exempt status period.  Finally, the opinion was written at time when the educational and licensing requirements along with the actual job duties of physician assistants were being standardized. *See* American Academy of Physician Assistants "Information about PAs and the PA Profession" at http://www.aapa.org/geninfo1.html; Accreditation Review Commission on Education for the Physician Assistant, Inc. "History of the ARC-PA" at http://www.arc-pa.org/General/history.html.

The only case that Plaintiffs cite for the proposition that the salary exception applies only to individuals who hold a physician's license is hardly dispositive. *Close v. State of New York* is

a case from the Northern District of New York in which state agency employees claimed they had not received overtime and had been subject to improper deductions. *Close v. State of New York*, 1996 U.S. Dist. LEXIS 1748 (N.D.N.Y. 1996).  The primary issues related to the applicability of the FLSA to public sector employees and the issue of improper deductions from salary, making only a passing reference to the salary basis exception being examined here. *Id.* at 34-35. The Texas cases cited are no more on point or helpful than *Close*. The *Weyandt v. State* case was a criminal case involving a woman who held herself out as a medical doctor to the public, when in reality she was not licensed to practice medicine in the State of Texas. *Weyandt v. State*, 35 S.W.2d 144, 148-149 (Tex. App.—Houston [14th Dist.] 2000) (defendant held a doctor of medicine degree from a university in Mexico but no license to practice in Texas although she was a Certified Registered Nurse Anesthetist (CRNA), an advanced nurse practitioner, and a certified hypnotherapist). *Bradford v. Alexander*, 886 S.W.2d 394 (Tex. App.—Houston [1st Dist.] 1994), was a medical malpractice case, and the reference to physician assistants was related to the competency of a PA to testify as an expert under the Medical Liability and Insurance Improvement Act regarding the standard of care for a physician. *Id.* at 397.

**G.**     **The Very State Statutes and Regulations that Govern the Education, Licensure and Practice of NPs and PAs Support the Inclusion of NPs and PAs in the Salary Basis Exception**

Plaintiffs make both sweeping and inaccurate conclusions about the state laws governing the practice of nurse practitioners and physician assistants.  As demonstrated above with respect to NPs, the statutes themselves are varied on many levels and defy broad characterizations.  In their motion and statement of material facts, Plaintiffs assume that all of the Plaintiffs are subject to essentially the same licensing and certification requirements, perform identical duties and have the same set of skills.  In addition to the fact that the Plaintiffs have not offered evidence

that this is the case, a brief review of the statutes and regulations governing NPs and PAs reveals that not only do the PA and NP statutes differ from each other, but the statutes and regulations for each practice vary from state to state.  Each statute or regulation requires differing levels of training and education.  The statutes provide for different levels of physician supervision, if any, and have very different types of standards for prescriptive authority.  It can be said as a general statement, however, that neither the applicable licensing statutes nor the testimony of some of the Plaintiffs nor the testimony of EmCare's Regional Medical Directors support the conclusion that the NPs and PAs at issue "merely service the medical profession."  Thus, a review of the applicable state statutory schemes for NPs and PAs is instructive in this analysis.

### 1.    Nurse Practitioners

Nurse practitioners are primary care providers who practice in ambulatory, acute and long-term care settings.  The NPs in this lawsuit work in the following states:  Arizona, California, Florida, Georgia, Illinois, Kentucky, Maryland, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia.  The NPs in this lawsuit all provided or provide medical services in the emergency care setting. Generally speaking, NPs diagnose and manage acute episodic and chronic illnesses; their services include, but are not limited to, ordering, conducting, supervising, and interpreting diagnostic and laboratory tests and the prescription of pharmacologic agents and non-pharmacological therapies.  They practice autonomously and in collaboration with other health care professionals.

The Arizona statute governing nurse practitioners specifically refers to nurse practitioners as professionals who "ha[ve] an expanded scope of practice that includes:...[m]aking independent decisions in solving complex client care problems; [d]iagnosing, performing diagnostic and therapeutic procedures, prescribing, administering and dispensing therapeutic

measures, including legend drugs, medical devices and controlled substances within the scope of registered nurse practitioner practice on  meeting the requirements established by the board." ARIZ. REV. STAT. § 32-1601(15)(d)(4-5) (2004).  The Georgia regulations for nurse practitioners states that NPs "provide[] primary nursing and medical services to individuals, families and groups emphasizing health promotion and disease prevention as well as the diagnosis and management of acute and chronic diseases."  GA. COMP. R. & REGS. r. 410-12-.03 (2004).   In New Mexico, nurse practitioners "perform an advanced practice that is beyond the scope of practice of professional registered nursing."  N.M. STAT. ANN. § 61-3-23.2  (Michie 2004).  They "practice independently and make decisions regarding health care needs of the individual, family, or community and carry out health regimens, including the prescription and distribution of dangerous drugs and controlled substances included in Schedules II through V of the Controlled Substances Act [30-31-1 NMSA 1978]; and serve as a primary acute, chronic long-term and end of life health care provider and as necessary collaborate with licensed physicians, osteopathic physicians or podiatrists."  *Id.*  Nurse practitioners in Pennsylvania are licensed under the State Board of Medicine and are referred to as "practitioners other than medical doctors." 49 PA. CODE § 18.21 (2004).  The Virginia Administrative Code specifically states that "[a] licensed nurse practitioner shall be authorized to engage in practices constituting the practice of medicine in collaboration with and under the medical direction and supervision of a licensed physician."  18 VA. ADMIN. CODE § 90-30-120(A) (2004).   The Washington code states that nurse practitioners "are prepared and qualified to assume primary responsibility and accountability for the case of their patients."  WASH. ADMIN. CODE § 246-840-300 (2004).

The language found in the preamble or definitional sections of the applicable statutes or regulations establishes that the NP operates at a higher level and expanded manner from that of a

nurse:

1.   ARIZ. ADMIN. CODE § R4-19-505 (2004) *"In addition to* the scope of practice permitted a professional nurse, an RNP may perform the following acts in collaboration with a physician:....";

2.   16 CAL. CODE REGS. tit. 16, § 1480 (2004) "'Nurse practitioner'" means a registered nurse who possesses *additional preparation and skills* in physical diagnosis, psychosocial assessment, and management of health illness needs in primary health care, and who has been prepared in a program [that] conforms to board standards....";

3.   FLA. STAT. ch. 464.003 (2003) "'Advanced or specialized nursing practice' means, *in addition* to the practice of professional nursing, the performance of advanced-level nursing acts approved by the board which, by virtue of postbasic specialized education, training, and experience are proper to be performed by an advanced registered nurse practitioner.";

4.   GA. COMP. R. & REGS. r. 410-12-.01 (2004) "The advanced practice registered nurse is authorized to perform *advanced nursing functions and certain medical acts* which include, but are not limited to, ordering drugs, treatments, and diagnostic studies.";

5.   225 ILL. COMP. STAT. 65/15-5 (2004) "'Advanced practice nurse'...means a person who: (1) is licensed as a registered professional nurse...; (2) meets the requirements for licensure as an advance practice nurse...; (3)...has a written collaborative agreement with a collaborating physician in the diagnosis of illness and management of wellness and other conditions...; (4) care for patients (A) by using *advance diagnostic skills*, the results of diagnostic tests and procedures ordered by the [APN], a physician assistant, a dentist, a podiatrist or a physician, and professional judgment to initiate and coordinate the care of patients;  (B) by ordering diagnostic tests, prescribing medications and drugs in accordance with Section 15-2...; and (C) by using medical, therapeutic, and corrective measures to treat illness and improved health status;"

6.   KY. REV. STAT. ANN. § 314.011(8) (Bender 2003) "'Advanced registered nursing practice' means the performance of *additional acts* by registered nurses who have gained additional knowledge and skills through an organized postbasic program of study and clinical experience....The additional acts shall...include but not be limited to prescribing treatment, drugs devices and ordering diagnostic tests;"

7.   MD. REGS. CODE tit. 10 § 10.27.07.02 (2004) "A nurse practitioner may perform *independently* the following functions...;"

8.   NEV. REV. STAT. 632.012 (2004) "'Advanced practitioner of nursing' means a registered nurse who: 1. Has specialized skills, knowledge and experience; and 2. Is authorized by the Board to provided services *in addition to* those that other registered nurses are authorized to provide;" NRS 632.237 "1. The Board may grant a certificate of recognition as an advanced practitioner of nursing to a registered nurse who has

completed an educational program designed to prepare a registered nurse to: (a) Perform designated acts of medical diagnosis; (b) Prescribe therapeutic or corrective measures; and (c) Prescribe controlled substances, poisons, dangerous drugs and devices;"

9. N.J. Rev. Stat. § 45:11-49 (2004) "*In addition to* all other tasks which a registered professional nurse may, by law, perform, and advanced practice nurse may manage specific common deviations from wellness and stabilized long-term illnesses by: (1) initiating laboratory and other diagnostic tests; and (2) prescribing or ordering medications and devices, as authorized by subsections b. and c. of this section;"

10. N.M. Stat. Ann. § 61-3-23.2 (Michie 2004) "Certified nurse practitioners may: (1) perform an advanced practice that is *beyond the scope* of practice professional registered nursing; (2) practice independently and make decisions regarding health care needs of the individual, family or community and carry out health regimens, including the prescription and distribution of dangerous drugs and controlled substances...; and (3) serve as a primary acute, chronic long-term and end of life health care provider and as necessary collaborate with licensed medical doctors, osteopathic physicians or podiatrists;"

11. N.Y. Educ. Law § 6902(3)(a) (Consol. 2004) "The practice of registered professional nursing by a nurse practitioner,...may include the *diagnosis* of illness and physical conditions and the *performance* of therapeutic and corrective measures within a specialty area of practice, in collaboration with a licensed physician....;"

12. N.C. Admin. Code tit. 21, r. 36.0227 (4) (May 2004) "'Nurse Practitioner or NP' means a currently licensed registered nurse *approved* to perform medical acts under an agreement with a licensed physician for ongoing supervision, consultation, collaboration and evaluation of the medical acts performed;"

13. 49 Pa. Code § 18.21 (2004) "Certified Registered Nurse Practitioner...--A registered nurse licensed in this Commonwealth who, while functioning in the *expanded role* as a professional nurse, performs acts of medical diagnosis ore prescription of medical therapeutic or corrective measures in collaboration with and under the direction of a physician licensed to practice medicine in this Commonwealth;"

14. 22 Tex. Admin. Code § 221.1(3) (2004) "The advanced practice nurse is prepared to practice in an *expanded role*...;"

15. 18 Va. Admin. Code § 90-30-120(A) (2004) "A licensed nurse practitioner shall be authorized to engage in *practices constituting the practice of medicine* in collaboration with and under the medical direction and supervision of a licensed physician;"

16. W. Va. Code St. R. § 19-7-2(2.1) (2004) "Advanced nursing practice is the practice of nursing at *a level which requires substantial theoretical knowledge* in a specialized area...;"

17. Wash. Admin. Code § 246-840-300 (2004) "An advanced registered nurse

practitioner is a registered nurse prepared in a *formal educational program* to assume primary responsibility for continuous and comprehensive management of a broad range of patient care, concerns or problems;"

18.   WIS. ADMIN. CODE § N 8.10(7) (2004) "Advance practice nurse prescribers shall work in a collaborative relationship with a physician. The collaborative relationship is a process in which an advanced practice nurse prescriber is working with a physician, in each other's presence when necessary, to deliver health care services with the scope of the practitioner's *professional expertise*."

In many of the 20 states where the Opt-in NPs Plaintiffs practice or have practiced, the state regulatory scheme recognizes NPs as primary care providers.[6]  In addition, many of the states where the Opt-ins NPs practice, NPs are permitted to practice independently.[7]  Several of the states permit an NP to practice without supervision,[8] and none of the states require on-site supervision by a physician at all times.[9]  Importantly, all of the states at issue give NPs prescriptive authority, and five of them permit NPs to write prescriptions for certain scheduled drugs independently.[10]

### 2.   Physician Assistants

Like NPs, PAs are health care professionals licensed to practice medicine with physician supervision.[11]  The PAs in this case work or have worked in Arizona, California, Florida, Georgia, Illinois, Kentucky, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, Washington and

---

[6] *See, e.g.,* 16 CAL. CODE REGS. tit. 16, § 1480 (2004); GA. COMP. R. & REGS. r. 410-12-.03(2)(a) (2004); N.M. STAT. ANN. § 61-3-23.2 (Michie 2004); WASH. ADMIN. CODE § 246-840-300 (2004).

[7] *See, e.g.,* 201 KY. ADMIN. REGS. 20:057(1-2)(2003) (defining "collaboration" and "collaborative practice agreement" as necessary for prescription authority only); N.M. STAT. ANN. § 61-3-23.2 (Michie 2004) ("Certified Nurse Practitioners may: ... practice independently ..); WASH. ADMIN. CODE § 246-840-300 (2004) ("An advanced nurse practitioner: ... Shall be held individually accountable for practice...").

[8] *Id.*

[9] *See, e.g.,* 225 ILL. COMP. STAT. 65/15-15 (2004) (requiring that a supervising physician be onsite at least one time per month).

[10] *See, e.g.,* ARIZ. ADMIN. CODE § R4-19-507 (2004); N.M. ADMIN. CODE. tit. 16, §16.12.2.13 (O)(5)(2004); WIS. ADMIN. CODE § N 8.03 (2004).

[11] PAs who are employed by the federal government are credentialed to practice medicine without physician supervision.

Wisconsin.  PAs conduct physical exams, diagnose and treat illnesses, order and interpret tests, counsel on preventative health care, assist in surgery and in virtually all states may obtain authority to write prescriptions.  The PAs in this case were all practicing or practiced in the emergency department setting.

The PA profession began in the mid-1960s when physicians and educators at Duke University, the University of Colorado, and the University of Washington saw a shortage of primary care physicians.  *See* Accreditation Review Commission on Education for the Physician Assistant, Inc. "History of the ARC-PA" at http://www.arc-pa.org/General/history.html.  Dr. Eugene Stead of the Duke University Medical Center in North Carolina assembled the first class of PAs in 1965 and based the curriculum in part on his knowledge of the fast-track training of doctors during World War II. American Academy of Physician Assistants "Information about PAs and the PA Profession" at http://www.aapa.org/geninfo1.html.  PAs are educated in intensive medical programs accredited by the Accreditation Review Commission on Education for the Physician Assistant and, in order to receive a license from the state in which they wish to practice, must pass a national certification examination administered by the National Commission for Certification of Physician's Assistants.   American Academy of Physician Assistants    "Information    about    PAs    and    the    PA    Profession"    at http://www.aapa.org/geninfo1.html; Accreditation Review Commission on Education for the Physician    Assistant,    Inc.    "About    Physician    Assistants"    at    http://www.arc-pa.org/General/history.html.  PAs are taught, as are medical students, to diagnose and treat medical problems.  PAs undergo classroom and laboratory training in basic medical and behavioral sciences (anatomy, pharmacology, pathophysiology, clinical medicines, and physical diagnosis) followed by clinical relations in internal medicine, family medicine, surgery,

pediatrics, obstetrics, gynecology, emergency medicine and geriatric medicine. American Academy of Physician Assistants "Information about PAs and the PA Profession" at http://www.aapa.org/geninfo1.html.

A review of some of the statutory language from statutes governing the licensure and practice of PAs is also instructive. The Arizona statute makes reference to the "practice of medicine" in referring to PAs. ARIZ. REV. STAT. § 32-2551(P)(1) (2004). The California statute makes reference to PAs and the "practice of medicine" and also defines unprofessional conduct for a PA as anything that would constitute unprofessional conduct for a physician or surgeon. CAL. BUS. & PROF. CODE. § 3534 and 3534.4 (2004); 16 CAL. CODE REGS. tit. 16, § 1399.521 (2004). In Georgia, PAs are issued a license from the Georgia Composite State Board of Medical Examiners, which is the board that licenses physicians. GA. COMP. R. & REGS. r. 360-5-.01, et. seq. (2004). The Illinois statute states in its preamble that as "a matter of public health and concern the practice as a physician assistant,…merit and receive the confidence of the public.…" 225 ILL. COMP. STAT. 95/1 (2004). The Kentucky statute specifically references a physician assistant's ability to "practice medicine." KY. REV. STAT. ANN. § 311.850(1)(e) (Bender 2003). In New Mexico, PAs receive their licenses from the New Mexico Medical Board under the authority of the New Mexico Medical Practices Act., with the primary duty of the Board being that of issuing licenses to qualified physicians, physician assistants and anesthesiologist assistants.…" N.M. STAT. ANN. § 61-6-1 (Michie 2004). In addition, the New Mexico Board includes at least one physician assistant by operation of law. N.M. STAT. ANN. § 61-6-2(A) (Michie 2004). Tennessee defines the profession of physician assistant as "one of the healing arts .…" TENN. COMP. R. & REGS.0880-3.03(3) (2003). Finally, in West Virginia, PAs are licensed under the West Virginia Medical Practices Act, as are physicians, and are governed

by the West Virginia Medical Board. W. VA. CODE § 30-3-5 (2004) ("The board shall be the sole authority for the issuance of licenses to practice medicine and surgery and to practice podiatry and certificates for physician assistants in this state and shall be a regulatory and disciplinary body for the practice of medicine and surgery and the practice of podiatry and for physician assistants in this state.") Of the 19 states where the PA Opt-n Plaintiffs practice or practiced, 16 states do not require onsite supervision by a physician,[12] and 11 states permit PAs to obtain prescriptive authority for scheduled drugs.[13]

### H.  The Licensure, Actual Duties and Compensation Level of June Belt and the Opt-In NPs and PAs Demonstrates the Exempt Nature of Their Duties and the Applicability of Sections 541.300 and 541.314

#### 1.  Educational Level of Plaintiffs

As set forth in the Stein Report, the salary basis exception has its genesis in the notion that issuance of a license to practice in field of law or medicine "may be taken as an adequate substitute for the salary test ...." 1940 Stein Report at 42.  Each of the Plaintiffs is certified to practice under the statutory framework in the states where they work.  The Plaintiffs are an extremely educated group—67 of the Plaintiffs possess a four-year degree along with their particular state license and national certification.  App. Exh. S.  Of that group, 36 possess a Masters Degree and/or some post-masters education or training.  *Id.*  June Belt, for example, possesses a Bachelor of Science degree in nursing, as well as a Master of Science degree in acute care within the nurse practitioner program and possesses an ACLS ("Advanced Cardiac Life

---

[12] *See, e.g.,* ARIZ. ADMIN. CODE § R4-17-101(19) (2004) ("Supervision does not require a physician's constant physical presence if the supervising physician .. is or can be easily in contact with the physician assistant by radio, telephone or telecommunication."); 225 ILL. COMP. STAT. 95/4(3) (2004) ("Supervision of the physician assistant shall not be construed as to necessarily require the personal presence of the supervising physician at all times at the place where services are rendered, so long as there is communication available for consultation by radio, telephone or telecommunications ..).

[13] *See, e.g.,* ARIZ. REV. STAT. § 32-2532 (2004); 225 ILL. COMP. STAT. 95/7.5 (2004); N.M. STAT. ANN. § 61-6-7(D) (Michie 2004); W. VA. CODE ST. R. § 11-1B-14 (2004).

Support") certification. Others possess degrees and credentialing far beyond the minimum required for their practice. App. 69. Pamela Taggart, an Opt-in Plaintiff working in New Jersey, possesses an associate's degree in nursing, a Bachelor of Science degree in nursing, a Master of Science degree in nursing, a Bachelor of Science degree in biology and a Ph.D. in Biochemistry. App. 119.

**2.    Emergency Department Duties of Plaintiffs**

Not only do certain governing statutes themselves state that NPs and PAs are engaged in the practice of medicine or are part of a profession that is one of the healing arts, the everyday activities of the NPs and PAs employed by Texas EM-I or those employed in other states by other entities related to EmCare, Inc., are those of primary care providers. NPs and PAs are utilized and work in a manner and capacity separate and distinct from that of nurses. App. 039-040 Hermann Splatt Dep. 34:12-25 35:1; App. 044-046 William Keldahl Dep. 27-29; App. 049-050 Kevin Mounce Dep. 38-40; 44:18-25; App. 037 Scott Freeman Dep. 38-39; App. 041-042 David Jones Dep. 61-62; App. 052-053 Leo Brazeau Dep. 52-53; App. 034-035 June Belt Dep. 86:17-25; 87:1-9.

While the physicians in the emergency department may have the ultimate responsibility for the care of a patient, in everyday practice, the NPs and PAs at issue perform duties that the public normally recognizes as duties to be performed by a physician, including examining patients, formulating diagnoses, developing and implementing treatment plans, performing minor surgeries, assisting in place of a second physician in major surgeries, ordering laboratory tests and x-rays and prescribing controlled and/or regulated drugs and devices. In many Emergency Departments, NPs and PAs function as the principal care providers, with physicians seeing only the most egregious cases. In addition, the NPs and PAs routinely direct the activities of the nurse staff to assist them in their duties. *See* App. Exhs. F, G, H, I, and J.

### 3.     Annual Compensation of Plaintiffs

The Plaintiffs in the instant action are or were highly compensated individuals.  App. 122-191 Salary Data for Opt-in Plaintiffs.  In 2001, of the Opt-in Plaintiffs who worked a full year, over 45% earned over $70,000.  Of this group, nearly half of them earned over $100,000 a year.  In 2002, for those worked a full year, over 37% earned over $80,000, and of that group almost half of them earned over $100,000.  In 2003, 34% of those working a full year earned over $80,000, and exactly half of that group earned over $100,000.  The Department of Labor has made much of the fact that a high level of compensation is indicative of exempt status and has made allowances for highly compensated individuals in the new regulations at § 541.601 ("[a] high level of compensation is a strong indicator of an employee's exempt status,..."),  69 Fed. Reg. 22269, and it certainly cannot be said that the Plaintiffs do not fall squarely in that category.

I.     **The Department of Labor Has Not Communicated to Emcare That it Believes EmCare Employs NPs or PAs or That EmCare or any Related Entity Has Violated the FLSA with Respect to NPs or PAs**

Plaintiffs misstate the facts in their motion regarding EmCare's knowledge of the Department of Labor's conclusions after their investigations of EmCare.  EmCare strongly disputes Plaintiffs' statements or inferences that the Department of Labor ever indicated to EmCare, orally or in writing, that it was in violation of the FLSA regarding NPs and PAs. Plaintiffs incorrectly state or suggest that there have been three investigations of EmCare by the Department of Labor.  In June 2001, EmCare received a letter from Perry Lopez, an investigator in the Arlington, Texas office of the Department of Labor, indicating the Department's desire to conduct a compliance inquiry.  Plaintiffs' App. Ex. 3.  Through counsel, EmCare subsequently sent a letter to Mr. Lopez asserting that EmCare, Inc. was not the employer of any NPs or PAs, and also asserting that NPs and PAs fall under the salary exception found in 29 C.F.R. § 541.314.

App. 61.1 Craig Wilson Dep. 93:4-10; Plaintiffs' App. Ex. 3.  Mr. Lopez subsequently advised EmCare, through counsel, in early 2002 that the Department of Labor was closing its file on the matter and that the file was being sent back to the originating Department of Labor office in South Carolina.  *Id.* at 91:24-25, 92:1-6.

In the fall of 2002, the Department of Labor once again contacted EmCare, Inc.  This time, the contact was made by Investigator Tomi Jo Stefanos of the Arlington, Texas office in the form of a very standard letter asking for EmCare to make available for review its payroll records, etc.  App. 016-017 Craig Wilson Decl. ¶ 3.  In late fall 2002, Ms. Stefanos visited the EmCare corporate offices, where the payroll records were made available to her for review.  *Id.* at ¶ 3.  Ms. Stefanos met with Donald King, Director of Human Resources for EmCare and Craig Wilson, in-house counsel for EmCare.  App. 064 Don King Dep. 33; App. 016-017 Craig Wilson Decl. ¶ 3.  Ms. Stefanos explained that the investigation was initiated because of a complaint made by a June Belt, a nurse practitioner and former employee of Texas EM-I.   App. 016-017 Craig Wilson Decl. ¶ 3.  Although Ms. Stefanos explained the nature of the complaint by Ms. Belt, she did not state at that time that she believed EmCare was Ms. Belt's employer nor did she state that she found EmCare to be in violation of the FLSA.  App. 055 Craig Wilson Dep. 23; App. 017 Craig Wilson Decl.  ¶ 4. On or about February 27, 2003, Ms. Stefanos called Mr. King with a follow-up question or two and some questions about recommendations for her upcoming trip to Hawaii.  App. 018 Don King Decl. ¶ 2.  At no time during that conversation did Ms. Stefanos indicate what her findings or recommendations were with regard to EmCare or with respect to any NPs or PAs.  App. 018 Don King Decl. ¶ 2.

**J.**     **Defendants are not Liable to Plaintiffs Under Washington or Illinois State Law**

For the same reasons and based on the same evidence referenced herein, Defendants are

not liable to Plaintiffs under the Illinois Minimum Wage Law, ILL ST. CH. 820 § 105/4a, or the

Washington Minimum Wage Act, ARCW §49.46.010 (2004); WAC 296-128-530 (2004).

## III.
## CONCLUSION

Plaintiffs have failed to establish that EmCare is or has been the employer of the

Plaintiffs in this case and that EmCare could be subject to the provisions of the FLSA with

regard to the Plaintiffs.  Plaintiffs have also failed to establish as a matter of law that EmCare,

Texas EM-I and St. Paul ERDocs are joint employers or alter egos of each other such that they

could be held liable to all of the Plaintiffs in this case.   Even assuming that Plaintiffs could

establish EmCare is a employer and/or that Texas EM-I is the employer of any Plaintiffs other

than those working in Texas, genuine issues of material fact still exists regarding the application

of the salary basis exception to PAs and/or NPs.   Even giving deference to the DOL's

interpretation of its own regulations, the language of § 541.3 and § 541.314 can be read to cover

NPs and PAs—a result supported by the rules of statutory construction, the statutory and

regulatory language related to NPs and PAs in the relevant states, and the actual licensure and

duties of the Opt-in Plaintiffs—and Plaintiffs have failed to put in the record competent summary

judgment evidence that would support granting their motion as to all Plaintiffs.  Accordingly,

Plaintiffs' motion should be denied.

Respectfully submitted,

**BAKER & MCKENZIE LLP**

By  /s/Ann Marie Painter
       Ronald E. Manthey
       State Bar No. 1292700
       Ann Marie Painter
       State Bar No. 00784715

2001 Ross Avenue, Suite 2300
Dallas, TX  75201
Telephone No. +1 214 978 3000
Facsimile No. +1 214 978 3099

ATTORNEYS FOR DEFENDANTS
EMCARE, INC. AND TEXAS EM-I
MEDICAL SERVICES, P.A.

## CERTIFICATE OF SERVICE

     This is to certify that a true and correct copy of the foregoing document has been served upon counsel of record by facsimile and electronically on this 17th day of August 2004, as shown below:

James A. Jones
Jones & Associates, P.C.
5015 Tracy, Suite 100
Dallas, Texas  75205

John T. Cox III
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas  75201

Richard J. Burch
Bruckner Burch, P.L.L.C.
5847 San Felipe #3900
Houston, Texas  77057

      /s/Ann Marie Painter

DALDMS/502408.1

- 29 -

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 3

    A.   Standard of Review.................................................................................. 3

    B.   EmCare, Inc. Does Not Employ Nurse Practitioners or Physician
    Assistants and Texas EM-I Does Not Employ Nurse Practitioners or
    Physician Assistants Outside of The State Of Texas ............................ 3

    C.   Plaintiffs Have Failed to Offer Evidence Specific to Plaintiffs Other Than
    Named Plaintiff June Belt and Opt-In Plaintiffs Scott Freemen, David
    Jones, William Keldahl, Kevin Mounce and Herman Splatt .................. 8

    D.   The Language of § 541.3 and § 541.314 Does Not Exclude PAs and/or
    NPs From the Salary Basis Test Exception .......................................... 9

        1.   Both Sections 541.3 and 541.314 Contain Language That Can Be
        Applied to NPs and PAs ............................................................... 9

        2.   Nurses are Not Nurse Practitioners........................................... 11

    E.   The New FLSA Regulations Contain Language That May Also be Read to
    Include NPs and PAs ............................................................................ 12

    F.   There is No Case Law That Directly Supports Plaintiffs' Position .......... 15

    G.   The Very State Statutes and Regulations that Govern the Education,
    Licensure and Practice of NPs and PAs Support the Inclusion of NPs and
    PAs in the Salary Basis Exception....................................................... 16

        1.   Nurse Practitioners.................................................................... 17

        2.   Physician Assistants.................................................................. 21

    H.   The Licensure, Actual Duties and Compensation Level of June Belt and
    the Opt-In NPs and PAs Demonstrates the Exempt Nature of Their Duties
    and the Applicability of Sections 541.300 and 541.314 ...................... 24

        1.   Educational Level of Plaintiffs .................................................. 24

        2.   Emergency Department Duties of Plaintiffs............................... 25

**TABLE OF CONTENTS**
**(continued)**

Page

    3.     Annual Compensation of Plaintiffs .......................................................... 26

I.    The Department of Labor Has Not Communicated to Emcare That it
Believes EmCare Employs NPs or PAs or That EmCare or any Related
Entity Has Violated the FLSA with Respect to NPs or PAs ............................... 26

J.    Defendants are not Liable to Plaintiffs Under Washington or Illinois State
Law .................................................................................................................. 28

III.    CONCLUSION ............................................................................................................ 28

# TABLE OF AUTHORITIES

**Page**

CASES

*Bradford v. Alexander,*
   886 S.W.2d 394 (Tex. App.—Houston [1ˢᵗ Dist.] 1994) ....................................... 16

*Catani v. Chiodi,*
   No. CIV. 00-1559 (DFW/RLE),
   2001 WL 920025 (D. Minn. Aug. 13, 2001) ...................................................... 4, 6

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ......................................................................................... 9

*Close v. State of New York,*
   1996 U.S. Dist. LEXIS 1748 (N.D.N.Y. 1996) ................................................ 16

*Cruz-Lovo v. Ryder Sys.,*
   298 F. Supp. 2d 1248 (S.D. Fla. 2003) ............................................................ 8

*Fierros v. Texas Dep't of Health,*
   274 F.3d 187 (5ᵗʰ Cir. 2001) ............................................................................ 3

*Fontenot v. Upjohn Co.,*
   780 F.2d 1190 (5ᵗʰ Cir. 1986) ......................................................................... 3

*Harrison v. Washington Hospital Center,*
   1979 U.S. Dist. LEXIS 10063 (D.D.C. August 31, 1979) ................................. 15

*Jeanneret v. Aron's East Coast Towing, Inc.,*
   No. 01-8001-CIV-HURLEY, 2002 U.S. Dist.
   LEXIS 12200 (S.D. Fla. Jan. 29, 2002) ........................................................... 7

*Mooney v. Aramico Servs. Co.,*
   54 F.3d 1207 (5ᵗʰ Cir. 1995) ........................................................................... 8

*Permian Petroleum v. Petroleos Mexicanos,*
   934 F.2d 635 (5th Cir. 1991) ........................................................................ 6, 7

*Subway Equip. Leasing Corp. v. Sims,*
   994 F.2d 210 (5th Cir. 1993) ........................................................................... 6

*Watson v. Graves,*
   909 F.2d 1549 (5th Cir. 1990) ........................................................................ 4

*Weyandt v. State,*
   35 S.W.2d 144 (Tex. App.—Houston [14ᵗʰ Dist.] 2000) ................................... 16

*Zahra Spiritual Trust v. United States,*
   910 F.3d 240 (5ᵗʰ Cir. 1990) ........................................................................... 7

STATUTES

16 CAL. CODE REGS. tit. 16, § 1399.521 (2004) ..................................................... 23

16 CAL. CODE REGS. tit. 16, § 1480 (2004 ...................................................... 19, 21

18 VA. ADMIN. CODE § 90-30-120(A) (2004) ............................................... 14, 18, 20

## TABLE OF AUTHORITIES
### (continued)

Page

201  KY. ADMIN. REGS. 20:057(1-2)(2003)..................................................................... 21

22 TEX. ADMIN. CODE § 221.1(3) (2004) ...................................................................... 20

225 ILL. COMP. STAT. 65/15-5 (2004) .................................................................. 19, 21

225 ILL. COMP. STAT. 95/1 (2004)................................................................................ 23

225 ILL. COMP. STAT. 95/4(3) (2004) .......................................................................... 24

225 ILL. COMP. STAT. 95/7.5 (2004) ........................................................................... 24

29 C.F.R. § 541.304 ................................................................................................ 9, 12

29 C.F.R. 541.3 .................................................................................................... passim

29 C.F.R. 541.314 ............................................................................................... passim

29 U.S.C. § 201 *et seq.* ............................................................................................... 2

29 U.S.C. § 203(d) ......................................................................................................... 3

29 U.S.C. § 216(b) .......................................................................................................... 3

49 PA. CODE § 18.21 (2004) .................................................................................. 18, 20

69 Fed. Reg. 22172 ...................................................................................................... 14

69 Fed. Reg. 22267 ...................................................................................................... 13

69 Fed. Reg. 22269 ...................................................................................................... 26

ARCW §49.46.010 (2004) ............................................................................................ 28

ARIZ. ADMIN. CODE § R4-17-101(19) (2004) ............................................................. 24

ARIZ. ADMIN. CODE § R4-19-505 (2004) ................................................................... 19

ARIZ. ADMIN. CODE § R4-19-507 (2004) ................................................................... 21

ARIZ. REV. STAT. § 32-1601(15)(d)(4-5) (2004) ......................................................... 18

ARIZ. REV. STAT. § 32-2532 (2004) ............................................................................ 24

ARIZ. REV. STAT. § 32-2551(P)(1) (2004) ................................................................... 23

CAL. BUS. & PROF. CODE. § 3534 and 3534.4 (2004) ............................................... 23

FLA. STAT. ch. 464.003 (2003) ................................................................................... 19

GA. COMP. R. & REGS. r. 360-5-.01, *et. seq.* (2004) ................................................ 23

GA. COMP. R. & REGS. r. 410-12-.03 (2004)................................................... 18, 19, 21

ILL ST. CH. 820 § 105/4a.............................................................................................. 28

KY. REV. STAT. ANN. § 311.850(1)(e) Bender 2003).................................... 14, 19, 23

MD. REGS. CODE tit. 10 § 10.27.07.02 (2004) ............................................................ 19

N.C. ADMIN. CODE tit. 21, r. 36.0227 (4) (May 2004) .............................................. 20

N.M. ADMIN. CODE. tit. 16, §16.12.2.13 (O)(5)(2004) .............................................. 21

**TABLE OF AUTHORITIES**
(continued)

Page

N.J. REV. STAT. § 45:11-49 (2004) ............................................................... 20

N.M. STAT. ANN. § 61-3-23.2  (Michie 2004) ........................................ 18, 20, 21

N.M. STAT. ANN. § 61-6-1 (Michie 2004) ................................................... 23

N.M. STAT. ANN. § 61-6-7(D) (Michie 2004) ............................................. 24

N.Y. EDUC. Law § 6902(3)(a) (Consol. 2004) ........................................... 20

NEV. REV. STAT. 632.012 (2004) ................................................................ 19

TENN. COMP. R. & REGS.0880-3.03(3) (2003) ..................................... 14, 23

W. VA. CODE § 30-3-5 (2004) ............................................................... 14, 24

W. VA. CODE ST. R. § 11-1B-14 (2004) ................................................... 24

W. VA. CODE ST. R. § 19-7-2(2.1) (2004) .................................................. 20

WAC 296-128-530 (2004) ......................................................................... 28

WASH. ADMIN. CODE § 246-840-300 (2004) ...................................... 18, 20, 21

WIS. ADMIN. CODE § N 8.03 (2004) ........................................................ 21

WIS. ADMIN. CODE § N 8.10(7) (2004) .................................................... 21

**OTHER AUTHORITIES**

Accreditation Review Commission on Education for the Physician Assistant, Inc.
  "History of the ARC-PA" ..................................................................... 15, 22

American Academy of Physician Assistants
  "Information about PAs and the PA Profession" ............................. 15, 22, 23

**RULES**

FED. R. CIV. P. 56(c) ................................................................................. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

JUNE BELT, on behalf of herself and on §
behalf of all other similarly situated, §
 §
 §
        Plaintiff, §
 §
vs. §        CIVIL ACTION NO. 6:03-CV-73
 §
(1) EmCare, Inc., §        JUDGE DAVIS
(2) Texas EM-I Medical Services, P.A., and §
(3) St. Paul ERDocs, P.A. §
 §
        Defendants. §

**DEFENDANTS' EMCARE, INC.'S AND TEXAS EM-I'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

**BAKER & MCKENZIE, LLP**

Ronald E. Manthey
State Bar No. 1292700
Ann Marie Painter
State Bar No. 00784715

2001 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone No. +1 214 978 3000
Facsimile No. +1 214 978 3099

ATTORNEYS FOR DEFENDANTS
EMCARE, INC. AND TEXAS EM-I MEDICAL
SERVICES, P.A.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| JUNE BELT, on behalf of herself and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 6:03-CV-73 |
| (1) EmCare, Inc., (2) Texas EM-I Medical Services, P.A., and (3) St. Paul ERDocs, P.A. | § § § § | JUDGE DAVIS |
| Defendants. | § § | |

## EXHIBITS TO DEFENDANTS' EMCARE, INC.'S AND TEXAS EM-I'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| **Exhibits** | **Description** | **Bates** |
|---|---|---|
| Exhibit A | Statement of Genuine Issues | APP 001-012 |
| Exhibit B | Declaration of Ann Marie Painter | APP 013-014 |
| Exhibit C | Notice of Consent for Suzanne Taylor Thompson | APP 015 |
| Exhibit D | Declaration of Craig Wilson | APP 016-017 |
| Exhibit E | Declaration of Don King | APP 018-019 |
| Exhibit F | Declaration of Terry Meadows, M.D. | APP 020-023 |
| Exhibit G | Declaration of James L. Murphy | APP 024-027 |
| Exhibit H | Declaration of Doug Webster, D.O. | APP 028-030 |
| Exhibit I | Declaration of Anjel Iscovich, M.D. | APP 031-033 |
| Exhibit J | Excerpts from the Deposition of June Belt | APP 034-035.3 |
| Exhibit K | Excerpts from the Deposition of Scott Freeman | APP 036-037 |

DALDMS/502470 1

Exhibit L        Excerpts from the Deposition of Hermann Splatt        APP 038-040

Exhibit M        Excerpts from the Deposition of David Jones        APP 041-042

Exhibit N        Excerpts from the Deposition of William Keldahl        APP 043-047

Exhibit O        Excerpts from the Deposition of Kevin Mounce        APP 048-050

Exhibit P        Excerpts from the Deposition of Leo Brazeau        APP 051-053

Exhibit Q        Excerpts from the Deposition of Craig Wilson        APP 054-061.1

Exhibit R        Excerpts from the Deposition of Don King        APP 062-064

Exhibit S        Documentation regarding educational level        APP 065-121
                 of Opt-ins

Exhibit T        Payroll spreadsheets for Opt-ins        APP 122-191

20

Respectfully submitted,

**BAKER & MCKENZIE LLP**

By  /s/Ann Marie Painter
    Ronald E. Manthey
    State Bar No. 1292700
    Ann Marie Painter
    State Bar No. 00784715

2001 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone No. +1 214 978 3000
Facsimile No. +1 214 978 3099

ATTORNEYS FOR DEFENDANTS
EMCARE, INC. AND TEXAS EM-I
MEDICAL SERVICES, P.A.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served upon counsel of record by facsimile and electronically on this 17th day of August 2004, as shown below:

James A. Jones
Jones & Associates, P.C.
5015 Tracy, Suite 100
Dallas, Texas 75205

John T. Cox III
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201

Richard J. Burch
Bruckner Burch, P.L.L.C.
5847 San Felipe #3900
Houston, Texas 77057

/s/Ann Marie Painter